DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS J. WALSH (CABN 314290)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Laura.Vartain@usdoj.gov
    Nicholas.Walsh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-CR-00180 RS |
|     Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
|   v. | |
| APRIL MYRES, | Hearing Date: November 19, 2019 |
|     Defendant. | Time: 2:30 pm |

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS

1

## I. INTRODUCTION

When San Francisco Sheriff's Department ("SFSD") Deputy Sheriff April Myres filed an insurance claim seeking $67,000 to recover from the loss of her purportedly stolen service firearm and other work and personal items, she committed a fraud on Farmers Insurance that was firmly rooted in her corrupt conduct as a deputy sheriff.  To commit her fraud, Deputy Myres lied to law enforcement and the insurance company in a scheme to hide that her felon ex-boyfriend had her service firearm.  Deputy Myres did so purely to benefit herself: she wanted money, she wanted to keep her job, and she did not want to get caught.  This course of conduct was a wholesale abandonment of Deputy Myres' oath to protect the public: she allowed her service firearm to remain on the streets of the Bay Area held by a dangerous felon for nearly a year while she sought material gain.

In June 2019, a jury convicted Deputy Myres of mail and wire fraud for her fraudulent submissions to Farmers Insurance.  For the reasons set forth below, the United States requests that the Court impose the following sentence, which is at the high end of the sentencing guidelines range: (1) 24 months incarceration concurrent on Counts 1 and 2; (2) three years supervised release with the conditions set out in the Presentence Investigation Report ("PSR"); and, (3) a $200 mandatory special assessment.

## II. ARGUMENT

### A. Deputy Myres' Conduct was Rooted in Corruption, Motivated by Greed, and it Endangered Public Safety

The Court is familiar with the facts of the case as presented during the jury trial and also set out in the PSR.  Rather than repeat them here, the United States highlights Deputy Myres' core conduct, organized into three main points as relevant to sentencing considerations relating to the seriousness of the conduct.

First, Deputy Myres' ongoing course of conduct endangered public safety in the jailhouse and outside it for years.  It began before her mail and wire fraud in 2016; it began when she used her power as a Deputy Sheriff at the SFSD to conduct a clandestine and illegal relationship with Antoine Fowler, an inmate directly in her custody with a long criminal history replete with firearm and burglary

offenses.[1]  But Deputy Myres' undermining of her code of conduct did not stop at the county jail's doors.  Upon Mr. Fowler's release from six years in custody at the San Francisco County Jail in January 2016, Deputy Myres then welcomed him home to live with her at her house in San Francisco, where she stored her firearm, and where he lived with her until the morning of the so-called burglary in March 2016.  Nearly a year later, in February 2017, the Federal Bureau of Investigation ("FBI") arrested Mr. Fowler driving with Deputy Myres' firearm and a 30 round magazine in it.  In short, this was not a one-time bad decision.  It was a pervasive and long standing undermining of the public trust and endangerment of public safety.

Second, the Court does not need to resolve any factual dispute regarding how Mr. Fowler came into possession Deputy Myres' firearm for sentencing purposes, because whether Deputy Myres gave Mr. Fowler the gun or whether he stole it, Deputy Myres' failure to raise the alarm that he might have her firearm and her ongoing lies demonstrate that she knew that Mr. Fowler had her service firearm.

There are three possibilities for *how* Fowler got the gun.  Deputy Myres could have given Mr. Fowler her SFSD firearm, as Mr. Fowler contends she did, and which is consistent with E.L.'s reporting.  Or, Deputy Myres, having let Mr. Fowler live in her house with the service firearm, could have learned that he stole it, but then she lied about it to the SFSD, the FBI, and to Farmers Insurance, and allowed it to remain at large while seeking to recover money for it.  Finally, Deputy Myres could have come home to find it missing just hours after she and Mr. Fowler had a dramatic fight, and yet had no idea that Mr. Fowler had taken it.  Either of the first two options are plausible, and the third – advanced by Deputy Myres at trial – is not.  The defense theory that the so-called burglary was a "revenge burglary" and yet Deputy Myres had no idea that Mr. Fowler had her firearm has no evidence in support of it, is inconsistent with the trial evidence, jury verdict, and defies common sense.

Under either of the first two possibilities, Deputy Myres knew that Mr. Fowler had her firearm.

---

[1] Deputy Myres' corruption came to light through recorded jail calls and when Mr. Fowler's cellmate, E.L., reported first to the SFSD and then to the FBI that Deputy Myres intended to give her service firearm with a 30 round "clip" in it to Mr. Fowler upon his release from custody

Neither party called E.L. to testify.  It is not required for this sentencing to decide anything related to E.L.'s credibility.  Nonetheless, the fact that E.L. reported this information while Mr. Fowler was in custody, coupled with the fact that well over a year later Mr. Fowler was found with Deputy Myres' firearm and a 30 round clip, establishes the reliability of his report.  It was no coincidence.

The best evidence of her knowledge are her repeated lies and omissions designed to hide Mr. Fowler's presence in her life and his access to her home and firearm. Deputy Myres repeatedly hid that Mr. Fowler lived in her home until the morning of the burglary, including lying under oath at her deposition about persons who lived with her, and whether she had any "disgruntled ex-boyfriends" or other suspects. Further, Deputy Myres knew that Mr. Fowler was a snitch in need of protection. The Court should reject her implausible claim that she had no clue who had her firearm.

Third, Deputy Myres' fraud was motivated by personal gain and mitigation of any potential loss or harm to herself that could arise from her corrupt conduct. She was not truthful with SFSD, other law enforcement or her insurance company, and her repeated lies and concealment of information were designed to benefit only herself. Deputy Myres submitted a Proof of Loss to her home insurance company, Farmers Insurance, seeking reimbursement for over $67,000 for the SFSD firearm and other work and personal property that she claimed was stolen. Throughout it all, Deputy Myres claimed that she had no idea who had committed the theft. In making the false insurance claim, Deputy Myres sought to gain from the same conduct that led her firearm to be on the streets in the hands of a convicted felon. As Deputy Myres readily admitted at trial, her aim was at the very least to protect her job, and she apparently gave no thought whatsoever to what the risks of arming Mr. Fowler were to public safety.

The number of lies in the claim to Farmer's Insurance underscores the extent to which Deputy Myres sought to gain from the so-called burglary. Deputy Myres claimed that Farmer's Insurance should pay her for work items that she never paid for and had been reissued, at no cost to herself. She further sought reimbursement for items that the FBI found in her home (in one case, that Farmers Insurance photographed in her home days after it was allegedly stolen) and then a long list of items that she cannot account for given her fraudulent scheme, and she asked for recoupment of $67,000.

### B.  Deputy Myres Abused Her Position of Trust to Commit the Offense

The United States substantially agrees with the PSR's calculation of the relevant sentencing guidelines, with one objection: the United States asks the Court to apply a two level enhancement for the abuse of position of trust or use of special skills under U.S.S.G. § 3B1.3. Deputy Myres used her position as a Deputy Sheriff to commit the offense and also to attempt to conceal it.

To begin, the Sentencing Guidelines make clear that it is not just the offense of conviction that

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS
4

requires consideration when determining whether Deputy Myres abused her position of trust or used special skills in committing her offenses:

> The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.,* all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction.

U.S.S.G. § 3B1.3, Introductory Commentary. See United States v. Duran, 15 F.3d 131, 133 (9th Cir. 1994) (explaining that the commentary was binding and that "In applying the abuse of trust adjustment, sentencing courts may now consider relevant conduct other than that involved in the offense of conviction.").

It is clear that Deputy Myres held a position of trust as a San Francisco County Deputy Sheriff, which is a law enforcement officer and jailor at the County Jail granted a level of discretion that can be abused. See, e.g., United States v. Foreman, 926 F.2d 792 (9th Cir. 1990) (holding police officers occupy a position of trust). In California, Deputy Sheriffs function akin to police officers, although they also function as correctional officers. See Cal. Penal Code § 830.1(a) (designating police officers and deputy sheriffs as peace officers under state law). For sentencing purposes, there is no difference between the two. See, e.g., United States v. Scurlock, 52 F.3d 531, 541 (5th Cir. 1995) (finding correctional officers hold a position of trust because, among other things, "The public places a great deal of trust in correctional officers. They expect that the officers will not participate with inmates in schemes to violate the law."). Thus, the only question as to the applicability of U.S.S.G. § 3B1.3 is whether Deputy Myres abused that position in committing her crimes. She did.

Deputy Myres abused her position of trust first when she entered into a relationship with an inmate under her supervision and in her custody at San Francisco County Jail, which is the foundation for this entire criminal scheme. She further used her specialized skills to conceal her unlawful relationship from other law enforcement agencies and Farmers Insurance in multiple ways, including: (1) used her knowledge of the jail recording system to conceal her identity when speaking with Mr. Fowler while he was incarcerated by using a different phone than the phone the Sheriff's Department was aware of and ensuring that Fowler spoke in coded language in the jail calls; (2) allowed Mr. Fowler to live in her home where she kept her service firearm; (3) never told the SFSD, the San Francisco

Police Department, or the FBI – all three of which were trying to find her firearm – that Mr. Fowler, himself a convicted burglar who was just released from jail for a six-year sentence on a firearm charge, was living with her up and until the time of the so-called burglary; (4) hugged and spoke with a classmate from the police academy when he responded to scene of the so-called burglary and later called that same police officer to complain about her treatment by the investigating sergeant in an attempt to get the sergeant removed; (5) filed her fraudulent insurance paperwork twice using a SFSD fax cover sheet; and, (6) wore her work uniform at a recorded statement with an insurance company investigator. Together, these facts paint a compelling picture of how Deputy Myres abused her position of trust and used specialized skills.

The Ninth Circuit has found similar conduct constituted an abuse of trust by a police officer. In Foreman, a police officer who was in the midst of attempting to smuggle drugs through an airport was approached by investigators. See 926 F.2d at 793-94. She then showed her badge and identified herself as a police officer before attempting to continue on her way. See id. at 794. On that set of facts, the Ninth Circuit found that a "police officer knows that power of her badge," and that, "one reasonable inference is that she kept her badge with her for the very purpose she used it, to exhibit to officers in the event she was stopped, and thus deflect questioning." Id. at 795.

The Ninth Circuit then rejected the defendant's argument that, because she merely identified herself as a police officer as her training taught her she should, she did not abuse any special privilege of her position. See Foreman, 926 F.2d at 796. This argument is similar to the argument that Deputy Myres now advances, that she was merely acting normally under the circumstances. The Ninth Circuit made clear that:

> We find no merit in this argument. Notwithstanding that having a police badge itself may be a special privilege, the adjustment in § 3B1.3 is for "abuse of a *position* of trust." The guideline does not expressly limit such abuse to special privileges accorded to one with a position of trust, nor do we believe that such a limitation can be inferred.

Id. (emphasis in original). And then, in a statement applicable to the facts of this case as well as to Foreman's, the Ninth Circuit held that:

> More specifically, police officers are accorded public trust to enforce the law. The public, including fellow law enforcement agents, expect that police officers will not violate the laws they are charged with enforcing. Foreman took advantage of that trust to make it easier for her to conceal criminal activity. We believe that this is precisely the type of situation contemplated by § 3B1.3 as an abuse of position of public trust.

Id. (emphasis added).

Here, Deputy Myres entered into an illegal relationship with an inmate in violation of her position of trust, then concealed the reasonably foreseeable aftereffects of that relationship by attempting to conceal that relationship and defraud Farmers Insurance as part of the same scheme and course of conduct. She effectively used her badge, invoking the power of her office, by using SFSD fax cover sheets to facilitate and conceal her crime when submitting false documents to Farmers Insurance and then exacerbated that abuse of her position of trust by wearing her work uniform to a Farmers Insurance interview about her claims. There was no requirement that she use a cover sheet on letterhead to submit her claim. Her acts were the functional equivalent of Foreman flashing her badge to deflect questioning. See Foreman, 926 F.2d at 793-96. See also United States v. Reddick, 34 F.3d 1067 (4th Cir. 1994) (unpublished decision) (affirming district court's list of abuses that included the "use of an officer's uniform itself," as conduct warranting a Section 3B1.3 sentencing enhancement for police officer).

The victim impact statement from the Sheriff Vicki L. Hennessy on behalf of the SFSD illustrates that Deputy Myres' conduct warrants the enhancement. Sheriff Hennessy emphasizes that "April Myres abused her position as a deputy sheriff to begin a relationship with a convicted felon who was in the custody of the San Francisco Sheriff's Department." She continued in her letter, stating that, "Ms. Myres committed crimes that threatened the safety and security of San Francisco jails, which extends to the people housed in our jails as well as deputies, non-sworn staff, service providers, contract workers, and daily visitors." Further, Sheriff Hennessy pointed out that Deputy Myres violated the Law Enforcement Code of Ethics that she swore to uphold and in so doing, "betrayed public trust in the San Francisco Sheriff's Department, hurting staff morale and costing taxpayers…."

In conclusion, the United States asks the Court to apply a two level enhancement for the abuse of position of trust or use of special skills under U.S.S.G. § 3B1.3. Applying the enhancement results in a total offense level of 15, as calculated below:

| | |
|---|---|
| Base Offense Level:<br>§ 2B1.1(a)(1) | 7 |
| Adjustments:<br>§ 2B1.1(b)(1)(D) (intended loss more than $40,000, in fact $67,046.78) | +6 |

Role in the offense:
§ 3B1.3 (abuse of position of trust or use of special skill)                                         +2
Adjusted Offense Level:                                                                                              15
Acceptance of Responsibility:                                                                                    0
Total Adjusted Offense Level:                                                                                   15

Range: CHC I                                                                                              18 to 24 months

**C.     Application of the Section 3553(a) Factors Shows that a Sentence at the High End of the Guidelines Range is Just and Appropriate**

The significant conduct at issue in this case warrants a sentence at the high end of the applicable Guidelines range. Among the relevant factors before the Court at sentencing, (1) the history and characteristics of the defendant; (2) promoting respect for the law and affording adequate deterrence to criminal conduct (general deterrence); and, (3) the seriousness of the offense and providing just punishment for the offense, all of which weigh in favor of a high-end Guidelines sentence.

**1.     The History and Characteristics of the Defendant**

Deputy Myres' position as a Deputy Sheriff and her reprehensible abuse of her position have been discussed at length in this memorandum. Those who swear to uphold the law and are entrusted by the public to carry firearms in the course of their duty to enforce that law bear the responsibility not to abuse that trust. The long-term nature of Deputy Myres' conduct cuts against any argument that her length of service or lack of criminal history warrants leniency. Indeed, this situation was not the first investigation the SFSD conducted regarding her improper relationships with inmates, as Sergeant Ambat testified at trial. Moreover, Deputy Myres' history and characteristics do not offer any mitigating factors.

**2.     Promoting Respect for the Law and Affording Adequate Deterrence to Criminal Conduct (General Deterrence).**

Deputy Myres, a law enforcement officer with 20 years of experience, set aside her training and committed crimes in violation of the law she was sworn to uphold. Her actions hurt the SFSD and placed the public at risk. Her actions hurt the morale at the SFSD and indeed risked the security of those who are housed in, work at, and visit the San Francisco County Jail. Deputy Myres and the public are fortunate that her firearm was not used – to the best of the government's current knowledge – for other

crimes while it was out of her custody in the possession of Mr. Fowler.  A sentence at the high end of the sentencing guidelines range is appropriate to provide adequate general deterrence.

### 3. The Seriousness of the Offense and Providing Just Punishment

Deputy Myres' offense was not a minor insurance fraud, nor was it unrelated to her job.  At its core, the insurance fraud was an attempt to gain financially from her own corrupt conduct.  She was convicted of mail and wire fraud in connection with a scheme to defraud that prioritized her financial gain and employment at the expense of her coworkers, the SFSD, and public safety.  She does not appear to have accepted any responsibility for her actions.  Her conduct is worthy of the meaningful custodial sentence that the United States recommends that the Court impose.

### III. CONCLUSION

For the reasons set forth above, the United States recommends that the Court impose the following sentence: (1) 24 months incarceration concurrent on Counts 1 and 2; (2) three years supervised release with the conditions set out in the PSR; (3) a $200 mandatory special assessment.

DATED:   November 12, 2019                    Respectfully submitted,

                                              DAVID L. ANDERSON
                                              United States Attorney


                                              ____*/s/ Laura Vartain Horn*____
                                              LAURA VARTAIN HORN
                                              NICHOLAS J. WALSH
                                              Assistant United States Attorneys