MICHAEL J. SHEPARD (State Bar No. 091281)
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA  94105
Telephone:       +1 415 318-1221
Facsimile:       +1 415 318-1300
Email:           mshepard@kslaw.com

JAMIE A. LANG (State Bar No. 253769)
KING & SPALDING LLP
633 W. Fifth Street, Suite 1600
Los Angeles, CA  90071
Telephone:       +1 213 443-4325
Facsimile:       +1 213 443-4310
Email:           jlang@kslaw.com

Attorneys for Defendant
APRIL DIANE MYRES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>APRIL DIANE MYRES,<br><br>                    Defendant. | Case No. 17-CR-00180-RS<br><br>**SENTENCING MEMORANDUM AND, IF NECESSARY, REQUEST FOR EVIDENTIARY HEARING, FOR DEFENDANT APRIL MYRES**<br><br>Date:          November 19, 2019<br>Time:          2:30 p.m.<br>Judge:         Hon. Richard Seeborg |

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 2

II.     BRIEF SUMMARY OF THE RELEVANT FACTS FOR
        SENTENCING ................................................................................... 3

        A.      Fowler Committed the Burglary ....................................................... 4
        B.      Ms. Myres Reported the Burglary to the Police and Submitted an
                Insurance Claim ............................................................................... 5

III.    OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND
        RESPONSE TO THE RECOMMENDED SENTENCE BY THE
        PROBATION OFFICE ........................................................................ 6

        A.      Objections to the Presentence Investigation Report ......................... 8

                1.      Objections to the Guideline Calculation ................................ 8

                        a)      The Intended Loss Cannot Be $67,046.08 ................. 9
                        b)      The Appropriate Total Offense Level is 8 and, at
                                most, 9 ...................................................................... 10

                2.      Objections to Material in the Presentence Investigation
                        Report ................................................................................ 11

                        a)      The PSR's Inclusion of and Reliance on
                                Statements Made by Eduardo Lascala, an
                                Unidentified Confidential Source, and Fowler is
                                Inappropriate ............................................................ 11

                                (1)     Statements by Eduardo Lascala ................. 12
                                (2)     Statements by Confidential Source ............ 16
                                (3)     Statements by Antoine Fowler .................. 18
                                (4)     Alternate Request for an Evidentiary
                                        Hearing ..................................................... 20

                        b)      Ms. Myres's Refusal to Allow the FBI to
                                Fingerprint her Home Cannot be Used as Evidence
                                Against Her .............................................................. 21
                        c)      Other Needed Corrections .......................................... 21

                3.      Response to the Recommended Sentence by the Probation
                        Office ................................................................................ 23

                        a)      A sentence of 18 months is unjustifiably harsh ................... 23

                                (1)     The Justification Offered In the PSR is
                                        Flawed ...................................................... 24
                                (2)     The PSR Fails To Consider Mitigating
                                        Factors Under Section 3553(a) .................. 26

i

b) Other Provisions of the Recommended Sentence Should be Adjusted ................................................. 27

IV. THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553(A) SUPPORT A SENTENCE OF PROBATION ........................................ 28

A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant .................................................... 28

1. The Nature and Circumstances of the Offense ................................. 28
2. The History and Characteristics of the Defendant ............................ 28

a) Ms. Myres Is a Hard-Working, Caring Mother and Member of Her Community .................................................. 28
b) At the time of the offenses for which she was convicted, Ms. Myres was under great stress ...................... 32

3. Other Section 3553(a) Factors Also Counsel for a Lenient Sentence ....................................................................................... 34
4. Acquitted and Uncharged Conduct Should Play No Role In The Sentence ................................................................................ 37

V. CONCLUSION ...................................................................................... 41

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Duncan vs. Louisiana*,
   391 U.S. 145, (1968)................................................................38

*Jones v. United States,*
   574 U.S. 948  (2014)................................................................38

*Koon v. United States*,
   518 U.S. 81 (1996)................................................................34, 35

*United States v. Bell*,
   808 F.3d 926 (D.C. Cir. 2015)................................................39, 40, 41

*United States v. Coleman*,
   370 F. Supp. 2d 661 (S.D. Ohio 2005) (Marbley, J.)................................40

*United States v. Faust*,
   456 F.3d 1342 (11th Cir. 2006) (Barkett, J., specially concurring)................40

*United States v. Henderson*,
   19 F.3d 917 (5th Cir. 1994) ................................................9, 10

*United States v. Hernandez*,
   894 F.3d 1104 (9th Cir. 2018) ................................................8

*United States v. Hymas*,
   780 F.3d 1285 (9th Cir. 2015) ................................................10

*United States v. Jimenez Martinez*,
   83 F.3d 488 (1st Cir. 1996)................................................21

*United States v. Johnson*,
   245 F. Supp. 3d 393 (E.D.N.Y. 2017) ................................................35

*United States v. Kim*,
   25 F.3d 1426 (9th Cir. 1994) ................................................21

*United States v. Lasley*,
   832 F.3d 910 (8th Cir. 2016) (Bright, J., dissenting)................................40

*United States v. Manatau*,
   647 F.3d 1048 (10th Cir. 2011) ................................................9, 10

*United States v. Medina*,
   706 F.3d 932 (9th Cir. 2013) ................................................8

*United States v. Mercado*,
   474 F.3d 654 (9th Cir. 2007) ...........................................................37, 38, 39

*United States v. Ochoa-Gaytan*,
   265 F.3d 837 (9th Cir. 2001) ...........................................................................8

*United States v. Ortiz*,
   993 F.2d 204 (10th Cir. 1993) ...............................................................7, 12, 18

*United States v. Paul*,
   239 Fed. App'x 353 (9th Cir. 2007) ............................................................36

*United States v. Pimental*,
   367 F. Supp. 2d 143 - 152 (D. Mass. 2005) (Gertner, J.) ......................................40

*United States v. Prescott*,
   581 F.2d 1343 (9th Cir. 1978) ...............................................................7, 21, 25

*United States v. Roberts*,
   14 F.3d 502 (10th Cir. 1993) ........................................................................21

*United States v. Sabillon Umana*,
   772 F.3d 1328 (10th Cir. 2014) ................................................................39, 40

*United States v. Sitton*,
   968 F.2d 947 (9th Cir. 1992) ...........................................................................8

*United States v. Smith*,
   683 F.2d 1236 (9th Cir. 1982) ......................................................................35

*United States v. Watts*,
   519 U.S. 148 (1997)........................................................................................38

*United States v. White*,
   551 F.3d 381 (Merritt, J., dissenting, joined by five others)..............................40

*United States v. Yu Chunchai*,
   476 F. App'x 119 (9th Cir. 2012) ..................................................................35

**Federal Statutes**

18 U.S.C. § 3553............................................................................................37

18 U.S.C. § 3553(a) ................................................................................ *passim*

18 U.S.C. § 3553(a)(2)(A) ..............................................................................35

18 U.S.C. § 3553(a)(2)(B) ..............................................................................35

18 U.S.C. § 3553(a)(2)(C) .........................................................................35, 36

U.S.S.G. § 2B1.1 ...........................................................................................................9, 11

U.S.S.G. § 2B1.1(b)(1)(B) ...................................................................................................11

U.S.S.G. § 2B1.1(b)(1)(D) ....................................................................................................8

U.S.S.G. § 6A1.3(a) .........................................................................................................7, 12

**Constitutional Provisions**

Fourth amendment .......................................................................................................7, 21, 25

Fifth Amendment .............................................................................................................39, 40

Sixth Amendment .......................................................................................................38, 39, 40

**Other Authorities**

Valerie Wright, Ph.D., *Deterrence in Criminal Justice:  Evaluating Certainty v. Severity of Punishment, The Sentencing Project*, at p. 7 (November 2010) ...........................37

*Pew Report, Time Served:  The High Cost, Low Return of Longer Prison* http://www.pewtrusts.org/~/media/assets/2012/06/6/time_served_report.pdf .......................36

*Prohibiting Punishment of Acquitted Conduct Act of 2019* https://www.grassley.senate.gov/news/news-releases/durbin-grassley-introduce-bipartisan-criminal-justice-reform-bill ..................................................................................41

United States Sentencing Commission, *Staff Discussion Paper, Sentencing Options Under the Guidelines* (1996) .............................................................................................37

Wayne A. Logan, *Informal Collateral Consequences*, 88 Washington L. Rev. 1103 (2013)...........................................................................................................................36

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) .........36, 37

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.  INTRODUCTION**

3      Before the Court for sentencing is April Myres, a hard-working single mother, dedicated

4  to her family and her community, who at a very stressful time of her life mistakenly entered into

5  a relationship that triggered the nightmarish chain of events that brought her to this Court.  The

6  prosecution seeks to punish Ms. Myres because she had a relationship with an inmate while she

7  was a prison guard, and because she failed to own up to that relationship at a time when she

8  knew that doing so would get her fired.  Ms. Myres agrees that her relationship with Antoine

9  Fowler was a horrible misjudgment that impacted her and others, but it should not be a basis for

10  punishment in this Court.  She has already paid a heavy price for it:  as a result of this

11  misjudgment, she lost her job and her profession, her son was nearly shot, and many of her hard-

12  earned possessions were taken in a burglary.  Even if this collection of pain were deemed

13  insufficient punishment, none of her conduct relating to Fowler constituted a federal offense.

14  The prosecution tried to make a federal offense out of it, but the jury acquitted her on that

15  charge.

16      What the prosecution is left with is the jury's finding of a small and unsuccessful

17  insurance fraud.  The proof at trial demonstrated that Ms. Myres was in fact a victim of a

18  burglary, and that she received no compensation from her insurer for her losses.  The draft

19  Presentence Investigation Report ("PSR" or "Report") acknowledged that the loss for Guidelines

20  purposes was only $9,573.37 (the value of the three items found in her home and of the SFSD

21  equipment she claimed).  The prosecution attempted to juice up this small and unsuccessful fraud

22  by creating an "intended loss" out of legalese in Ms. Myres's insurance policy, and by blaming

23  Ms. Myres's failure to acknowledge her relationship with Fowler as the cause of Fowler having

24  her gun for ten months.  The final Presentence Investigation Report erroneously accepted both of

25  these efforts:  the loss calculation is incorrect because "intended loss" as defined in the

26  Guidelines is not governed by legalese in the policy but by the defendant's subjective intent,

27  which could not have been to cheat Farmers out of the full value of the loss given that her home

28  was in fact burglarized with substantial losses.  The accusation that Ms. Myres's failure to

2

1  acknowledge her relationship with Fowler caused her gun to remain on the streets for ten months

2  is false:  law enforcement knew of the relationship and considered Fowler to be a suspect from

3  the start.

4      Even more important is that this sentencing should not focus only on the offenses for

5  which Ms. Myres was convicted, let alone the various misconduct on which the government

6  focuses and for which Ms. Myres was neither charged nor convicted.  It should focus instead on

7  Ms. Myres's history and characteristics, her life apart from the offenses of which she was

8  convicted.  As is demonstrated in Part IV below, for most or all of her adult life, Ms. Myres has

9  been a devoted, hard-working, law-abiding single mother, a willing, caring and regular volunteer

10  in her community, and a dedicated twenty-year employee of the Sheriff's Department – where

11  she was lauded for taking the unattractive jobs, for mentoring new employees, for treating

12  everyone with respect, and for counseling inmates.  Of equal significance, the conduct for which

13  she was convicted occurred during an extremely stressful time in her life, with exacerbated

14  pressure at work on top of the already high-stress job of being a prison guard, combined with a

15  threat on her life outside work.

16      As part of its challenging task of pulling all these sentencing factors together, Ms. Myres

17  asks the court to consider that the prosecution's small and unsuccessful insurance fraud case

18  would never have made it to any criminal court, let alone a federal one with its more severe

19  sentences, absent the fear that Ms. Myres had given her service revolver to a felon.  That this fear

20  proved to be groundless confirms what the weight of the other sentencing factors demonstrates:

21  this is not a case in which the defendant should be sent to jail.

22      **II. BRIEF SUMMARY OF THE RELEVANT FACTS FOR SENTENCING**

23      The Court having heard the evidence at trial, Ms. Myres offers this brief identification of

24  the facts that bear on the most material disputed issues at sentencing, which occur following

25  Fowler's release from custody on January 11, 2016 and continue through the date of Ms.

26  Myres's arrest on the charges in this case.  Other relevant facts can be found in the sections of

27  this Memorandum in which they arise.

28      During the period between January 11, 2016, and the burglary of her home on the

1   evening of March 24/25, 2016, Ms. Myres was employed as a Deputy Sheriff.  She was working

2   a lot of overtime, including in the courts, where she needed her duty weapon.

3          On February 26, 2016, Fowler got into a "tussle" with Ms. Myres's son, and her duty

4   weapon went off; her son was almost shot.  That she needed the weapon for work and that

5   Fowler nearly shot her son with it makes it unlikely that she would have given it Fowler, let

6   alone pay Fowler to take it, as Fowler (and perhaps the prosecutors) suggest.

7          Ms. Myres and Fowler broke up over the night of March 23/24, 2016.  After a text early

8   in the morning of March 24 – in which Fowler was arranging to pick up his possessions and was

9   begging Ms. Myres to come talk to him – they never saw each other or communicated again.

10  A. **Fowler Committed the Burglary**

11         Fowler burgled her home on the night of March 24/25, 2016; Ms. Myres was spending

12  the night at her sister's home following threats on Ms. Myres's life.  Among other indications of

13  his burglary, he had photos on his phone of a number of the items that were stolen from her

14  home; on March 26, 2016, he was offering those items to his sisters and attempting to fence them

15  – but was not talking to Ms. Myres about them.  He was also found with Ms. Myres's gun ten

16  months later, on February 2, 2017.

17         Although the prosecution from time to time has dipped its toe in the water of suggesting

18  that Ms. Myres staged the burglary and/or was in on it with Fowler, no credible evidence has

19  ever been adduced to support his suggestion.  The Court will recall that after three years of

20  investigation, the best the prosecution could do at trial was to offer a text from Ms. Myres to

21  Fowler at 7:27 pm on March 23, 2016.  That text read: "It's about to start."  *See* Gov. Ex. 32.  By

22  offering this text, the prosecution was inviting the jury to conclude that what was "about to start"

23  was their execution of their joint burglary plans.

24         This invitation to the jury turned out to be an embarrassing fiasco for the government.  As

25  Ms. Myres proved, what was "about to start" at 7:30 pm on March 23, 2016 was one of the most

26  important religious events of the year for Jehovah's Witnesses, a church of which she is a

27  member, and an event that she attended.  *See* Def. Ex. 1089 (invitation to March 23, 2016

28  "Lord's Evening Meal" at Portola Kingdom Hall); Trial Tr. at 1079:23-1080:17 (witness

4

1    Leonard Dixon confirming Ms. Myres's presence at the celebration on March 23, 2016 at Portola

2    Kingdom Hall, which began at 7:30 p.m.).  After this fiasco, the government beat a retreat and

3    acknowledged in its closing that there was evidence to support Ms. Myres's contention that

4    Fowler committed a revenge burglary.  *See* Trial Tr. at 1137:3-5 ("There is evidence to support

5    that maybe it was a revenge burglary, but there is also evidence to suggest otherwise.").

6         For sentencing, the prosecution has suggested to the United States Probation Office

7    ("USPO") that Ms. Myres was in on the burglary because Fowler said so when interviewed by

8    the FBI after he was arrested with Ms. Myres's gun.[1]  As is detailed in Part III below, there is no

9    doubt that, true to his nature, Fowler was lying, part of a desperate attempt to curry favor with

10   the FBI to avoid jail, given his history as a snitch.[2]  He lied repeatedly about whether and how he

11   got the gun, trying one inconsistent story after another in a performance that would be comedic if

12   it were in a different context.  He eventually settled on a story in which he claimed that he was

13   paid by Ms. Myres to take her gun.  This claim is demonstrably false.  And far from "coming

14   clean," even after Fowler supposedly settled on a story, he continued to lie about the burglary: he

15   denied knowledge about any stolen items other than the gun, he never admitted that he possessed

16   any of those items after the burglary, and instead, when addressing the items Ms. Myres's

17   claimed were stolen, he told the FBI that he did not know "what she did with all that."   By

18   comparison, Fowler's interview makes the "it's about to start" text look like a good piece of

19   evidence for the prosecution.[3]

20   B.  **Ms. Myres Reported the Burglary to the Police and Submitted an Insurance Claim**

21        After she discovered the burglary on the morning of March 25, 2016, Ms. Myres reported

22

23   [1]  One aspect of the interview helpful to Ms. Myres is that Fowler leaves no doubt that he knew
24   the way into Ms. Myres's house – up the neighbor's stairs, over the fence, and into the backyard
     – that the defense (and the SFPD) identified at trial as the likely entry point for the burglary.
25
     [2] The FBI made clear during the interview that it wanted to make as many charges against Ms.
26   Myres as it could.

27   [3]  The only other "evidence" offered by the prosecution is third and fourth-hand reports from
28   unreliable and sometimes unidentified sources, most of which are merely picking up statements
     by Fowler.

it to law enforcement and to her insurer, Farmers.  The morning she reported the burglary, Ms. Myres spoke with at least three different responding SFPD officers, as well as allowed them to walk through her house and to take fingerprints.  A few days after the burglary, Ms. Myres once again spoke with law enforcement, this time the FBI, and allowed them into her home, until the FBI asked her to take more fingerprints and continued to press her about who had access to her home.  At that point, Ms. Myres exercised her constitutional rights in refusing to allow law enforcement to fingerprint her home.  Although Ms. Myres did not ever tell law enforcement about Fowler and did not provide consistent information about her son's whereabouts on the day of the burglary, she did not act with the intent to defraud Farmers or to interfere with a criminal investigation; rather she did so to save her job at the SFSD and to avoid the profiling of her son.

Ms. Myres first filed her proof of loss with Farmers on May 4, 2016.  In it, she reported that forty-three items were stolen.  When the FBI searched her home in February, 2017 to look for the forty-three items on her claim form, it found three of them.  The evidence suggests that the remaining forty had been stolen.  The value of the three items that were claimed as stolen but found in her home was $3,184.62.

Included among the forty items that were stolen were Ms. Myres's gun and other SFSD-issued material, the total claimed value of which was $6,388.75.  There was evidence at trial suggesting that Ms. Myres had been presented with an official document declaring that she was responsible for any loss of those items, *see* Gov't Ex. 12, and that she was told by the "go-to person" that many of those items were hers after a four-year period, *see, e.g.*, Trial Tr. at 1023:16-1025:13); the prosecution presented evidence that those items belonged to SFSD.

## III. OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND RESPONSE TO THE RECOMMENDED SENTENCE BY THE PROBATION OFFICE

Ms. Myres appreciates the consideration provided by the Probation Office and by U.S. Probation Officer Specialist Goldsberry.  We nonetheless contend that the final PSR, and the Probation Office's Recommendation, rest on fundamental errors, many of which were introduced for the first time when the final version of the Report changed significantly from the Draft. Among the most significant errors are:

- In a critical passage justifying its sentencing recommendation, the Report relies expressly on Ms. Myres's invocation of her Fourth amendment privilege.  This is constitutionally impermissible.  *United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir. 1978).

- In changing its sentencing guidelines calculation from the draft to the final report, the Probation Office relied on "intended loss," but it ignored completely the definition of that term contained in the Guidelines itself and the case law, which render "intended loss" incapable of justifying the sentence recommended in the report.

- A pivotal justification for its sentencing recommendation was flatly contradicted by the FBI at trial: the Report blames Ms. Myres for "not naming [Fowler] immediately as a possible suspect," and concludes that as a result of her not identifying Fowler, her weapon, vest and OC cannister "ma[de] it to the streets, with only her firearm ever being recovered" – even though the case agent testified on direct examination that right from the start the FBI was "very concerned that [Fowler] had the gun."  Trial Tr. at 926:7-8.

- The Report is filled with uncorroborated and unreliable information, the sources of which are scoundrels.  Some are unidentified, but the majority are fraudulent felons who cannot be trusted.  Some allegations lack any detail that would allow them to be rebutted. Hearsay may be permissible at sentencing, but only when it has sufficient indicia of reliability to support its probable accuracy, U.S.S.G. § 6A1.3(a), and this sort of scurrilous chatter does not.  *See United States v. Ortiz*, 993 F.2d 204, 208 (10th Cir. 1993) (sentence clearly erroneous when it relied on uncorroborated out of court statement of confidential informant).

- Attempting to justify the inclusion of statements in the Report from unreliable sources who kept changing their stories, the Report explains that "the jury found the evidence credible enough to find her guilty," but none of the information from those sources was ever presented to the jury by the government (or anyone else) – understandably so given its total lack of credibility.

- The Report finds no factors that would warrant a sentence outside the applicable advisory guideline range, but it does not address the mitigating factors presented by Ms. Myres,

7

including the loss of her job and her profession as a result of the conduct detailed in the
Report, the great stress she was under at the time of the offense and her relationship with
Fowler, her history as a giving and caring member of the community, and the unique
danger she would face if sentenced to custody based on her work as a jail guard.

A. **Objections to the Presentence Investigation Report**

The PSR incorrectly calculates the guidelines, contains material that requires correction
or deletion, and makes an erroneous sentencing recommendation.  In addition, for the reasons
noted in Part IV.A.4 below, to the extent the PSR or the prosecution asks the court to consider
acquitted or uncharged conduct, Ms. Myres suggests that the court should not do so.

1. **Objections to the Guideline Calculation**

On November 6, 2019, the USPO issued the final PSR, which calculates a total offense
level of 13.  (PSR ¶¶ 24-32.)  To reach this offense level, the USPO added 6 levels to the base
fraud level, having calculated the intended loss under § 2B1.1(b)(1)(D) to be $67,046.78, the
total amount of the claim submitted by Ms. Myres to Farmers Insurance.  This was a change
from the draft PSR, which had calculated a total offense level of 9, using the value of the three
items found in Ms. Myres's home in February 2017 and the value of her SFSD-issued equipment
to determine the loss amount, which total $9,573.37.

Ms. Myres submits that the initial approach taken by the USPO is the more correct one
and that the calculation now in the PSR cannot be reconciled with the definition of "intended
loss" in the Guidelines and the case law.  The remainder of the calculation in the PSR is arguably
correct,[4] making the correct offense level 8 (or, at most, 9) and resulting in a Guidelines range of
0-6 months, or, at most, 4-10 months.  As is addressed in Part IV below, the application of the

---

[4] One exception is that the PSR denies Ms. Myres a two-level reduction for acceptance of
responsibility, which effectively penalizes her for exercising her trial and appellate rights.  Ms.
Myres believes this penalty is unconstitutional, notwithstanding the law to the contrary.  *See,
e.g.*, *United States v. Sitton*, 968 F.2d 947, 962 (9th Cir. 1992); *United States v. Medina*, 706
F.3d 932, 940 (9th Cir. 2013); *see also United States v. Ochoa-Gaytan*, 265 F.3d 837, 843 (9th
Cir. 2001); *United States v. Hernandez*, 894 F.3d 1104, 1111 (9th Cir. 2018) (remanding for
clarification where district court record made repeated reference to untimely contrition post-trial:
"You decided to roll the dice, and it came up snake eyes").

1    factors of Section 3553(a) compels the conclusion that even if the guideline range is 4-10

2    months, the court should give a below-guidelines sentence and place Ms. Myres on probation.

3                    a)       **The Intended Loss Cannot Be $67,046.08**

4            The draft PSR recognized that Ms. Myres was the victim of a burglary and that she could

5    not have intended to defraud Farmers out of the full value of her claim ($67,046.78) because

6    many items in that $67,000 claim actually had been stolen -- about $58,000 worth, according to

7    the calculation in the draft PSR.  Without changing its view on the fact that Ms. Myres was a

8    burglary victim who lost roughly $58,000 in the burglary, the final PSR reaches the confounding

9    conclusion that she nonetheless intended to defraud Farmers out of the full $67,000.  It reaches

10   this conclusion based on a construction of the legalese in her insurance policy: in essence, the

11   PSR argues, a provision of the Farmers policy says the claim is "taken as a whole" so any

12   misrepresentation in the claim disqualified Ms. Myres from any reimbursement.  Addendum to

13   PSR ¶14.

14           Perhaps this legal construction would be a reasonable argument in a civil suit over the

15   policy proceeds, but it has no place in a Guideline calculation of "intended loss."  "Intended

16   loss" provides an alternative way for the prosecution to enhance the base fraud offense level

17   when, as in this case, there is no actual loss.  Unlike an "actual loss" calculation, which includes

18   what a defendant "should have known was a potential result," U.S.S.G. § 2B1.1, Application

19   note 3(A) (i), (iv), "intended loss" allows no imputed or constructive knowledge, focuses on the

20   defendant's actual intent, and is limited to "the pecuniary harm that the defendant *purposely*

21   sought to inflict."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii) (emphasis added).  The case law

22   leaves no doubt that the use of the word "purposely" in the Guideline's definition of "intended

23   loss" was expressly designed to exclude losses that "the defendant merely *knew* would result,"

24   *United States v. Manatau,* 647 F.3d 1048, 1050 (10th Cir. 2011) (Gorsuch, Circuit Judge)

25   (emphasis in original), losses the defendant "might have *possibly and potentially* contemplated,"

26   *id.,* and losses based on the defendant's "constructive intent."  *United States v. Henderson*, 19

27   F.3d 917, 928 (5th Cir. 1994).

28           By accepting the prosecution's invitation to rely on policy legalese instead of looking at

1    Ms. Myres's subjective intent, the PSR took a path prohibited by the Guidelines.  There is no

2    evidence that Ms. Myres knew of this legalese in the policy, but *Manatau* and *Henderson*

3    establish that even if she did so know, that legalese makes no difference to a calculation of

4    "intended loss."  Ms. Myres could not have intended a loss of $67,046.78 when she submitted

5    her claim that included, based on the calculation in the draft PSR, about $58,000 of actual losses.

6    *See Manatau,* 647 F.3d at 1050, 1055 (holding that intended loss requires an inquiry into the

7    defendant's subjective state mind, and is limited to the loss that the defendant "purposely sought

8    to inflict").[5]

9                        b)        **The Appropriate Total Offense Level is 8 and, at most, 9**

10           The draft PSR was correct in concluding, as Ms. Myres proved at trial, that most of the

11   items she claimed to have been stolen were in fact stolen.  Among other proof, Ms. Myres

12   introduced at trial evidence in the government's possession that it chose not to present:  photos

13   and texts from Fowler's phone.  This evidence shows that right after the burglary, Fowler was

14   texting photos of a number of the stolen items to his sisters, offering those items to them and/or

15   seeking their help in fencing those items.[6]  *See, e.g.*, Trial Tr. at 856-864 (testimony from FBI

16   Special Agent Scanlon regarding text messages and photos found on Fowler's phone).  Notably,

17   although Fowler and Ms. Myres displayed no hesitation about texting each other about pretty

18   much every subject imaginable, there is not a single text between Fowler and Ms. Myres about

19   any of the stolen items; Fowler stole and fenced the items without her knowledge or

20   participation, and Ms. Myres was not committing a fraud when she made an insurance claim

21

22   [5] Although current Ninth Circuit law may be to the contrary, *see United States v. Hymas*, 780
     F.3d 1285, 1290 (9th Cir. 2015) (quoting *United States v. Mezas de Jesus*, 217 F.3d 638, 642
23   (9th Cir. 2000)) (clarifying six-factor test for "disproportionate effect" analysis), Ms. Myres
     believes that the four to five-level difference in her otherwise low guideline range, which is
24   triggered by the PSR's "intended loss" determination, should be governed by a "clear and
     convincing evidence standard" given the statistically dramatic increase in her potential sentence.
25   However, for the reasons stated in the text, the "intended loss" calculation cannot be justified
     under any standard of proof.
26

27   [6] Ms. Myres became aware of this evidence for the first time after this case was indicted, when
28   Fowler's phone was produced to her counsel in discovery.  She was not aware of it at the time
     she was alleged to have committed a misprision of felony.

                                                          10

1  seeking compensation for her possessions that were stolen.

2  As a result, the intended loss, based on the jury's verdict, is the value of the three items

3  found by the FBI in its search: one Blue Fox Fur Vest ($649.24); one pair of Gucci Rain Boots

4  ($315.38); and one Louis Vuitton Purse ($2220.00), totaling $3,184.62. *See* Trial Tr. at 845:5-

5  847:22 (testimony from FBI Special Agent Scanlon identifying these three items as ones he

6  seized during the FBI's search of Ms. Myres's home); Gov. Ex. 1, pp. 6, 8 (the items listed on

7  Ms. Myres' proof of loss form).  This intended loss produces an adjustment of one level, for a

8  total offense level of 8.

9  The draft PSR also included in the value of the fraud the sixteen items shown by

10  Government's Exhibit 12 to have been issued to Ms. Myres by the Sheriff's Department, such as

11  the gun and the bulletproof vest, the total value of which is $6,388.75, *see* Gov't Ex. 1, pp. 6-8.

12  As a result, the worst possible intended loss is $9,573.37, which would produce an adjustment of

13  two levels.  *See* U.S.S.G. § 2B1.1(b)(1)(B) (intended loss more than $6,500).  But including

14  these items in an "intended loss" calculation would fly in the face of Government's Exhibit 12

15  (document presented to Ms. Myres by the SFSD) showing that Ms. Myres could be liable for

16  items issued to her by the Sheriff's Department if they were lost) and the testimony of Captain

17  Lisette Adams (the go-to person at the Sheriff's Department on matters of policy), who said she

18  told Ms. Myres shortly after the burglary that, based on her research, including her review of the

19  San Francisco City Charters, after a certain period of time department-issued equipment became

20  the employee's equipment, *see, e.g.*, Trial Tr. at 1023:16-1025:13).  In light of this evidence, the

21  Department-issued items do not qualify as harm Ms. Myres "purposely sought to inflict."

22  U.S.S.G. § 2B1.1, Application Note 3(A)(ii). Accordingly, Ms. Myres submits that an

23  adjustment of one level is appropriate, resulting in a total offense level of 8.

24  **2.  Objections to Material in the Presentence Investigation Report**

25  **a)  The PSR's Inclusion of and Reliance on Statements Made by Eduardo**

26  **Lascala, an Unidentified Confidential Source, and Fowler is Inappropriate**

27  The PSR contains a substantial amount of information attributed to sources who are

28  uncorroborated and who lack any indicia of reliability.  These sources include felons with a

1   history of lying, felons who walked away from the statements cited in the PSR, admitted thieves,

2   and an anonymous source – one who is not only unknown (and therefore her reliability cannot be

3   investigated by the defense) but who does not even come with the usual law enforcement

4   imprimatur that she had provided reliable information in the past.  Although the prosecution

5   knew of all these sources well in advance of trial, they tellingly called none of them at the trial –

6   no doubt recognizing that doing so would be a complete fiasco.

7           Despite being unwilling to rely upon it itself, the prosecution proffered this information

8   to the USPO for use in the PSR.  In response to Ms. Myres's objection to its inclusion in the draft

9   PSR, the USPO in the final PSR noted Ms. Myres's objections (but only in part) and included the

10  information anyway, in an apparent attempt to split the baby.  *See, e.g.*, PSR ¶¶ 8, 14 and

11  Addendum to PSR ¶ 11.  But this is a baby that cannot be split.  None of this information

12  belongs in a PSR, and paragraphs 7, 13, 17, portions of 18 (the statements attributed to Fowler)

13  and the last sentence of 47 should be stricken.  *See* U.S.S.G. § 6A1.3(a) (requiring information

14  considered at sentencing to have "sufficient indicia of reliability to support its probable

15  accuracy"); *Ortiz*, 993 F.2d at 208 (sentence clearly erroneous when it relied on uncorroborated

16  out of court statement of confidential informant).  This is especially so because the USPO's only

17  proffered rationale for continuing to include this information – namely, that "[t]he jury found the

18  evidence credible enough to find her guilty of wire fraud," Addendum to PSR ¶ 12 – is

19  indefensible:[7] none of these sources, nor the evidence being attributed to them, was presented to

20  the jury at trial.

21                  **(1)      Statements by Eduardo Lascala**

22          Paragraph 7 of the PSR consists entirely of statements by Lascala, who has proven to be

23  as unreliable as they come.  A brief introduction to Lascala shows that his words do not belong

24  in a document that is supposed to contain reliable information.  He is an admitted liar.  *See, e.g.*,

---

[7] The USPO also notes that the statements made by these three individuals "were part of the investigation into the criminal conduct and led to the prosecution of this case."  Addendum to PSR ¶ 12.  While true, Ms. Myres respectfully submits that the fact that someone was interviewed as part of the prosecution's investigation does not make the information received from that person reliable.

1   Ex. 1 (Lascala Deposition) at p. 109 (When asked, "Have you lied to the police before," Lascala

2   replies, "Sure I have. . . . ").  To make matters worse, he suffers from severe mental health issues

3   which impact his memory, including schizophrenia, bipolar disorder, loss of consciousness and

4   hallucinations, and he concedes that he has periods (big or small) where he cannot remember

5   certain things in his life, even after he is on medication, due to his loss of consciousness

6   diagnosis (and also likely due to his admitted drug use, including methamphetamine).  *See, e.g.,*

7   *id.* at pp. 14-17; pp. 81-82 (describing how he does not remember certain crimes he has

8   committed due to loss of consciousness), pp. 120-121 (admits to using methamphetamine after

9   released from immigration custody in San Diego; p. 158 (admits he has had paranoid reactions

10   in the past, including "thinking things are being done that turn[] out not to be accurate").

11      Lascala also has a lengthy criminal history, including convictions for battery (1999),

12   child endangerment (1999), obstructing a peace officer and battery against a corrections officer

13   (2004), stalking (2006), possessing marijuana, concentrated cannabis (2010), giving a false ID to

14   police officers and battery against a police officer (2011), and felon in possession of a firearm

15   and ammunition and possession of methamphetamine (2015), *see id.* at pp. 28-32, and also

16   admitted to habitually violating his probation or parole.  *See id.* at pp. 98-99.  His record of crime

17   is so long and his memory so poor that when deposed he could not recall several of his

18   convictions (or the facts underlying them), even when confronted directly with them.  *See, e.g.,*

19   *id.* at p. 29 (does not remember battery conviction); p. 31 (does not recall 2011 arrest and

20   conviction for giving a false ID to police officers); pp. 106-107 (does not remember that he had a

21   number of domestic violence arrests).

22      If this is somehow not enough, when put under oath and asked about many of the

23   statements attributed to him in the PSR, he walked away from them.  Among other things,

24   Paragraph 7 includes Lascala's claim that Fowler told him that Ms. Myres promised Fowler her

25   gun, but when put under oath during a pre-trial deposition Lascala himself eventually disputed

26   this claim.  *See, e.g.*, *id*. at pp. 50-51 (When asked specifically whether he remembers "if [he]

27   ever had any conversation with him, Mr. Fowler, about the gun," Lascala replies "From what I

28   recall, at this moment, no."); *id.* at p. 52 (When asked whether he (Lascala) had "give[n] [Deputy

13

1   Kendall] the information about the vacation and the man cave and the gun with the 30-round

2   clip," Lascala replies, "No."); *id.* at pp. 215-218 (admits to not recalling how he knew Ms. Myres

3   was going to give Fowler a gun, and that Ms. Myres never told him that she was going to buy a

4   gun for Fowler).

5       Similarly, the PSR's statement about Lascala seeing photos of the gun was also disputed

6   by Lascala himself on at least two separate occasions.  During his December 16, 2015 interview

7   with the FBI, when asked whether "at one point [he] ever s[aw] like a picture of [the Glock] or

8   anything like that," Lascala replied, "No, I didn't see no pictures."  *See* Ex. 2 (Transcript of

9   12/16/2015 Statement of Eduardo Lascala) at p. 22.  Lascala also could not recall seeing

10  "anything with regard to the gun or clip" during his 2017 deposition, further undercutting the

11  notion that Fowler had photos of the gun Ms. Myres had supposedly promised him.  Ex. 1

12  (Lascala Deposition) at pp. 49-50.  It also is worth noting that Fowler was in custody for

13  possession/manufacture of an assault weapon, and therefore would have had photos of guns as

14  part of the discovery in his state case.

15      In addition to all these facts that render Lascala unreliable, Lascala had a strong incentive

16  to curry favor with the government to get his federal sentence reduced and to delay his

17  deportation from the United States.  *See, e.g., id*. at pp. 236-241 (describing the 12-month

18  sentence reduction Lascala received as a result of the government's § 5K1.1 motion); *id*. at p. 20

19  (When asked how important it was for him to stay in the United States, Lascala replied "Very

20  important.").

21      Even if Lascala had a whit of credibility, none of what he said withstands the slightest

22  scrutiny and would not merit inclusion in the PSR.  This is true of each of the substantive claims

23  selected for inclusion in the PSR.

24      **The Glock and the Hawaii trip.**  Lascala's claim that Ms. Myres would procure a Glock

25  pistol for Fowler was based on Fowler, who himself is completely unreliable (as is discussed

26  below).  In any event, the claim that Ms. Myres promised to give Fowler her service weapon[8] (a

27

28  [8] The PSR has an ambiguous parenthetical, stating that "LaScala reported Fowler said Deputy
    Myres was going to get him her Glock pistol with a 30-round magazine (not SFSD issued

1   claim that Lascala abandoned during his deposition) is not credible for many reasons: As is

2   reflected by his prior history and by the photos on his phone showing himself with multiple guns,

3   *see* Ex. 3 (photos extracted from Fowler's phone, provided by the government in discovery at

4   Bates Nos. PROTECTED-002898), Fowler had ready access to guns and did not need one from

5   Ms. Myres.  Even if he somehow did need one from her, she needed her own gun for work, and

6   could easily have bought him a different one.  If Fowler did in fact say anything to Lascala about

7   Ms. Myres's gun, it was most likely puffing, playing up his relationship with what he hoped

8   would happen, as opposed to anything that Ms. Myres actually said.  To underscore this point,

9   despite literally hundreds of hours of recordings of calls between Fowler and Ms. Myres while he

10  was in custody, there is no mention of her Glock or of a 30-round magazine.

11          In any event, none of this advances the argument that the prosecution seeks to make.  The

12  evidence at trial established that Ms. Myres continued to possess her Glock because she needed it

13  to work overtime as a bailiff (work that the USPO verified that she did).  *See* PSR ¶ 60.  While

14  she was doing so, Fowler nearly shot her son with the Glock, which would only add to her

15  reasons not to give the gun to Fowler.  Then they broke up.  Fowler was also supposedly

16  promised a trip to Hawaii, but there was no evidence that any such trip ever occurred.  If

17  anything, these circumstances would establish Fowler's motive to steal the gun, having

18  supposedly been promised it and not having received it (or his trip to Hawaii).  In light of the

19  other facts established at trial, even if Fowler claimed he would get the gun, these circumstances

20  do not prove that Ms. Myres said so or that she gave it to him.

21          **Private gym meetings**. Lascala's statement that Ms. Myres and Fowler would "meet

22  privately" at the gym is also not credible: in addition to there being cameras all over the jail

23  facility that would have identified any such conduct, it is unlikely that other guards would allow

24  one unarmed female deputy to be in the gym, by herself, with either one or two male inmates, for

25  an extended period of time.  And, there was nothing untoward about Ms. Myres taking Lascala

26  and Fowler to the gym separately from the other inmates because both Lascala and Fowler were

27

28  equipment, and the style of gun and magazine found on Mr. Fowler when he was arrested)."
    PSR ¶ 7.  This could be read to say that the *Glock* was not SFSD issued equipment, but it was.

1    in Administration Segregation and not in the general population, and Fowler was a known snitch.

2    **Intimate relationship.**  In a similar vein, as revealed during his deposition, Lascala's

3    statement that "Ms. Myres and Mr. Fowler had an intimate relationship while he and Mr. Fowler

4    were cellmates" was, by his own admission, baseless.  When asked whether he "s[aw] any

5    physical contact between the two of them," "besides the conversations," Lascala replied,

6    "Physical contact, no."  Ex. 1 (Lascala Deposition) at p. 65.  When pressed further, Lascala said

7    that while he saw some "brushing of hands," he "never saw them making out or anything like

8    that."  *Id*.  Even Fowler, despite his effort to curry favor with the government, denies he and Ms.

9    Myres's had an intimate relationship while he was in custody.  *See* Ex. 4 (Fowler's post-arrest

10   interview(s)).[9]

11   Lascala is as unreliable as they come.  None of his information was corroborated, it

12   makes no sense, and when put under oath he walked away from it.  The government wisely

13   elected not to offer this information at trial.  It does not belong in the PSR.

14   **(2)    Statements by Confidential Source**

15   Ms. Myres also objects to the inclusion of information relayed by a confidential source

16   ("CS"), as reflected in Paragraphs 13 and 17 of the PSR.  In addition to the fact that confidential

17   sources are inherently unreliable, the identity of this CS was never confirmed by the government.

18   As a result, Ms. Myres has never had an opportunity to gather information about the reliability of

19   this witness (who, by his/her own admission, was in SFSD custody for three or four months in

20   2014 related to a murder that was committed by the CS's son), let alone cross-examine him/her.

21   Nor did the prosecution supply a whit of evidence to suggest that this unknown source was

22   reliable.  Moreover, the information provided by this CS relies almost exclusively on statements

23   provided by other individuals who, in turn, are relaying information they heard from yet another

24   person, thereby increasing further the unreliability of the CS's information.  *See* PSR ¶13 (CS

25   describing information s/he got from Ms. Myres's niece J.M. who, in turn, apparently got the

26

27   [9] The PSR also includes a statement from Lascala that he saw Ms. Myres and Fowler "with
     tissues."  Exactly what this is supposed to mean is unknown, especially given the lack of even a
28   claim of an intimate relationship, and given that guards would ensure that tissues were available
     for inmate use when possible.

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM

1   information from another individual); ¶ 17 (CS describing information s/he got from his/her son

2   who, in turn, got the information from Fowler).

3       With respect to the information contained in Paragraph 13, the record contradicts J.M.'s

4   statements to the CS that "Mr. Johnson II [Ms. Myres's son] helped Mr. Fowler with the

5   burglary" and that he "had all of Ms. Myres's jewelry."  PSR ¶ 13.  As noted above, photos and

6   texts from Fowler's phone show that right after the burglary Fowler was texting photos of a

7   number of the stolen items to his sisters, offering those items to them and/or seeking their help in

8   fencing those items.  *See, e.g.*, Trial Tr. at 856-864 (testimony from FBI Special Agent Scanlon

9   regarding text messages and photos found on Fowler's phone).  Notably, Ms. Myres's son was

10  *not* one of the people with whom Fowler was texting.  In addition, as also proven at trial,

11  approximately one month before the burglary "there was a tussle with Antoine Fowler and her

12  son [at Ms. Myres's house], and the pistol went off and a round went into the floor of the house."

13  Trial Tr. at 971:17-20.  It makes no sense that Ms. Myres's son would do anything for Fowler

14  shortly after Fowler almost shot him, let alone help Fowler rob his mother's house and obtain

15  possession of the very gun with which Fowler almost shot him.

16      The remaining claims attributed to the CS are too unspecified to be the subject of a

17  meaningful response.  *See, e.g.*, ¶13 ("participated in criminal activity with Ms. Myres in the

18  past;" "knew Deputy Myres had previously defrauded an insurance company regarding stolen

19  jewelry").[10]  This last claim is particularly rich if its source was J.M., who admitted to stealing

20  jewelry from Ms. Myres's sister, especially since no insurance claim was made on the theft.  *See*

21  Ex. 5 (FBI 302 of February 2017 interview of J.M.).  There is no actual evidence or

22  corroboration for any claim that Ms. Myres engaged in other criminal activity, and no detail that

23  would allow Ms. Myres a fair chance to refute them.

24      That this vague, uncorroborated, contradicted, third and fourth-hand hearsay – which

25

26  _____

    [10] Although the PSR is written as if the source referred to her as Deputy Myres, it is not
27  conceivable that the source did so, as outside of the SFSD while Ms. Myres worked there, no one
    does so other than the prosecution, especially since she has not been so employed for several
28  years.  Being a prison guard is not a title for life, like being a Senator.  Tellingly, even the Sheriff
    herself, in her letter to the court, calls the defendant Ms. Myres rather than Deputy Myres.

1   even the prosecution chose to ignore at trial – does not belong in the PSR is confirmed by the

2   fact that at least two of the CS's sources are known to be unreliable.  As noted above, one, J.M.,

3   admits to stealing from her own mother.  *See Id*.  And, for the reasons discussed immediately

4   below, Fowler is even worse.  This is precisely the sort of information that should get nowhere

5   near a courtroom under any circumstances.  *See, e.g., Ortiz*, 993 F.2d at, 208 (sentence clearly

6   erroneous when it relied on uncorroborated out-of-court statement of confidential informant).

7               **(3)      Statements by Antoine Fowler**

8          Of the three untested witnesses, Fowler is perhaps the most unreliable, making it

9   indefensible for the prosecution to rely on him, as it did in providing the information contained

10   in the PSR.  That the prosecution calls everything Ms. Myres says self-serving and cannot bring

11   itself to acknowledge for even a passing second that this might be true of Fowler reflects how

12   little reliable evidence it has for the accusations it makes in the PSR.

13          Not only does Fowler have a lengthy criminal record, including felony convictions for

14   second degree burglary, identity theft, and possession/manufacture of an assault weapon, but he

15   is a habitual liar – one the government carefully shied away from using at trial.  He lied

16   repeatedly to Ms. Myres during their relationship, and he lied repeatedly to the FBI after his

17   arrest in February, 2017.  Recognizing Fowler's complete lack of credibility, the prosecution

18   initially told the USPO that the Court "does not need to decide whether Deputy Myres gave Mr.

19   Fowler the gun or whether Mr. Fowler stole it."  Gov't August 8, 2019 letter at 3.

20          Nonetheless, the PSR plucks one statement from Fowler's post-arrest interview: a claim

21   that "Ms. Myres gave him her duty weapon" and gave him $2500 to dispose of it,[11] as if this is

22   all he said on the subject.  In fact, Fowler lied so many times during the interview on this subject

23   that it is a challenge to keep track of all of them.  Initially, he denied having her gun, and did so

24   repeatedly.  Then he said that the gun "got tooked," but did not know who took it.  Later, he said

25

26   _____

27   [11]  As noted above, Ms. Myres is lodging a copy of Fowler's post-arrest interview with her
   sentencing memorandum (and is doing so under seal).  Because the recording is very difficult to
   understand and no meaningful transcript was ever provided by the government, Ms. Myres has

28   done her best to accurately quote or reflect segments from that interview.

1  that Ms. Myres gave the gun to "his people," but it "never went through [his] hands."  Ex. 4

2  (Fowler's post-arrest interview(s)).  He even disingenuously offered to try to find it.  He insisted

3  the gun would not be found in his car, and assured the FBI and the SFPD that he had done

4  nothing wrong.[12]  Of course, all this time the gun was in his car.  Amidst an interview in which

5  he was told that the FBI and the SFPD were taking Ms. Myres into custody and were interested

6  in prosecuting her ("the more charges I can get on April"), Fowler's history as a snitch let him

7  know exactly what to do: try his best to lay it off on Ms. Myres.

8        But the story he spun, that he was paid to take Ms. Myres's gun, is not tenable, and by no

9  means is it more likely than not true.  Beyond Fowler's repeated lies and unreliability, he had

10 nearly shot her son with that gun; if she wanted to get rid of it, there were far safer ways to do it

11 for her family than to give it to Fowler – especially a couple of days after the shooting, which is

12 when he claimed she gave it to him.  At any time, and without doubt at that time, he'd be the last

13 person on the list.  Also, he had access to guns himself and did not need one from Ms. Myres.

14 Nor does his claim that he was paid to take her gun fit with the other evidence in the case, which

15 showed that Ms. Myres was continuing to work overtime and needed to have her gun to do so.

16       The story that Fowler settled on during his umpteenth try has still more problems.  If Ms.

17 Myres wanted to get rid of the gun, despite her need for it, there were endless ways to do so for

18 free.  And if Ms. Myres had in fact paid Fowler $2500 to take her gun, there would be records of

19 such a withdrawal from her bank account, but the government presented no such record and no

20 such record exists.  Finally, Fowler's story was based on the assumption that Ms. Myres needed

21 to get rid of the gun because it had been fired, but no evidence has ever been offered to explain

22 why this assumption was valid; in fact the SFSD never checked to see if her gun was fired or if

23 any ammunition had been used.

24       By contrast, there was considerable evidence that the gun was stolen by Fowler in a

25 burglary, including the evidence on his phone showing his possession of Ms. Myres's stolen

26

27 _____

28 [12] This is not a complete listing of the lies.  Among others, he also lied about having asked for an attorney at the start of the interview, and, as is noted below, he lied about the burglary.

items and his efforts to sell those items without ever touching base with Ms. Myres.  Notably, when coming up with his story about how the burglary was faked and how Ms. Myres gave him $2500 to take her gun, in addition to denying any participation in the burglary, Fowler also falsely denied knowledge about the stolen items, and never admitted that he possessed them after the burglary.  Instead, when addressing the items Ms. Myres claimed were stolen, Fowler told the FBI that he did not know "what she did with all that" – a statement that is disproven by the evidence on his phone, and a statement that is false even if the prosecution's occasional and half-hearted version of what happened (that Fowler and Ms. Myres faked the burglary together) were accurate.

If Fowler in his interview was really "coming clean" with the FBI, his role in the burglary would have been part of what he said.  But he was not coming clean; he was prevaricating, throwing up different stories to see what would stick and please his audience as he desperately sought a way to avoid going to jail.[13]  By far the most reasonable conclusion is that Fowler went through a series of lies to hide the fact that he committed the burglary and stole the gun, eventually settling on a story he knew his interviewers wanted to hear – that Ms. Myres paid him to take the gun.  Unfortunately for him, that story and the details he supplied turn out to be irreconcilable with the rest of the evidence in the case.  Fowler's tale does not deserve a place in the PSR, and should not be relied upon in sentencing Ms. Myres.[14]

### (4)    Alternate Request for an Evidentiary Hearing

The Court therefore should strike paragraphs 7, 13, 17, portions of 18 (the statements attributed to Fowler), and the last sentence of paragraph 47.  If the Court instead intends to rely on any of the information from these witnesses in the PSR, Ms. Myres respectfully requests an

---

[13]  As he told the FBI, he had snitched in the past, and he knew "what comes with that."

[14]  The statement attributed to him in Paragraph 17 about having "full access" to Ms. Myres's house is also false.  As shown by the evidence at trial, Fowler's relationship with Ms. Myres was over before the burglary and he had no lawful access to her house at the time of the burglary. Because he viewed it as being in his interest to do so, Fowler admitted in his interview that his relationship with Ms. Myres was over by the time of the burglary.

evidentiary hearing so that she can question these witnesses regarding the veracity of their claims.  *See, e.g., United States v. Jimenez Martinez,* 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing)*; United States v. Roberts,* 14 F.3d 502, 521 (10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity).

b)    **Ms. Myres's Refusal to Allow the FBI to Fingerprint her Home Cannot be Used as Evidence Against Her**

On not one but two occasions, the PSR reports that Ms. Myres refused a request to allow fingerprints to be taken in her home.  *See* PSR ¶¶ 10-11.  Ms. Myres did not merely "request a notation that [she] had a constitutional right to refuse the FBI's entry into her home."  PSR, ¶ 11, n.1.; to the contrary, Ms. Myres has consistently stated that this cannot be used as evidence against her and objected to its inclusion in the PSR.  *See, e.g.,* Ex. 6 (October 1, 2019 letter) at 7; Ex. 7 (October 29, 2019 letter) at 5.  As the Court ruled when it excluded this evidence at trial, Ms. Myres had a constitutional right to refuse the FBI's entry, and it cannot be used as evidence against her.  *See* CR 174 at 3; *Prescott*, 581 F.2d at 1351 ("[P]assive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing.").[15]

c)    **Other Needed Corrections**

**Paragraph 17:**  It is true, as stated in the last sentence of this paragraph, that the weapon discharge occurred on February 26, 2016.  However, the context in which this sentence appears

---

[15] While it is true that the exclusionary rule has not been applied to sentencing proceedings, *United States v. Kim,* 25 F.3d 1426, 1434-36 (9th Cir. 1994), this is not a case in which evidence was seized in violation of the Fourth amendment.  Rather, this is a case in which the prosecution and now the USPO are seeking to punish a citizen based on constitutionally protected conduct.  Such punishment for constitutionally protected conduct has no place at any stage of a criminal proceeding.

leaves the impression that this date came from the information Fowler provided to the son of the CS. That impression is untrue. In the draft PSR, the statement attributed to Fowler was that he had "recently gotten into an argument with the defendant's son, at which time the gun discharged into a wall at Myres's residence." Draft PSR ¶15. This statement, typical for Fowler, was inaccurate: the argument and the shot were in February, and were not "recent" in December. When the prosecution noted this error, Ms. Myres responded that it had no objection to correcting the date as long as the error in Fowler's recitation was noted. *See* Exhibit 13 (October 31, 2019 letter) at 3. The final PSR corrects the error in a way that makes it appear that Fowler got the date right, and does not note that his contrary statement was corrected by USPO.

**Paragraph 47:** This is a paragraph that for the most part accurately reports information provided by defense counsel. However, the USPO exercised its discretion to add into the final PSR a comment on the defense submission. *See* PSR ¶ 47 (last sentence). The first part of that comment is based on another Lascala statement that should be stricken for the reasons set forth above, and the second part is wrong. The second part was added into the final PSR based on a prosecution objection, and the statement in the final PSR that "text messages prior to the burglary suggested that Fowler ended the relationship" is copied almost verbatim from the prosecution objection. But neither the prosecution objection nor the PSR identifies any such message, and the last text between the two -- in which Fowler says his mother will come pick up his stuff from Ms. Myres's home and asks if she would come over so they could talk, which never happened, *see* Ex . 8 (Def. Trial Ex. 1081) -- demonstrates that the prosecution objection was wrong and should not have been included.

**Paragraph 61:** This paragraph quotes from a letter submitted by the San Francisco Sheriff's Department. Although the PSR understandably does not quote the offending portion, the Court should know that the letter is overstated: for example, it asserts that Ms. Myres "actively conspired with this person [Fowler] to stage a robbery." In fact, the prosecution did not come close to proving that Ms. Myres had any part in Fowler's theft (and, in any event, it was a

1    burglary rather than a robbery).

2    **Addendum, Paragraph 6:**  We appreciate the diligence of the USPO in examining the

3    prosecution's proposed abuse of trust enhancement, in consulting with the Sentencing

4    Commission, and in rejecting the proposed enhancement.  In so doing, however, the PSR

5    needlessly comments on, and determines that conduct of Ms. Myres "may be wholly

6    inappropriate and worthy of her termination."  Ms. Myres appreciates that she should have used

7    better judgment, but calling her conduct of sending a fax from work (when her home machine

8    was broken), *see, e.g.*, Trial Tr. at 1249:12-15 (referring to a background conversation that

9    occurred during a recorded interview at Ms. Myres's home the morning of the burglary, where

10   someone states that the fax machine is "not working"); *see also* Trial Tr. at 822:8-11 (Farmers

11   representative Timothy Daszko confirming that "it's not uncommon for insureds to send

12   documents relevant to their claim from work"), noting that she was a 20-year employee of the

13   SFSD, *see, e.g.*, Gov't Ex. 2 at p. 1 (Ms. Myres mentions she was a 20-year veteran of the SFSD

14   in order to show she had more than the four years of service she was told was sufficient to give

15   her ownership rights to certain equipment); Trial Tr. at 1023:25-1025:13 (testimony by Lisette

16   Adams explaining to Ms. Myres that, after a certain period of time, department-issued equipment

17   became the employee's equipment), and stopping on her way home while wearing her uniform

18   potentially "wholly inappropriate and worthy of termination" is outside the scope of the PSR and

19   was apparently written without any reference to any rules of conduct or  rules for termination

20   governing employees of the Sheriff's Department.

21   **Addendum, paragraph 12.**  Ms. Myres respectfully disagrees with the USPO response

22   for the reasons in Part II.A.2 above.

23   **Addendum, paragraph 14.**  Ms. Myres respectfully disagrees with the USPO response

24   for the reasons in Part II.A.1 above.

25   3.    **Response to the Recommended Sentence by the Probation Office**

26   a)    **A sentence of 18 months is unjustifiably harsh**

27   This is an unusual sentencing.  Ordinarily, the prosecution wants to focus the sentencing

28   on the offense of conviction, and the defendant wants to focus it on the Section 3553(a) factors.

1    In this case, it is Ms. Myres who wants to center the sentencing on the offense of conviction as

2    well as the Section 3553(a) factors, while the prosecution prefers to focus on other alleged

3    misconduct by Ms. Myres rather than on her small and unsuccessful insurance claim following

4    an actual burglary, which are the offenses of which Ms. Myres was convicted.  *Compare* Sent.

5    Rec. at 2 ("government contends the defendant abused her position of trust by having a

6    relationship with an inmate, having him live in her home in proximity of her firearm, and later

7    orchestrating a fake burglary in order to claim over $67,000 in insurance benefits" to *id.* ("the

8    defense sees this case as a simple insurance fraud"). [16]

9           The USPO in crafting its sentencing recommendation sought to chart its own independent

10   course.  *See* Sent. Rec. at 2.  But its independent course, constructed without the benefit of

11   hearing and seeing the evidence at trial and without vetting its facts with the parties, suffers from

12   critical factual and legal failures.  Based on those failures, as well as the PSR's lack of

13   consideration of the Section 3553(a) factors Ms. Myres recommended to the USPO, Ms. Myres

14   respectfully, but strongly, disagrees with the Probation Officer's recommended sentence of 18

15   months.

16                    **(1)    The Justification Offered In the PSR is Flawed**

17          Nearly every statement in the pivotal portion of the PSR – the second paragraph on page

18   2 of the recommendation, following the description of the positions of the parties and starting

19   with the word "Nevertheless" -- is flawed.  The PSR first asserts that Ms. Myres refused to

20   provide the law enforcement officers investigating her burglary "with *any* information that would

21   assist in finding the perpetrator (allowing them to fingerprint her home and notifying them that a

22

23   _____

24   [16] To address the prosecution's contentions in reverse order, the prosecution utterly failed to
     establish as it asserts in the final part of the sentence that the burglary was a fake, and for the
25   reasons noted in Part II above, the weight of the evidence is that Ms. Myres was the victim of a
     burglary.  The prosecution's middle clause assumes that it is improper for a Deputy Sheriff to be
26   engaged in a relationship with a felon following his release from custody, but it offers no support
     for that proposition and it runs counter to the notion that felons who have served their time
27   should be allowed to fully re-integrate into society.  As is addressed in the text below, and as she
     acknowledged at trial, Ms. Myres agrees that having a relationship with an inmate while she was
28   a prison guard and he was in custody, even a non-intimate relationship, was a horrible mistake of
     judgment, one for which she has already paid heavily.

1   convicted felon had just lived in her home for three months)" (emphasis added).  This is wrong

2   twice.  Most significantly, it is a violation of Ms. Myres's constitutional rights to punish her for

3   her exercise of her Fourth amendment rights in declining to allow fingerprints to be taken in her

4   home.  *Prescott,* 581 F.2d at 1351.

5           In addition, this same assertion in the PSR is an overstatement in two different ways.

6   First, it is an overstatement to say she did not allow fingerprints because Ms. Myres had already

7   allowed SFPD to fingerprint (and otherwise walk through ) her home the morning of the

8   burglary.  *See, e.g.,* Trial Tr. at 332:6-334:22 (testimony by SFPD Officer Kellogg, explaining

9   how he searched for fingerprints in different areas of the house but was not able to get any due to

10  presence of dust and other environmental reasons).  Second, it is an overstatement to assert that

11  she provided no information to the investigating officers -- in fact,  she answered questions from

12  three different SFPD officers the morning of the burglary, and at one point agreed to come to the

13  station to review the neighbor's video surveillance.  *See* Trial Tr. at 486:23-487:12.  As the

14  evidence also showed at trial, during her interviews with Officers Larsen and Dicroce it became

15  clear to Ms. Myres that the police were looking closely at her sons, a fact that upset Ms. Myres

16  and caused her to get frustrated with and not trust the officers.  The PSR's next sentence repeats

17  the error that Ms. Myres did not "make *any* attempt to assist investigating officers" (emphasis

18  added).[17]  Some of her answers were incorrect, but she did supply some accurate information.

19          In the next  sentence, the PSR accuses Ms. Myres of allowing her gun and other SFSD-

20  issued items to remain on the street based on her not identifying Fowler as a possible suspect, as

21  if law enforcement had no idea of his possible involvement and had to figure it out later.  This is

22  wrong.  As Special Agent Folger testified at trial on direct examination, having been advised of

23  the relationship between Ms. Myres and Fowler, and having first surveilled Fowler when he left

24

25

26  [17] The PSR also faults Ms. Myres for refusing to provide her telephone number to law
    enforcement.  *See* Sent. Rec. at 1.  But this assertion is flatly contradicted by the SFPD incident

27  report, which lists a cell phone number for Ms. Myres, as well as the fact that Officer Dicroce
    was able to successfully call Ms. Myres a few days after the burglary, on April 1, 2016.  *See*

28  Trial Tr. at 462:15-25 (Officer Dicroce testifying that she called and spoke with Ms. Myres on
    April 1, 2016).

1    the jail and went to Ms. Myres's house, the FBI considered him a suspect from the start.  *See*

2    Trial Tr. at 926: 7-8.

3          As its final sentence in the paragraph, the PSR asserts that "multiple agencies expended

4    vast resources to investigate the defendant's behavior at the jail, the reported burglary, and how

5    Mr. Fowler ended up with her firearm."  Sent. Rec. at 2.   While Ms. Myres acknowledges that

6    her conduct at the jail caused investigative resources to be expended, her conduct at the jail is not

7    part of the conduct for which she was convicted, and she has already suffered considerable

8    punishment as a result of her behavior at the jail.  It is true that multiple agencies investigated the

9    burglary and how Fowler ended up with her firearm, but that was their job, given that the weight

10   of the evidence established that she was the victim of a burglary.  Ms. Myres should not be

11   punished more severely because her home was burglarized, law enforcement investigated, and

12   found the evidence showing that Fowler committed the burglary.

13         The only other justification offered in the PSR for recommending 18 months'

14   imprisonment for a small and unsuccessful insurance fraud is that Ms. Myres was a Deputy

15   Sheriff at the time of the offense; the PSR goes so far as to say that, as a result, "the entire

16   criminal justice system is undermined."  Sent. Rec. at 2.  Respectfully, while Ms. Myres

17   appreciates the point made in the PSR about the impact of any participant in the criminal justice

18   system, it is blown well out of proportion.  Ms. Myres's offense was not job-related; it involved a

19   burglary of her home.  In addition, she was at one of the lowest rungs at the Sheriff's

20   Department, primarily serving as a prison guard and being paid by the hour.  And what merit that

21   is left in the point raised in the PSR should be further offset by the 20 years of public service that

22   Ms. Myres provided, and by the extra risk she would face in custody as a former prison guard --

23   neither of which the PSR was willing to consider at all.

24         These erroneous rationales were the basis for the PSR's top-of-the guideline-range

25   recommendation -- a guideline range that already had been incorrectly inflated.  For these

26   reasons, Ms. Myres urges the court not to follow the recommendation in the PSR.

27              **(2)      The PSR Fails To Consider Mitigating Factors Under Section**

28   **3553(a)**

An additional and important reason not to follow the recommendation in the PSR is that it fails to address the 3553(a) factors that Ms. Myres presented to the USPO.  These factors are addressed in greater detail in Part IV below.

In the end, Ms. Myres respectfully submits that at its heart, this is a sentencing about a small and unsuccessful insurance fraud -- one that never would have found its way into federal court, or any other court in which jail was a possibility for a first-time offender, absent the accusation that she gave her gun to a known felon.  The government tried but failed to prove that allegation under any standard of proof.  At the same time, there are substantial mitigating factors under Section 3553(a), as detailed in Part IV below; these facts provide an explanation for, and more than an even counterweight to, any aggravating qualities from the fact that she committed the crime of which she was found guilty while she was employed as a Deputy Sheriff.  As a result, the sentence should be below, rather than at the top of, the guideline range, as the PSR recommends.

b)      **Other Provisions of the Recommended Sentence Should be Adjusted**

Ms. Myres also objects to two of the recommended conditions of supervised release, namely, that she "must not open any new lines of credit and/or incur new debt without the prior permission or the probation officer" and that she "must provide the probation officer with access to any financial information, including tax returns, and shall authorize the probation officer to conduct credit checks and obtain copies of income tax returns."  Sent. Rec. at 3.  The justification in the PSR for these conditions is "to ensure any income is from legitimate sources." *Id.*  But no evidence has *ever* been presented to suggest that the source of Ms. Myres's income was anything but legitimate.  To the contrary, the evidence presented at trial showed that she was a diligent worker for a range of respected employers, and that she worked a lot of overtime to support her lifestyle.  *See, e.g.*, Trial Tr. at 1021:15-25 (testimony from Lisette Adams, confirming Ms. Myres worked a lot of overtime at the department); *id.* at 999:20-1000:20 (testimony from Beverly Myres, confirming Ms. Myres was "a hard working person" who "worked her regular hours as a sheriff and [] worked a lot of overtime" when asked how Ms. Myres afforded her fashionista lifestyle).

27

## IV. THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553(A) SUPPORT A SENTENCE OF PROBATION

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence *sufficient, but not greater than necessary* to comply with the purposes of sentencing. Ms. Myres respectfully submits that the statutory purposes of sentencing are satisfied in this case with a sentence of probation.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

#### 1. The Nature and Circumstances of the Offense

In Parts II and III above, Ms. Myres has provided her view of the offense of which she was convicted. She was found guilty of mail and wire fraud as a result of a small and unsuccessful insurance claim that arose out of a burglary at her home. The prosecution made a federal case out of this small and unsuccessful claim because it thought that Ms. Myres had given her gun to a felon and staged the burglary in order to cover up her conduct, but neither of those facts proved to be true -- and the jury acquitted Ms. Myres of the count in which that theory was presented. Undeterred, the prosecution has attempted to identify aggravating circumstances, but for the most part, as explained above, these aggravating circumstances are either overblown or tied to her conduct at the jail, which is unconnected to the crime for which she was convicted, and for which she has already been punished.

#### 2. The History and Characteristics of the Defendant

Two aspects of Ms. Myres history and characteristics should stand out to the court. First, she is a hard-working and caring mother, as well as a hard-working and caring member of her community. Second, the behavior that brought her to this court was an aberration, and occurred during a period in which she was under extreme stress, both at work and outside of work.

##### a) Ms. Myres Is a Hard-Working, Caring Mother and Member of Her Community

Ms. Myres is a fifty-five year-old woman with no criminal history who has devoted much of her life to serving the public, whether as a Deputy Sheriff or through her longstanding

1  volunteer work on behalf of her church and her community.  As reflected in the many letters

2  submitted by her family and friends, as well as her own statement, Ms. Myres is a hard-working,

3  loyal, compassionate, and generous person who deeply regrets the terrible mistake she made in

4  getting involved with Fowler.  Notwithstanding Ms. Myres's inclination to remain steadfast in

5  the face of adversity, her friend Gerald Boddie expressed his appreciation for "her expressions of

6  regret over some of the decisions she has made, in her own words, it was a terrible mistake, and

7  as I observed her facial expression she truly meant it."  Ex. 9-B.  And, as explained by her niece,

8  Annie Moses, "[o]n the surface April may come across as having a hard exterior, and a rather

9  dismissive demeanor.  I can honestly say these qualities serve as a protective wall.  She's a deep

10  thinker, and she is more fragile than many realize."  Ex. 9-P.

11        Her devotion to others of course starts with her family.  Frequently a single working

12  mother,[18] she was nonetheless a very hands-on mother and raised two boys.  Her friend Carmen

13  Jenkins describes Ms. Myres as "a very confident and strong woman, she has single handedly

14  raise[d] two sons, with your experience as a Judge you may have had a chance to see raising

15  African American Men in this day and age is not an easy task, but she has done it, she works

16  hard at everything she does, and she expects nothing less from herself and her sons."  Ex. 9-I.

17  Ms. Myres's friend Kim Gordon also commented on her industrious nature and family devotion,

18  describing how she "did quite a bit of overtime to provide for herself and primarily her two

19  sons."  Ex. 9-F.  Now that one of her sons has a son himself, Ms. Myres is very active in raising

20  her grandson; as Mr. Gordon wrote, Ms. Myres "has done an excellent job with her grandson

21  who I'm very proud of."  *Id.*  This devotion is not limited to her immediate family.  Ms. Myres's

22  niece Konya Johnson similarly relates how her aunt would pick her up and help her run errands

23  after her husband left her and she had no means of transportation.  Ex. 9-K.

24        Despite all the time she has devoted to her work and to her family, Ms. Myres always

25  made time to volunteer to also help her friends, her neighbors, her church, and her community.

26

27  [18] Several of the men she married were so-called "Disneyland fathers:" willing to take their
children on fun trips like Disneyland, but not willing to devote any time to the daily work of

28  raising a child.

1   In the words of her friends, the Hassons, Ms. Myres is a "true friend," someone "who sticks

2   closer than a brother/sister, is constant in his/her loyalty and friendliness, comes to the aid of

3   their companion in times of misery or pain, and gives advice that is factual and genuine."  Ex. 9-

4   G.   Ms. Myres's friend Martha Joseph similarly describes Ms. Myres as someone who

5   "volunteers to help, in all types of weather, neighbors she doesn't know." Ex. 9-L.  Her sister,

6   Gwen Moses, recounts how Ms. Myres, even though she did not have a car at the time, took the

7   bus to help one of her friends who had just had surgery and could not get around, as well as how

8   Ms. Myres invited one of Gwen's friends to stay with her when that friend had mold in the walls

9   of her own home.  Ex. 9-Q.  Similarly, Ms. Myres's sister Beverly reports an occasion in which

10  Ms. Myres literally went the extra mile – many of them – to ensure that a disoriented neighbor

11  got proper care, even though it was in the middle of the night.  Ex. 9-R.  And fellow congregants

12  Thelma and David Dozier recall how they asked Ms. Myres a question about home security and

13  unexpectedly received an entire home security plan in response.  Ex. 9-D.  Her fellow congregant

14  Marlin Norman adds that she is an advocate for others in the congregation, and that she takes the

15  initiative to set up group activities – part of her "selfless attitude toward her family, friends,

16  community and others."  Ex. 9-T.

17          In addition, as noted by Mr. Gordon, "April has done much in the community with

18  volunteer work and I know she enjoys working with young children." Ex. 9-F.  These

19  sentiments are emblematic of the one expressed by Ms. Myres's nephew, Aaron Moses, who

20  describes Ms. Myres as someone who is "dearly loved and has the capacity to show and receive

21  love from others." Ex. 9-O.   Not surprisingly, Ms. Myres's commitment to helping others was

22  not limited to friends and family; she also gave encouragement to individuals she encountered at

23  her job.  *See, e.g.,* PSR ¶ 48 (describing an incident recalled by Ms. Myres's sister, Beverly

24  Myres, when a former female inmate "wanted to thank her sister for her encouragement while

25  she was in incarcerated at the San Francisco jail").

26          Ms. Myres was also devoted to her job as a Deputy Sheriff.  As Captain Adams writes,

27  for twenty years, Ms. Myres took the unattractive jobs whenever she was asked to do so.  Ex. 9-

28  A.  She self-identified needed tasks and did them without the need for oversight.  *Id.*  She also

served as a mentor to new female Deputies, offering training, guidance, and support.  *Id.*  She treated inmates, staff and the public with respect – not always true of prison guards – and was skilled at de-escalating tense and potentially violent situations.  *Id.*  She counseled inmates who were struggling after being separated from their loved ones.  *Id.*  She did all this while ably fulfilling the responsibilities of a single mother, talking to her sons on extended shifts making sure homework was done, a healthy dinner was eaten and checking in on the events of the day.  *Id.*  The PSR erred when it wiped away entirely every day of this twenty years of service, without a whit of offsetting credit, based on Ms. Myres's conduct during a much shorter period of time in which Ms. Myres was under extreme stress.

Beyond being described as a caring and generous individual and employee, Ms. Myres is also known to her family and friends, such as attorney James Latimer, as " an industrious, hardworking, and caring woman who is community-minded.  She has worked hard, contributing greatly to both her church and her family."  Ex. 9-M.  In the words of her friend, Carmen Jenkins, "April has never asked anyone for a hand out, she has always provided for her own household because of being a hard worker, she has spent many overtime hours helping the judicial system because of them being understaffed, she took care of her family at home while working hard for her former employer for many years."  Ex. 9-I.

Simply put, and as observed by her nephew, Aaron Moses and her brother, Marcel Myres, Ms. Myres is much more than the narratives the Court has heard.  Ex. 9-O and Ex. 9-S.  As a single mother to two sons, and now a grandson, and as a diligent worker in everything in which she was engaged, Ms. Myres tried to set an example by working hard and being generous with those around her.  She appreciates that some of her conduct that was revealed in this case fell far short of that standard.  As reflected in her own statement, Ms. Myres is genuinely remorseful for her poor decision to get involved with Fowler, recognizing that "[t]he disastrous results of [her] bad associations and choices have greatly impacted [her] family, friends, fellow deputies, and for this [she] is truly sorry."  Ex. 10 (Ms. Myres's personal statement).  She has "no one to blame but [her]self" for "allow[ing] [her] treacherous heart to justify a wrong course."  *Id.*

b)     **At the time of the offenses for which she was convicted, Ms. Myres was under great stress**

As the Court is aware, Ms. Myres has spent the majority of her career working for the San Francisco Sheriff's Department, primarily in the San Francisco county jails.  While rewarding, this work also proved to be extremely stressful and psychologically taxing.  Shortly after beginning her employment with the Department, Ms. Myres was confronted with her first inmate suicide (and she ultimately dealt with several more, as well as attempted suicides).  About that first suicide, a hanging, Ms. Myres remembers trying to hold up the deceased's legs while her supervisor cut him down, as well as the inmate's body weight falling on her once he was cut down.

Ms. Myres did not receive psychotherapy after the first suicide, but was given two or three days off work.  As to the other suicides, Ms. Myres remembers cutting down inmates, calling medical, and starting CPR.  One inmate, who wrote in blood on the wall in Mandarin that he was going to kill himself, was found by Ms. Myres and her co-worker(s) sitting under his sheet on the bed.  The officers snatched the cover off his head and although the inmate was cold to the touch, he ultimately was saved.

Other aspects of Ms. Myres's job in the jails also proved challenging and the experience as a whole left her very stressed at work.  In addition to dealing with suicides, the inmates have many ways to challenge the Deputies, such as by backing up their toilets.  The inmates also sometimes required medical assistance.  Because medical assistance was not always available, Ms. Myres was expected to provide it, which added to the frustration and stress.

Ms. Myres's stress at the jail was further compounded in late 2013 and early 2014.  In October 2013 (after the divorce was finalized) Ms. Myres's ex-husband, Leonard Colvin, was arrested for attempted murder.  Although Colvin was housed at the San Francisco jail in San Bruno, he was frequently transported to Ms. Myres's workplace on the 7th floor of 850 Bryant Street for court dates, which sometimes resulted in his being on her unit all day, depending on the court's calendar.  Colvin's presence there was quite troubling to Ms. Myres, especially when Colvin developed a friendly relationship with her ex-husband Deputy Gerald Williams, who at

32

that time was working at the jail in San Bruno. Colvin and Williams began talking about Ms. Myres in personal, and sometimes disparaging, terms, and Ms. Myres heard about these conversations in detail from other inmates and deputized staff. As recounted to Ms. Myres, Colvin was constantly making threats against her while he was in custody, including against her life. *See* Ex. 11 (November 2014 SFSD correspondence). Notwithstanding these threats, Colvin continued to be housed, on and off, at the jail where Ms. Myres worked.

It was in these highly stressful circumstances that Ms. Myres encountered an inmate named Antoine Fowler, whom she had known previously in the community. Although Ms. Myres initially kept her distance from Fowler, over time she was, regrettably, drawn to him on account of his willingness to share useful information with her, as well as appear sympathetic to her, at this difficult time.

While in custody, Fowler frequently was transferred between San Bruno and 850 Bryant Street, so he was exposed to the conversations Leonard Colvin and Gerald Williams were having about Ms. Myres at the San Bruno jail, which apparently were numerous. Among other things, Fowler told Ms. Myres that Colvin said he was going to kill her and had made other similar threats against her. In this way, Ms. Myres and Fowler began a conversational relationship, during which Fowler repeatedly conveyed to her things that he was hearing about Ms. Myres that were upsetting to her.

Because Fowler seemed to be taking her side, Ms. Myres began to feel that he was her ally in a difficult situation. Although Ms. Myres was used to inmates flirting with her, and in the past had always shut that down immediately, with Fowler, she had a vested interest in the conversations they were having, both because of the useful information he was hearing and also because some of those conversations included threats against her life.

It was during a conversation in approximately October of 2014, that Ms. Myres's feelings began to evolve toward Fowler; he appeared to her to care about what she was going through. Ms. Myres felt herself getting deeper and deeper into an emotional relationship with him, but drew a line on physical contact while he was in custody. As the Court is aware, unfortunately Ms. Myres continued a relationship with Fowler after he was released from custody, and broke

1    up with him shortly before the burglary of her residence.

2         Ms. Myres does not provide this information to excuse her poor judgment, but rather to

3    help understand what was going on in her life when she exercised poor judgment, and why

4    exercising poor judgment at this time should not define her entire life.  Ms. Myres agrees that her

5    relationship with Fowler was inappropriate and unbefitting of a Deputy Sheriff.  As her written

6    statement reflects, she is deeply remorseful for and feels a great deal of shame about her

7    relationship with Fowler, as it has impacted her and others immeasurably and detrimentally.

8         Compounding the stress from her relationship with Fowler, on March 14, 2016 – the

9    same month of the burglary – Ms. Myres received a death threat arising out of her status as a

10   witness in a criminal case against Leonard Colvin.  In addition to a specific threat, the SFSD was

11   concerned that "people associated with Colvin may have surveillance on Deputy Myres."  Ex. 12

12   (SFSD report regarding the protection detail).  The SFSD viewed the situation as a serious one,

13   and for a period of time thereafter, Ms. Myres had a protection detail.  The detail had just ended

14   when Ms. Myres began to spend nights at her sister's home, both to be away from her own home

15   and for added comfort – and that's where Ms. Myres was on the night of the burglary.

16        Although Ms. Myres made a terrible mistake getting involved with Fowler, that mistake

17   and the disastrous consequences that flowed from it do not justify a custodial sentence, let alone

18   one that amounts to 18 months, especially since it was an aberration that came at a time she was

19   under great stress.

20        3.    **Other Section 3553(a) Factors Also Counsel for a Lenient Sentence**

21        Beyond the nature and circumstances of Ms. Myres's small and unsuccessful insurance

22   claim, and her devotion to her family and community and the extreme stress she was under at the

23   time of the offense, there are several other mitigating factors that the Court should consider.

24        First, Ms. Myres has already been damaged by her conduct.  She lost her job and will

25   never again be able to obtain employment in her chosen profession.  This could be sufficient for

26   a sentencing departure, let alone for a variance from a guideline sentence.  *See, e.g., Koon v.*

27   *United States,* 518 U.S. 81, 110 (1996) (suggesting possibility of departure based on loss of law

28   enforcement employment, but disallowing it because in that case loss of job was within the

34

1   heartland of the guideline of the offense of conviction, which was a civil rights violation).  She

2   also suffered the detriment of nearly having her son shot, and of actually having her home

3   trashed and burglarized, with the uncompensated loss of a number of hard-earned items worth

4   about $60,000.

5          Given the loss of her job and the loss of $60,000 worth of her prized possessions, no jail

6   term is required for deterrence under Section 3553(a)(2)(B).  *See, e.g., United States v. Johnson,*

7   245 F. Supp. 3d 393, 396 (E.D.N.Y. 2017) (noting collateral consequences in addressing

8   deterrence when justifying below guidelines sentence); *United States v. Yu Chunchai*, 476 F.

9   App'x 119, 121 (9th Cir. 2012) (citing *United States v. Weber,* 451 F.3d 552, 558 (9th Cir. 2006))

10  (viewing community service as related to the goal of deterrence) (unpublished).

11         Second, if Ms. Myres were given a custodial sentence, she would face additional risk and

12  hardship as a result of her prior service as a prison guard.  This, too, is a recognized basis for

13  mitigation, and potentially even for a departure.  *Koon*,  518 U.S. at 111-12.

14         Third, there is no need for a custodial sentence to protect the public from further crimes

15  by Ms. Myres under Section 3553(a)(2)(c).  For well over 30 years, she has worked very hard in

16  legitimate employment, with not a hint of wrongdoing except third- and fourth-hand unspecified

17  information from unreliable sources that belongs nowhere near a courtroom.  The offense for

18  which she was convicted occurred during a time of unusual stress in her life – stress that is

19  unlikely to recur given that it was generated largely by her work in the extremely stressful job of

20  a prison guard, a position she will never again be able to hold.

21         Fourth, neither the guideline sentence nor the sentence proposed by the PSR are

22  necessary to "emphasize [] the seriousness of the offense," to "reflect respect for the law," and to

23  "provide just punishment."  Section 3553(a)(2)(A).  There is no empirical evidence and there are

24  no specific facts in this case that suggest that a sentence of imprisonment is necessary.  Absent

25  relief from the Court of Appeals, Ms. Myres will have a felony conviction for the rest of her life,

26  and will have it for a case that, for another defendant and absent the false accusation in Count

27  Four, would never have been prosecuted.  This alone is sufficient "punishment" for a first-time

28  offender like Ms. Myres, for whom these offenses were an aberration.  *See United States v.*

1  *Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) (citing *United States v. Glasgow*, 389 F. Supp. 217,

2  224-25 (D. D.C. 1975)) ("The stigma of a felony conviction is permanent and pervasive"); *see*

3  *also* Wayne A. Logan, *Informal Collateral Consequences*, 88 Washington L. Rev. 1103 (2013)

4  ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation

5  beyond the grave.").

6        Nor is there anything to indicate that an 18-month jail sentence – or any incarceration – is

7  required to "promote respect for the law."  *See* Zvi D. Gabbay, *Exploring the Limits of the*

8  *Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict

9  Resol. 421, 447-48 (2007) ("there is no decisive evidence to support the conclusion that harsh

10  sentences actually have a general and specific deterrent effect on potential white-collar

11  offenders").  The only real justification for any substantial jail sentence is to protect the public

12  from violent, chronic offenders, which Ms. Myres is not.  *See generally*, *Pew Report, Time*

13  *Served:  The High Cost, Low Return of Longer Prison Terms* (discussing generally the notion

14  that the purpose of longer sentences is to protect the public from chronic, violent offenders and

15  the costs and benefits to society of longer prison terms) (available at:

16  http://www.pewtrusts.org/~/media/assets/2012/06/6/time_served_report.pdf)

17        Given Congress's directive that a sentence that does not include a term of imprisonment

18  is appropriate for a first-time offender, a non-custodial sentence, perhaps accompanied by

19  community service or home detention, is "sufficient but not greater than necessary" to comply

20  with the purposes of sentencing.  This is particularly so because Ms. Myres has an exceptionally

21  low risk of recidivism, *see* 18 U.S.C. § 3553(a)(2)(C):  She is a first-time offender with no

22  criminal history, *see United States v. Paul*, 239 Fed. App'x 353, 354-55 (9th Cir. 2007) (vacating

23  16-month sentence and remanding to district court for proper consideration of mitigating factors,

24  including defendant's status as first-time offender), has maintained steady employment

25  throughout her life – even while raising two children, largely on her own – and has the full

26  support of her family.

27        Moreover, among low-risk offenders such as Ms. Myres, more time in prison actually

28  leads to increased risk of recidivism because of the loss of "pro-social contacts in the

1   community," and the removal from "legitimate opportunities."  *See* Valerie Wright, Ph.D.,

2   *Deterrence in Criminal Justice:  Evaluating Certainty v. Severity of Punishment, The Sentencing*

3   *Project*, at p. 7 (November 2010); *see also* United States Sentencing Commission, *Staff*

4   *Discussion Paper, Sentencing Options Under the Guidelines* (1996) (recognizing the

5   "criminogenic effects of imprisonment which include contact with more serious offenders,

6   disruption of legal employment, and weakening of family ties").  Furthermore, statistically, a

7   longer jail sentence does not necessarily increase the deterrent effect, particularly in white collar

8   cases.  *See* Zvi D. Gabbay, *supra*, 8 Cardozo J. Conflict Resol. at 447-48 (2007) (no evidence

9   that longer sentences have a general or specific deterrent effect on potential white-collar

10  offenders).

11        Finally, the court should consider that, absent the allegations relating the Fowler that the

12  prosecution failed to prove by *any* standard, the small and unsuccessful insurance claim for

13  which Ms. Myres was convicted would never be in federal court – or probably in any court at all.

14  An 18-month sentence for a case that would not have been prosecuted absent a false accusation

15  would by definition create unwarranted sentencing disparities. *See* Section 3553(a).

16        For these reasons, the sentence recommended by the USPO is excessive and does not

17  comply with Congress's directives.  A probationary sentence, perhaps with community service or

18  home detention, on the other hand, fulfills the purposes of sentences set forth in Section 3553

19  and takes into account the various factors this Court must consider.

20        4.        **Acquitted and Uncharged Conduct Should Play No Role In The Sentence**

21        Much of the prosecution's submissions to the USPO, and some of the PSR, appears to

22  suggest that Ms. Myres should be punished for conduct that was uncharged or for which she was

23  acquitted, ranging from claims about her conduct at the jail, to claims about her supposed

24  participation in a burglary, and to claims about her hiding Fowler's activity from law

25  enforcement.  We respectfully suggest that none of this acquitted or uncharged conduct should

26  play a role in Ms. Myres's sentence.  As set forth above, most of these claims are greatly

27  exaggerated or flatly untrue.  But even if Ms. Myres had not shown them to be untrue, this Court

28  should disregard them for constitutional and jurisprudential reasons.

1         Ms. Myres recognizes that the current state of the law in the Ninth Circuit allows for the

2  consideration of uncharged and acquitted conduct.  *See United States v. Mercado*, 474 F.3d 654

3  (9th Cir. 2007).  However, as noted in Judge Fletcher's dissent in *Mercado* – and as a growing

4  number of other Court of Appeals and District Court Judges have agreed (see the list provided

5  below) – Ms. Myres believes such consideration of acquitted conduct at her sentencing is

6  violative of her Sixth Amendment rights to a trial by jury.  *See Id.*, 474 F.3d at 664 (Fletcher J.,

7  dissenting) ("In many ways, the consideration of acquitted conduct is a more direct repudiation

8  of the jury verdict than is a sentence that exceeds the statutory maximum.  In the case with

9  acquitted conduct, the jury has been given the opportunity to authorize punishment and

10  specifically withheld it."  And "[b]y allowing judges to consider conduct rejected by the jury, the

11  court allows the jury's role to be circumvented by the prosecutor and usurped by the judge – two

12  of the primary entities against whom the jury is supposed to protect the defendant."  Citing

13  *Duncan vs. Louisiana*, 391 U.S. 145, (1968) ("Providing an accused with the right to be tried by

14  a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous

15  prosecutor and against the compliant, biased or eccentric judge."))

16         The *Mercado* majority reasoned that *United States v. Watts*, 519 U.S. 148 (1997) placed

17  no limitation on a sentencing court from considering conduct underlying an acquitted charge, so

18  long as that conduct had been proved by a preponderance of the evidence.  *See Mercado*, 474

19  F.3d at 656.  But the totality of the jurisprudence shows that the validity of such consideration of

20  conduct underlying an acquitted charge is not as clear as perhaps the *Mercado* majority (and the

21  government in this case) might believe.  A vigorous dissent in *Watts* doubted the wisdom of the

22  Court's summary approach to the issue.  Specifically, Justice Kennedy noted that the case

23  "raise[d] a question of recurrent importance" and presented a "precise issue" upon which the

24  Court had not yet passed: the use at sentencing of "not just prior criminal history but conduct

25  underlying a charge for which the defendant was acquitted."  *See Watts*, 519 U.S. at 170

26  (Kennedy, J., dissenting).  Kennedy continued that "to increase a sentence based on conduct

27  underlying a charge for which the defendant was acquitted does raise concerns about

28  undercutting the verdict of acquittal," and he urged the Court to "confront[] the question with "a

1  reasoned course of argument," instead of "shrugging it off." *Id.*  Justice Stevens – also in dissent

2  – went even further, calling the Court's holding "repugnant" to its constitutional jurisprudence.

3  *Id.* (Stevens, J., dissenting).

4  　　Since *Watts* was decided, other Justices have called for the Supreme Court to address this

5  and related issues.  In *Jones v. United States*, 574 U.S. 948 (2014),after a jury convicted the

6  defendants on some counts and acquitted them on others, the sentencing judge found that they

7  had engaged in the alleged conspiracy for which they had been acquitted and based their

8  sentences on that finding.  Dissenting from the denial of certiorari, Justice Scalia, joined by

9  Justices Thomas and Ginsburg, noted that "[t]he Sixth Amendment, together with the Fifth

10  Amendment's Due Process Clause," require that each element of a crime be either admitted to

11  the jury or proved beyond a reasonable doubt.  *Id.* at 8.  The dissent lamented that the Courts of

12  Appeal had "uniformly taken [the Supreme Court's] continuing silence" on the question "to

13  suggest that the Constitution does permit" sentences supported by judicial findings, including

14  findings that defendants "engaged in [an offense] of which the jury acquitted them," and

15  concluded that the Court's "disregard[]" for the Sixth Amendment that had "gone on long

16  enough." *Id.* at 9.

17  　　Following *Jones*, two now-Justices, writing for their respective Courts of Appeal, echoed

18  Justice Scalia's dissent.  In *United States v. Sabillon Umana*, 772 F.3d 1328 (10th Cir. 2014),

19  then-Judge Gorsuch invoked similar reasoning by observing that "[i]t is far from certain whether

20  the Constitution allows" a judge to increase a defendant's sentence "based on facts the judge

21  finds without the aid of a jury or the defendant's consent"—which would include, by necessity, a

22  finding that a defendant had committed an offense for which a jury acquitted him.  *Id.* at 1331.

23  The next year, in *United States v. Bell,* 808 F.3d 926 (D.C. Cir. 2015), then-Judge Kavanaugh

24  observed that "allowing judges to rely on acquitted or uncharged conduct to impose higher

25  sentences than they otherwise would impose seems a dubious infringement of the rights to due

26  process and to a jury trial." *Id.* at 928 (Kavanaugh, J., concurring in denial of rehearing en banc).

27  　　Numerous lower – court judges - beyond the *Mercado* dissent by Judge Fletcher cited

28  above – have expressed the view that the Fifth and Sixth Amendments should prohibit

1    consideration of acquitted conduct at sentencing.  Judge Millett has called the use of acquitted

2    conduct at sentencing an "important, frequently recurring, and troubling contradiction in

3    sentencing law."  *Bell*, 808 F.3d at 932 (Millett, J., concurring in denial of rehearing en banc); *Id.*

4    at 927 (Kavanaugh, J., concurring in denial of rehearing en banc) ("shar[ing] Judge Millett's

5    overarching concern").  Judge Bright has argued that "the use of acquitted conduct to enhance a

6    defendant's sentence should be deemed unconstitutional under both the Sixth Amendment and

7    the Due Process Clause of the Fifth Amendment," *United States v. Lasley*, 832 F.3d 910, 920-21

8    (8th Cir. 2016) (Bright, J., dissenting).  A number of other federal judges have reached the same

9    conclusion.  *See, e.g., United States v. White*, 551 F.3d 381, 392 (Merritt, J., dissenting, joined by

10   five others); *United States v. Faust*, 456 F.3d 1342, 1349 (11th Cir. 2006) (Barkett, J., specially

11   concurring); *United States v. Coleman*, 370 F. Supp. 2d 661, 670-671 (S.D. Ohio 2005)

12   (Marbley, J.) ("*Apprendi* and its progeny, including *Booker*, have elevated the role of a jury

13   verdict by circumscribing a defendant's sentence to the relevant statutory maximum; yet, the

14   jury's verdict is not heeded when it specifically withholds authorization.  Stated differently,

15   [when acquitted conduct is considered at sentencing] the jury is essentially ignored when it

16   disagrees with the prosecution."); *United States v. Pimental*, 367 F. Supp. 2d 143, 150 - 152 (D.

17   Mass. 2005) (Gertner, J.) ("It makes absolutely no sense to conclude that the Sixth Amendment

18   is violated whenever facts essential to sentencing have been determined by a judge rather than a

19   jury, and also conclude that the fruits of the jury's efforts can be ignored with impunity by the

20   judge in sentencing.")

21        The cases outlined above demonstrate that at least four sitting Justices – Gorsuch

22   (*Sabillon Umana*), Kavanaugh (*Bell*), and Thomas and Ginsburg (who joined Scalia's *Jones*

23   dissent) – have expressed concern with the consideration of uncharged or acquitted conduct at

24   sentencing and its impact on a defendant's Sixth Amendment rights.  Numerous other Court of

25   Appeals and District Court judges have also sounded the alarm of the constitutional implications

26   of such consideration.  Here, where Ms. Myres was convicted of mail and wire fraud, in

27   connection with a claim she submitted to Farmers Insurance after *she was the victim* of a

28   burglary, consideration of any conduct for which the jury acquitted her violates her Sixth

1  Amendment rights.

2       Even if the court believes it cannot yet declare the consideration of uncharged or

3  acquitted conduct to be impermissible, it should follow the invitation of Judge Kavanaugh in his

4  concurring opinion in *Bell*:  "even in the absence of a change of course by the Supreme Court, or

5  action by Congress[19] or the Sentencing Commission, federal district judges have power in

6  individual cases to disclaim reliance on acquitted or uncharged conduct."  *Bell*, 808 F.3d at 928.

7  Put differently, just because the court may still have the ability to consider such conduct, it does

8  not have to do so and should not do so in light of the constitutional and jurisprudential

9  considerations suggesting that it should not do so.

10                              **V.  CONCLUSION**

11       For the foregoing reasons, Ms. Myres respectfully requests that the Court enter a non-

12  custodial sentence.

13  DATED:  November 12, 2019            KING & SPALDING LLP

14

15

16                              By:  */s/ Michael J. Shepard___*

17                                   Michael J. Shepard

18                                   Jamie A. Lang
                                     Attorneys for Defendant

19                                   APRIL DIANE MYRES

20

21  [19] Relatedly, on September 26, 2019, U.S. Senators Dick Durbin (D-Ill.), and Chuck Grassley,

22  (R-Iowa), introduced the bipartisan *Prohibiting Punishment of Acquitted Conduct Act of 2019*.
    See https://www.grassley.senate.gov/news/news-releases/durbin-grassley-introduce-bipartisan-

23  criminal-justice-reform-bill. The bill seeks to prohibit acquitted conduct sentencing, wherein a
    judge enhances a sentence based on conduct underlying charges for which a defendant has been

24  acquitted by a jury.  The bill is supported by the following organizations: #Cut50; ALEC Action;
    Aleph Institute; American Bar Association; American Civil Liberties Union; American

25  Conservative Union; Americans for Prosperity; Americans for Tax Reform; Digital Liberty;
    Drug Policy Alliance; Due Process Institute; Fair Trials; Faith and Freedom Coalition; Families

26  Against Mandatory Minimums (FAMM); Federal Public and Community Defenders;
    Freedomworks; Innocence Project; Koch Industries; National Association of Criminal Defense

27  Lawyers; National Legal Aid and Defender Association; Prison Fellowship; R Street Institute;
    Right on Crime; The Sentencing Project; Texas Public Policy Foundation; and Tzedek

28  Association.

# EXHIBIT 1
# (DOCUMENT FILED SEAL)

# EXHIBIT 2
# (DOCUMENT FILED SEAL)

# EXHIBIT 3
# (DOCUMENT FILED SEAL)

# EXHIBIT 4
# (DOCUMENT FILED SEAL)

# EXHIBIT 5

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     02/13/2017

On February 8, 2017, Special Agent James A. Folger and Tyler A. Nave interviewed Jennifer Trishell Myres (hereinafter "J. Myres"), date of birth ████████, telephone number ████████ home address ████████ ████████ ████████ California, ████ outside of her house. After being advised of the identity of the interviewing Agents and the nature of the interview, J. Myres provided the following information:

J. Myres' is Beverly Myres' adopted daughter and April Myres' niece. J. Myres called the FBI because she read the criminal complaint online and saw her initials. J. Myres figured the FBI would be trying to find her anyway to interview her.

J. Myres said the burglary of April Myres' house was fake. Aaron Johnson II, April Myres' son and J. Myres' cousin, stopped by J. Myres' house on the day the FBI visited April Myres' house to get fingerprints after the alleged burglary. Johnson II said he had the jewelry from the burglary and said that he was going to get rid of it. Johnson II discussed melting it down and selling it. Johnson II said he might go to Las Vegas or Los Angeles and melt the jewelry there. Johnson II did not mention April Myres' firearm or vest. Johnson II sent J. Myres the photograph of Antoine Fowler. J. Myres said a Heidi Von, who is a friend of April Myres, knew about the fake burglary too.

April Myres was present during the fight between Johnson II and Fowler where a gun went off. This event occurred right before the fake burglary. J. Myres suggested the FBI go look at her mom's house to find the other objects that were allegedly stolen during the fake burglary of April Myres' house.

J. Myres did not recognize the name "Erica." J. Myres thought Johnson II might be in Oakland. She also suggested the FBI talk to Marcel Myres, her uncle. Craig Perry, April Myres' son who is a San Francisco Police Officer "does not fuck" with April Myres. The two of them do not get along. However, J. Myres searched spokeo.com and saw that Craig Perry might have some ownership interest in April Myres' house at 333 Tocoloma Avenue, San Francisco, CA. The information for that house used to list Gwen and Beverly, April Myres' two sisters, as people who might have an ownership

---

Investigation on   02/08/2017   at   San Francisco, California, United States (In Person)

File #   ████████

Date drafted   02/10/2017

by   James A. Folger, Tyler Anthony Nave

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Continuation of FD-302 of  (U) Interview of Jennifer Myres                    , On  02/08/2017 , Page  2 of 2

interest in the house. They are no longer listed, but Craig Perry is
listed.

   J. Myres' mother, cashed J. Myres' annuity check of approximately
$28,000 in 2006. Before then, J. Myres stole some of her mother's jewelry
and Beverly Myres filed an insurance claim for it. As retribution, Beverly
Myres also cashed J. Myres' check. Beverly Myres used the money to
refinance her own house. J. Myres was beaten when she was a child. Beverly
Myres is a private investigator.

AM-000784

# EXHIBIT 6

# KING & SPALDING

King & Spalding LLP
101 Second Street
Suite 2300
San Francisco, CA  94105
Tel:  +1 415 318 1200
Fax:  +1 415 318 1300
www.kslaw.com

Michael Shepard
Partner
Direct Dial:  +1 415 318 1221
Direct Fax:  +1 415 318 1300
mshepard@kslaw.com

October 1, 2019

**VIA EMAIL**

Jessica A. Goldsberry
U.S. Probation Officer Specialist
1301 Clay Street, Suite 220S
Oakland, CA 94612-5217

Re:    **United States v. April Myres.**
        **Case No.: 3:17-CR-001800-RS**

**Response by Defendant April Myres to the Government's "Production of Information for Purposes of Preparing Presentence Reports"**

Dear Ms. Goldsberry,

Defendant April Myres submits this response to the Government's letter of August 8, 2019, entitled "Production of Information for Purposes of Preparing Presentence Reports."

## Case Overview

The government's case against Ms. Myres[1] started with establishing that, while she was a Deputy Sheriff working, among other places, at the San Francisco County Jail, she began an

---

[1] Throughout its "Production of Information for Purposes of Preparing Presentence Reports," the government refers to Ms. Myres as "Deputy Myres."  But as she stands before the court for sentencing, Ms. Myres is no longer "Deputy Myres," having resigned her position in February

October 1, 2019
Page 2

inappropriate relationship with an inmate, Antoine Fowler.  From there, the government contended that after Fowler's release, Ms. Myres reported a "so-called burglary" to the police and to her insurance company, and others, *see* Trial Transcript at p. 1115 ("I'm going to talk to you about the so-called burglary"), and falsely claimed losses of $67,000.  Included among the claimed losses was Ms. Myres's service revolver.  Without ever offering a whit of evidence of how, when or where Ms. Myres learned that Mr. Fowler ended up with her gun (until discovery produced by the government in this case suggested it), the government also contended that Ms. Myres knew that Fowler had her gun after March 25, 2016 -- the morning after the burglary of her home -- and that when she spoke to the police and to her insurer in the days after March 25, 2016, she concealed that Fowler, a felon, possessed her weapon.

Based on these contentions, the government charged Ms. Myres with misprision of a felony, mail fraud, and wire fraud.  Following an eight-day trial, Ms. Myres was acquitted of misprision of a felony and convicted of mail and wire fraud.

Explaining the acquittal on the misprision charge to defense counsel and the FBI case agent afterwards, a number of jurors reported that they were convinced that Fowler did commit a burglary at Ms. Myres's home on the night of March 24/25, 2016, and that he stole a number of items, including her gun.  Their guilty verdicts on the mail and wire fraud counts were apparently based on evidence offered by the government to suggest that some of the items in Ms. Myres's insurance claim were knowingly false, most notably that three of the forty-three items on her insurance claim were found by the FBI in a search of her home in February, 2017.[2]

Ms. Myres encourages the Probation Office to review the transcripts of the closing arguments (and the trial as a whole) supplied by the government.  They demonstrate, as the jury concluded, that Mr. Fowler burgled Ms. Myres's home; they demonstrate that he stole a substantial number of items in that burglary, including her gun; and they demonstrate that Ms. Myres was justified in seeking reimbursement for most of the items that she listed as stolen in her insurance claim.  With the government having failed to connect Ms. Myres to giving Fowler her gun or knowing that he had it,[3] this case as found by the jury devolves into a very small

---

2017 following an investigation by the San Francisco Sheriff's Department and her arrest on the charges in this case.

[2] As Ms. Myres lays out in greater detail in her Motion for a New Trial, this verdict was irrevocably tainted by the admission of a vast quantity of highly prejudicial evidence that was not relevant (including a vile threatening telephone call) and/or that improperly sought adverse inferences from protected conduct such as Ms. Myers's exercise of her fourth amendment rights, her request that the police contact her through her lawyer, and her filing for bankruptcy.

[3] The Government offered only speculation – and no evidence whatsoever – that Ms. Myres knew that Fowler had her gun.  This lack of evidence led the court to take under advisement Ms. Myres's Rule 29 Motion at the close of the Government's case, and, if it were theoretically

October 1, 2019
Page 3

insurance fraud -- one that never would have been in federal court (or in any criminal proceeding) absent the gun-related charges that the government did not prove under any standard and are not true.

Both the post-trial comments of the jurors and the trial record not only confirm that Ms. Myres was convicted of a very small insurance fraud that would not on its own have landed in federal court, but they also establish two related propositions that show that the government's guideline calculations are inflated:  first, that Ms. Myres was the victim of a burglary and, as a result, that she was not intending to defraud the insurer when she sought compensation for most of her losses; and second, that far from Ms. Myres giving Fowler her gun, Fowler either committed or was responsible for the burglary and stole Ms. Myres's gun, which substantially undermines the government's argument for an abuse of trust enhancement.  Notably, both at trial and even again in its "Production of Information for Purposes of Preparing Presentence Reports" ("Gov. Ltr. to Probation"), while attempting to cast some doubt on these propositions, in the end the government disavowed any contest on the issue of whether there was a burglary, and whether Fowler committed that burglary and stole Ms. Myres's gun.  *See* Gov. Ltr. to Probation at 3; Trial Transcript at p. 1137 ("There is evidence to support that maybe it was a revenge burglary, but there is also evidence to suggest otherwise"); *see also id*., p. 1142 ("Again, the so-called burglary.  It does not matter for purposes of this case precisely what happened.  There is evidence to suggest that it was a revenge burglary.  There is evidence to suggest that it was not . . . .").

The government had no choice but to disavow any contest about these propositions because  its efforts to cast doubt on them are meritless, and because the evidence showed that Ms. Myres was the victim of a burglary committed or orchestrated by Fowler in which he stole her gun.  At trial, the government did not contest that a burglary occurred, but it did offer evidence designed to suggest that Ms. Myres was in cahoots with Fowler about the burglary:  a text from Ms. Myres to Fowler at 7:27 pm on March 23, 2016  that read:  "It's about to start." *See* Gov. Ex. 32.  The government was inviting the jury to find that this text referred to the burglary, but this invitation turned out to be an embarrassing fiasco for the government.  As Ms. Myres proved, what was "about to start" at 7:30 pm on March 23, 2016 was one of the most important religious events of the year for Jehovah's Witnesses, a church of which she is a member, and an event that she attended.  *See* Exhibit 1 (Def. Ex. 1089 ((invitation to March 23, 2016 "Lord's Evening Meal" at Portola Kingdom Hall)); Trial Transcript at pp. 1079-1080 (witness Leonard Dixon confirming Ms. Myres's presence at the celebration on March 23, 2016 at Portola Kingdom Hall, which began at 7:30 p.m.)

---

possible, the evidence on Count 4 got even weaker when the Government proposed a jury instruction that made it temporally impossible to convict Ms. Myres: to do so it would have to have found that she knew in April of 2016 about a crime not alleged to have occurred until February of 2017.  (Trial Tr. at 1240-42).

October 1, 2019
Page 4

After this fiasco, the government beat a retreat and acknowledged in its closing that there was evidence to support Ms. Myres's contention that Fowler committed a revenge burglary. *See* Trial Transcript at p. 1137. Nonetheless, the government continued to refer to the "so-called burglary," and offered some erroneous questions about Ms. Myres's proof of the burglary: for example, it suggested that Fowler stole the gun in February, *see* Trial Transcript at pp. 1138-1139 (government suggesting to the jury in closing argument that one of the items Fowler stole from Ms. Myres on or around February 29, 2016 was the gun), but this could not be right given that Ms. Myres needed the gun for the overtime she was working at the courthouse, *see, e.g.*, Trial Transcript at p. 1021 (testimony from Lisette Adams, confirming Ms. Myres worked a lot of overtime at the department); *id.* at pp. 999-1000 (testimony from Beverly Myres, confirming she drove Ms. Myres to 400 McAllister (a courthouse) for Ms. Myres's overtime shifts); and the government itself noted that she purchased a safe for the gun in March, perhaps, according to the government's closing argument, to "protect[] that firearm from Antoine Fowler," Trial Transcript at p. 1139. Given the weight of the contrary evidence, the government never even tried to argue at trial that Ms. Myres had not been the victim of a burglary, and its letter to the Probation Office concedes the existence of evidence suggesting that she was a victim.

While stating that the court need not decide whether Fowler stole the gun, the government's letter offers supposed "reasons to doubt" that the gun was stolen and that, instead, Ms. Myres gave Fowler her gun. These "reasons to doubt" melt in the face of the evidence that Ms. Myres did not give Fowler her gun. First, Ms. Myres proved at trial that Fowler nearly shot Ms. Myres's son Aaron with her gun, *see* Trial Transcript at p. 971; the notion that she gave it to him afterwards is hard to fathom. Second, Fowler did not need any guns – he had plenty of them. *See* Exhibit 2 (photos extracted from Fowler's phone, provided by the government in discovery at Bates Nos. PROTECTED-002898). Third, Ms. Myres needed her gun for her job. Fourth, if for some reason – despite his having plenty of guns and despite nearly shooting her son with her gun – Ms. Myres wanted Fowler to have a gun, she could have bought him one, rather than giving him the one she needed for work. Finally, the evidence – including Fowler's possession of other stolen items right after the burglary, and his fencing of those items without consulting Ms. Myres – shows that he stole the gun along with those other items.

Unable to rebut these facts, the government is left to rely on two extremely untrustworthy felons, Lascala and Fowler, both of whom told repeated lies and had strong incentives to curry favor with the government. The government relies on a supposed statement from Lascala even though it deposed Lascala before trial, at which time the government attempted to elicit the statement it attributes to Lascala and was unable to do so (and, not surprisingly, opted not to call him as a witness at trial). The government provided a copy of Lascala's deposition as part of its submission to your Office (Attachment No. 16, Rule 15 Transcript). We encourage you to review it; not only does it show the government was unable to elicit the statement on which it now seeks to rely, *see, e.g.*, Lascala Deposition at pp. 50-51 (Lascala does not recall ever having a conversation with Fowler about the gun); *id.* at p. 52 (When asked whether he (Lascala) had

October 1, 2019
Page 5

"give[n] [Deputy Kendall] the information about the vacation and the man cave and the gun with the 30-round clip," Lascala replies, "No."), but it also shows at great length and in considerable detail how untrustworthy Lascala is. *See, e.g.*, *id*. at pp. 87-258 (cross examination of Lascala by Tony Tamburello, Ms. Myres's prior counsel).

In its "Production of Information for Purposes of Preparing Presentence Reports," the government notes that Fowler claimed in his guilty plea that he obtained the gun from Ms. Myres. Ms. Myres will reserve full comment on Fowler's assertion – in particular, its incredible lack of veracity – for her sentencing position. In the meantime, it should suffice to say that this statement is at least the third different one supplied by Fowler to the government about whether and how he possessed the gun, that Fowler is a habitual liar, that he is attempting to curry favor with the government by claiming Ms. Myres gave him her gun, and that the government itself thought so little of the veracity of his statement that it made no effort to offer it at trial, even though — if it were true — it was the easiest way to prove the element of the misprision offense that required the government to establish that Ms. Myres knew that Fowler possessed her gun.

These facts, and other errors in the government's letter described below, show that the government's Guidelines calculations are substantially inflated and that the adjusted offense level for Ms. Myres at worst is 9. Combined with other mitigating circumstances, including the loss of her job, the danger to her as a former law enforcement officer if she is remanded into the custody of the Bureau of Prisons, and her history of charitable work, an application of the factors of Section 3553(a) compels the conclusion that Ms. Myres should be sentenced to probation.

**Response to the Government's Sentencing Guidelines Calculations**

The government's Guidelines calculations suffer from two significant errors. First, despite the fact that Ms. Myres showed at trial that Fowler burgled her home and stole a substantial number of items, the government claims an intended loss of the full value of her insurance claim, $67,046.78. This is flatly wrong: Ms. Myres did not and could not have intended to defraud her insurer out of $67,000 because, as she proved at trial, most of the items she claimed to have been stolen were in fact stolen.

Among other proof, Ms. Myres introduced at trial evidence in the government's possession that it chose not to present: photos and texts from Fowler's phone. This evidence shows that right after the burglary, Fowler was texting photos of a number of the stolen items to his sisters, offering those items to them and/or seeking their help in fencing those items.[4] *See, e.g.*, Trial Transcript at 856-864 (testimony from FBI Special Agent Scanlan regarding text messages and photos found on Fowler's phone). Notably, although Fowler and Ms. Myres displayed no hesitation about texting each other about pretty much every subject imaginable,

---

[4] Ms. Myres became aware of this evidence for the first time after this case was indicted, when Fowler's phone was produced to her counsel in discovery. She was not aware of it at the time she was alleged to have committed a misprision of felony.

October 1, 2019
Page 6

there is not a single text between Fowler and Ms. Myres about any of the stolen items; Fowler stole and fenced the items without her knowledge or participation, and Ms. Myres was not committing a fraud when she made an insurance claim seeking compensation for her possessions that were stolen.

As this evidence shows and as the jurors explained, Ms. Myres did not intend to defraud the insurer out of $67,000.  Rather, the intended fraud is the value of the three items found by the FBI in its search: Blue Fox Fur Vest ($649.24); Gucci Rain Boots ($315.38); and Louis Vuitton Purse ($2220.00), totaling $3,184.62.  *See* Trial Transcript at pp. 845-847 (testimony from FBI Special Agent Scanlon identifying these three items as ones he seized during the FBI's search of Ms. Myres's home); Gov. Ex. 1, pp. 6, 8 (the items listed on Ms. Myres' proof of loss form).  This intended loss produces an adjustment of one level, for a total offense level of 8.

Or, if the government could successfully include in the value of the fraud the sixteen items shown by Government's Exhibit 12 to have been issued to her by the Sheriff's Department, such as the gun and the bulletproof vest, the value of those items is $6,388.75, *see* Gov't Ex. 1, pp. 6-8. As a result, the worst possible intended loss is $9,573.37, which would produce an adjustment of two levels.  *See* U.S.S.G. § 2B1.1(b)(1)(B) (intended loss more than $6,500).  But including these items in an intended fraud calculation would fly in the face of Government's Exhibit 12 (showing that Ms. Myres could be liable for items issued to her by the Sheriff's Department if they were lost) and the testimony of Captain Lisette Adams (the go-to person at the Sheriff's Department on matters of policy), who said she told Ms. Myres shortly after the burglary that, based on her research, including her review of the San Francisco City Charters, after a certain period of time department-issued equipment became the employee's equipment, *see, e.g.*, Trial Transcript at pp. 1023-1025).

The second error in the government's calculation is its argument for the abuse of trust enhancement.  The vast bulk of its argument is premised on claims that Ms. Myres abused her position of trust by having an inappropriate relationship with Fowler while she was a prison guard, and that after Fowler's release she allowed him to live in her home, where she kept her gun.  Essentially the government contends that Ms. Myres abused the public's trust by being a bad Deputy Sheriff and that as a result she qualifies for the abuse of trust enhancement.

As a matter of law, this is a non-starter; none of this evidence justifies an abuse of trust enhancement in an insurance fraud.  The guideline enhancement – notably not quoted in the government's "Production of Information for Purposes of Preparing Presentence Reports" – provides that "[i]f the defendant abused a position of public or private trust . . . in a manner that *significantly facilitated the commission or concealment of the offense,* increase by two levels." U.S.S.G. § 3B1.3 (emphasis added).  The offense here is insurance fraud, and the government does not even try to argue that Ms. Myres's inappropriate involvement with Fowler significantly

October 1, 2019
Page 7

facilitated the commission or concealment of insurance fraud.  Ms. Myres has already lost her job; there is no basis for piling on a sentencing enhancement that does not fit her conduct.[5]

The government understandably did not argue that Ms. Myres's inappropriate relationship with Fowler or her allowing him to live with her somehow qualifies as relevant conduct.  It does not.[6]  None of that activity occurred during the commission of the offense of insurance fraud or in attempting to avoid detection or responsibility for the insurance fraud – the insurance claim was not made until after the relationship ended.  Nor would it help to argue Ms. Myres's inappropriate relationship with Fowler or her allowing him to live with her was undertaken "in preparation for" insurance fraud.  Especially given the government's fiasco in trying to connect Ms. Myres to the burglary, there is nothing about her relationship with Fowler that in any way was "preparation" for insurance fraud.  To the contrary, Fowler committed the burglary,[7] which establishes that at most the insurance fraud was limited to a few items, and that the only relation Fowler had with those items is that he failed to steal them.

Of the arguments in the government's "Production of Information for Purposes of Preparing Presentence Reports," the only ones  that even remotely relate to the abuse of trust guideline appear in the penultimate paragraph on page three of the letter.  In that paragraph, the letter asserts that Ms. Myres "filed some of the false claims using Sheriff's Department letterhead," that she "expressly stated that she was a 20 year employee of the Sheriff's Department," and that she "wore her work uniform at a recorded statement with an insurance company investigator."

---

[5] The government goes so far as to suggest that Ms. Myres abused a position of trust when she refused to allow the FBI to fingerprint her home.  As the court ruled when it excluded this evidence at trial, Ms. Myres had a constitutional right to refuse the FBI's entry, and it cannot be used as evidence against her.  *See* CR 174 at 3; *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978) ("[P]assive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing.").  That the government recycles this effort to punish Ms. Myres for the exercise of her constitutional right even after it was excluded at trial is a measure of the poverty of its evidence on abuse of trust.

[6] As provided in U.S.S.G. § 1B1.3(a)(1)(A), relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

[7] Following the government's "it's about time fiasco," the government's "Production of Information for Purposes of Preparing Presentence Reports" takes no position on whether Ms. Myres staged the burglary, and the evidence at trial showed that Fowler committed the burglary.  The burglary therefore cannot qualify as relevant conduct.

October 1, 2019
Page 8

Even before these assertions are put in context, they fail to establish the enhancement. This is because this conduct did not "significantly facilitate[]" the offense — a requirement that the government once again has no choice but to skip over entirely  The government did not and could not argue that any of this conduct "significantly facilitated" the offense.

At trial, the government suggested that Ms. Myres was attempting to intimidate the insurer to pay her claim by identifying herself as a Deputy Sheriff.  But the insurer had to know (and did know) that Ms. Myres was a Deputy Sheriff; her employment is called for in her claimand had already been provided.  *See* Gov. Ex. 1 (Original Proof of Loss Form mailed May 4, 2016) at p. 1, Question No. 6 (asking for Ms. Myres's Job Title ("Deputy Sheriff") and Employer Name ("San Francisco Sheriff Dept.")).

In any event, the claimed intimidation dissolves when put in context.  The "filing of a claim using Sheriff's Department letterhead" refers to a time when, in response to being hectored by the insurer for more information, *see, e.g.*, Gov't Exs. 43, 44, 45, 46, 47, and 48, Ms. Myres faxed the information from work; the government itself proved that her home fax machine was broken*. See, e.g.*, Trial Transcript at p. 1249 (referring to a background conversation that occurred during a recorded interview at Ms. Myres's home the morning of the burglary, where someone states that the fax machine is "not working"); *see also* Trial Transcript at p. 822 (Farmers representative Timothy Daszko confirming that "it's not uncommon for insureds to send documents relevant to their claim from work").  The reference to her being a 20-year employee was in the context of her repeating to the insurer what she had been told by Sheriff's Department Captain Adams – namely, that after four years, the title to certain property issued by the Department reverted to the employee; in that context, it was necessary to explain how long she had been an employee.  *See, e.g.*, Trial Transcript at pp. 1023-1025 (testimony by Lisette Adams explaining how, after a certain period of time, department-issued equipment became the employee's equipment); Gov't Ex. 2 at p. 1 (cover sheet for Ms. Myres's May 14, 2016 facsimile submission to Farmers Insurance, where she clarifies in response to "Question 5 (amounts claimed by company) per S.F. City Charter all equipment is mine after 4 years of service.   I am a 20 year veteran of the SFSD.  Can confirm with direct supervisor.").  Finally, Ms. Myres wore her work uniform because, in order to schedule the interview demanded by the insurer, she came directly from work.  *See* Trial Transcript at pp. 641-642 (testimony from Farmers Insurance representative Kimberly Hoiting, explaining that she scheduled her meeting with Ms. Myres at 5:00 p.m. due to Ms. Myres's work schedule).  All this conduct was appropriate under the circumstances rather than being an effort at intimidation, and none of it "significantly facilitated" the offense.

October 1, 2019
Page 9

     In sum, for the reasons outlined above, Ms. Myres submits that the following Sentencing Guidelines calculation is appropriate in this case:

| | |
|---|---|
| <u>Base Offense Level</u>: | 7 [U.S.S.G. § 2B1.1(a)(1)] |
| <u>Adjustment</u>: | +1 [U.S.S.G. § 2B1.1(b)(1)(A) (intended loss $6,500 or less)] |
| <u>Total Offense Level</u>: | 8 |

Using an offense level of 8 and a criminal history category I, the appropriate Sentencing Guidelines range is 0-6 months, which falls in Zone A of the Sentencing Table, making Ms. Myres's eligible for a sentence of probation.  *See* U.S.S.G. § 5B1.1(a)(1) (authorizing sentence of probation if "the applicable guideline range is in Zone A of the Sentencing Table").

     When this Guidelines range is combined with other mitigating circumstances in this case, including the loss of Ms. Myres's job and the danger to her as a former law enforcement officer if she is remanded into the custody of the Bureau of Prisons, as well as her longstanding charitable work, an application of the factors of Section 3553(a) compels the conclusion that Ms. Myres should be sentenced to probation.  We will submit additional information to you regarding these and other Section 3553(a) factors in the near future.

     Thank you for the time and attention you have already given to this matter, and please let us know if you have any questions.

Regards,

Michael J. Shepard
Attorney for Defendant April Myres

**EXHIBIT 7**

# KING & SPALDING

King & Spalding LLP
101 Second Street
Suite 2300
San Francisco, CA  94105
Tel:  +1 415 318 1200
Fax:  +1 415 318 1300
www.kslaw.com

Michael Shepard
Partner
Direct Dial:  +1 415 318 1221
Direct Fax:  +1 415 318 1300
mshepard@kslaw.com

October 29, 2019

**VIA EMAIL**

Jessica A. Goldsberry
U.S. Probation Officer Specialist
1301 Clay Street, Suite 220S
Oakland, CA 94612-5217

> Re:   **United States v. April Myres**
>        **Case No.: 3:17-CR-00180-RS**

Dear Ms. Goldsberry,

Thank you for taking the time to prepare the Presentence Investigation Report for Ms. Myres.  We appreciate your careful consideration of the information Ms. Myres submitted to you in reaching your conclusions.

Our response is divided into two parts.  First, we object to certain statements in the section of the PSR entitled "The Offense Conduct" that are attributed to government reports.  We do not dispute that this information comes from government reports, but the information is untrue and the sources on which the government relies are untrustworthy.  The PSR therefore should not include that information.  Second, we offer additional comments for your consideration on the sections addressing the "Factors that May Warrant a Sentence Outside of the Advisory Guideline System," the Guideline Caluclations, and the Discussion of a Fine.  Among other things, there are ample reasons for a sentence below the guideline range.

October 29, 2019
Page 2

## I.      Objections to Statements in the Section Entitled "The Offense Conduct"

The PSR contains a substantial amount of information attributed to witnesses that the government did not call at trial: Eduardo Lascala; an unidentifed confidential source who relied on secondhand information from other unreliable individuals; and Antoine Fowler.  All of these sources are totally lacking in credibility, uncorroborated, and contradicted by other evidence. Had the government thought their statements could be defended, they would have presented those statements at trial but the government wisely elected not to do so.  Those statements should not be used against Ms. Myres in the PSR.  Several other statements identified below are also objectionable

First, all of Paragraph 7 of the PSR is based on statements by Lascala, but as noted in our initial letter to you dated October 1, 2019, he is not a trustworthy source.  Paragraph 7 includes Lascala's claim that Fowler told him that Ms. Myres promised Fowler her gun, but when put under oath during a pre-trial deposition Lascala himself eventually disputed this claim.  *See, e.g.,* Lascala Deposition at pp. 50-51 (When asked specifically whether he remembers "if [he] ever had any conversation with him, Mr. Fowler, about the gun," Lascala replies "From what I recall, at this moment, no."); *id*. at p. 52 (When asked whether he (Lascala) had "give[n] [Deputy Kendall] the information about the vacation and the man cave and the gun with the 30-round clip," Lascala replies, "No."); *id.* at pp. 215-218 (admits to not recalling how he knew Ms. Myres was going to give Fowler a gun, and that Ms. Myres never told him that she was going to buy a gun for Fowler).  In any event, the statement Lascala abandoned partway through his deposition makes no sense.  As is reflected by his prior history and by the photos on his phone showing himself with multiple guns, Fowler had ready access to guns and did not need one from Ms. Myres.  Even if he somehow did need one from her, she needed her own gun for work, and could easily have bought him a different one.

Similarly, the PSR's statement about Lascala seeing photos of the gun was also disputed by Lascala himself on at least two separate occasions.  During his December 16, 2015 interview with the FBI, when asked whether "at one point [he] ever s[aw] like a picture of [the Glock] or anything like that," Lascala replied, "No, I didn't see no pictures."  *See* Ex. 1 at p. 22 (Transcript of 12/16/2015 Statement of Eduardo Lascala), which the government neglected to provide you as part of its submission to your Office.  Lascala also could not recall seeing "anything with regard to the gun or clip" during his 2017 deposition, further undercutting the notion that Fowler had photos of the gun Ms. Myres had supposedly promised him.  Lascala Deposition at pp. 49-50.  It also is worth noting that Fowler was in custody for possession/manufacture of an assault weapon, and therefore would have had photos of guns as part of the discovery in his state case.

Lascala's statement that Ms. Myres and Mr. Fowler would "meet privately" at the gym is also not credible: in addition to there being cameras all over the jail facility that would have identified any such conduct, it is unlikely that other guards would allow one unarmed female deputy to be in the gym, by herself, with two male inmates, for an extended period of time.  And,

October 29, 2019
Page 3

there was nothing untoward about Ms. Myres taking Lascala and Fowler to the gym separately from the other inmates because both Lascala and Fowler were in Administration Segregation and not in the general population, and Fowler was a known snitch.

In a similar vein, as revealed during his deposition, Lascala's statement that "Ms. Myres and Mr. Fowler had an intimate relationship while he and Mr. Fowler were cellmates" was, by his own admission, baseless. When asked whether he "s[aw] any physical contact between the two of them" "besides the conversations" Lascala replied, "Physical contact, no." Lascala Deposition at p. 65. When pressed further, Lascala said that while he saw some "brushing of hands," he "never saw them making out or anything like that." *Id.*

In addition to all these facts that render the claims attributed to Lascala unreliable, Lascala had a strong incentive to curry favor with the government to get his federal sentence reduced and to delay his deportation from the United States. *See, e.g., id*. at pp. 236-241 (describing the 12-month sentence reduction Lascala received as a result of the government's § 5K1.1 motion); *id*. at p. 20 (When asked how important it was for him to stay in the United States, Lascala replied "Very important."). He also has suffered from mental health issues, including schizophrenia, bipolar disorder, loss of consciousness and hallucinations, and has periods (big or small) where he cannot remember certain things in his life, even after he is on medication, due to his loss of consciousness diagnosis (and also likely due to his admitted drug use, including methamphetamine). *See, e.g., id.* at pp. 14-17; pp. 81-82 (describing how he does not remember certain crimes he has committed due to loss of consciousness), pp. 120-121 (admits to using methamphetamine after released from immigration custody in San Diego); p. 158 (admits he has had paranoid reactions in the past, including "thinking things are being done that turn[] out not to be accurate"). Lascala also has a lengthy criminal history, including convictions for battery (1999), child endangerment (1999), obstructing a peace officer and battery against a corrections officer (2004), stalking (2006), possessing marijuana, concentrated cannabis (2010), giving a false ID to police officers and battery against a police officer (2011), and felon in possession of a firearm and ammunition and possession of methamphetamine (2015), *see id.* at pp. 28-32, and also admitted to habitually violating his probation or parole. *See id.* at pp. 98-99. Notably, Lascala did not recall several of his convictions (or the facts underlying them) during his deposition, even when confronted directly with them. *See, e.g. id.* at p. 29 (does not remember battery conviction); p. 31 (does not recall 2011 arrest and conviction for giving a false ID to police officers); pp. 106-107 (does not remember that he had a number of domestic violence arrests). He also admitted to lying to the police in the past. *See id.* at p. 109 (When asked, "Have you lied to the police before," Lascala replies, "Sure I have. . . . Nothing I recall.").

October 29, 2019
Page 4

Lascala is as unreliable as they come. None of his information was corroborated, it makes no sense, and the government wisely elected not to offer it at trial. When put under oath, he walked away from the information proffered by the government. That information should not be included in the PSR.

Second, we object to the inclusion of information relayed by a confidential source ("CS"), as reflected in Paragraphs 12 and 15 of the PSR. In addition to the fact that confidential sources are inherently unreliable, the identity of this CS was never confirmed by the government. As a result, Ms. Myres has never had an opportunity to gather information about the reliability of this witness (who, by his/her own admission, was in SFSD custody for three or four months in 2014 related to a murder that was committed by the CS's son), let alone cross-examine him/her. Moreover, the information provided by this CS relies almost exclusively on statements provided by other individuals who, in turn, are relaying information they heard from yet another person, thereby increasing further the unreliabilty of the CS's information. *See* PSR ¶12 (CS describing information s/he got from Ms. Myres's niece J.M. who, in turn, apparently got the information from another individual); ¶ 15 (CS describing information s/he got from his/her son who, in turn, got the information from Fowler).

With respect to the information contained in Paragraph 12, the record contradicts J.M.'s statements to the CS that "Mr. Johnson II [Ms. Myres's son] helped Mr. Fowler with the burglary" and that he "had all of Ms. Myres's jewelry." PSR ¶ 12. As noted in our letter of October 1, 2019, photos and texts from Fowler's phone show that right after the burglary Fowler was texting photos of a number of the stolen items to his sisters, offering those items to them and/or seeking their help in fencing those items. *See, e.g.*, Trial Transcript at 856-864 (testimony from FBI Special Agent Scanlan regarding text messages and photos found on Fowler's phone). Notably, Ms. Myres's son was <u>not</u> one of the people with whom Fowler was texting. In addition, as also proven at trial, approximately one month before the burglary "there was a tussle with Antoine Fowler and her son [at Ms. Myres's house], and the pistol went off and a round went into the floor of the house." Trial Transcript at p. 971. It makes no sense that Ms. Myres's son would do anything for Fowler shortly after Fowler almost shot him, let alone help Fowler rob his mother's house and obtain possession of the very gun with which Fowler almost shot him.

That this uncorroborated, contradicted, third and forth-hand hearsay does not belong in the PSR is confirmed by the fact that at least two of the CS's sources are known to be unreliable. One, J.M., admits to stealing from her own mother. *See* Ex. 2 (FBI 302 of February 2017 interview of J.M.).

Fowler is even worse, making it indefensible for the government to rely on Fowler, as it did in providing the information contained in Paragraphs 15 and 16. Not only does he have a lenghy criminal record, including felony convictions for second degree burglary, identity theft, and possession/manufacture of an assault weapon, but he is a habitual liar – one the government carefully shied away from using at trial. The statement attributed to him in Paragraph 15 about

October 29, 2019
Page 5

having "full access" to Ms. Myres's house is false for the additional reason, as shown by the evidence at trial, that his relationship with Ms. Myres was over before the burglary and he had no lawful access to her house at the time of the burglary.  His post-arrest statement referenced in Paragraph 16 about Ms. Myres is even worse: the government's rescitation of it fails to note that this was at least the third different version of whether and how he got the gun that Fowler offered in the same interview:  he first repeatedly denied that he possessed the gun at all; then he tried to sell the story that she gave the gun to "his people" and he never possessed it; and only after it was found in his car did he offer the story that was proffered by the government and that appears in Paragraph 16.  That story was provided as part of an effort to curry favor with the government and get light treatment for his crimes – a path he has successfully followed in the past.  We also note that if Ms. Myres had in fact paid him $2500 to take her gun as Paragraph 16 suggests – a most unlikely scenario, as noted above, given that he nearly shot her son with it – there would be records of such a withdrawal from her bank account, but the government presented no such record and no such record exists.  Fowler's lies should not be included in the PSR.

We also dispute certain of the statements included in Paragraph 9.  The statement that Ms. Myres "informed the [SFPD] officer there were no saved video clips from March 24, 2016 because she had already deleted the footage" is not a fair description of the evidence.  What the evidence showed was that Ms. Myres had told the police that her Arlo camera was motion activated and "that there was no *video activation* during the time of the incident, but she did state that her locksmith had responded to her residence in the morning of March 24th, 2016, at around 8:00 a.m. and to fix the front gate lock and that she had deleted *that* footage."  *See* Trial Transcript at p. 433 (emphasis added); *id.* 430-433 (additional testimony by SFPD Officer Larsen regarding the positioning of the Arlo camera away from the likely point of entry).  In other words, she only deleted video that, as the evidence showed, could only have shown nothing — making the statement in Paragraph 9 at best useless, and at worst misleading (to the extent it suggests she deleted relevant evidence).  Ms. Myres also objects to the statement that Ms. Myres told the FBI that an "individual named Leonard Colvin was responsible for the theft of her weapon."  As reflected in the report from that interview, while Ms. Myres did tell the FBI about being approached by Colvin's cousin Dale at the courthouse and that she thought the timing of that incident and the theft of her SFSD weapon and vest was suspicious, she never claimed that Colvin was "responsible for the theft."  *See* Ex. 3 (FBI 302 of March and April 2016 interveiws of Ms. Myres).

Finally, Ms. Myres objects to the inclusion of any reference to her lawful refusal to allow the FBI to fingerprint her house.  *See* PSR ¶¶ 9-10.  As the court ruled when it excluded this evidence at trial, Ms. Myres had a constitutional right to refuse the FBI's entry, and it cannot be used as evidence against her.  *See* CR 174 at 3; *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978) ("[P]assive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing.").

October 29, 2019
Page 6

**II.    Proposed Corrections to the Sections Addressing the "Factors that May Warrant a Sentence Outside of the Advisory Guideline System," the Guideline Calculations, and the Discussion of a Fine**

We object to the conclusion in Part F of the PSR that there are no factors that would warrant a sentence outside the applicable advisory guideline range.  First, a custodial sentence would be unusually dangerous for Ms. Myres given her prior work in law enforcement and, more specifically, as a prison guard.  Second, as detailed in our letter of October 9, her relationship with Fowler – complaints about which are at the core of the government's August 8 letter – was the product of an extremely stressful environment at the jail, which was made even more stressful by the presence and conduct at the jail of two of her ex-husbands.  Third, Ms. Myres has already lost her job as a result of the conduct detailed in the government's letter.  Fourth, as will be set forth in more detail in letters from members of the community, both before and after the offense for which she was convicted, Ms. Myres has been a giving and caring member of the community, serving not only her immediate and her extended family, but also many strangers in the community, to whom she has devoted her time and her love in charitable and religious work. She should therefore be sentenced below the guideline range.

For the reasons stated in our letter of October 1, 2019, we believe level 8 is the correct Guideline calculation, but we view the level 9 you propose as a reasonable compromise.

We also take issue with the conclusion that Ms. Myres has the ability to pay a fine.  This conclusion is apparently based on the calculation of a positive monthly cash flow of $2,138.45, but it fails to account for the fact that this positive cash flow is based on using a figure only for the minimum amount she must pay on her credit card debt each month.  A calculation of this sort would mean that her credit card debt would forever be increasing, and would keep adding to the negative net worth, as calculated in the PSR, of negative $372,794.81.  The PSR also notes that Ms. Myres has a college degree and a "solid employment history," but fails to address the fact that Ms. Myres now has a felony conviction for fraud.

One final note.  The cover page of the report states that I am retained.  In fact, I was appointed by the court pursuant to the Criminal Justice Act.

October 29, 2019
Page 7


      Again, thank you very much for the time and attention you have already given to this matter, and please let us know if you have any questions.


                                              Respectfully submitted,


                                              Michael J. Shepard
                                              Attorney for Defendant April Myres

# EXHIBIT 8

| 1067 | Sent | **To**<br>+█████4686<br>April* | 3/24/2016<br>7:19:53 AM(UTC-7) | | | Sent | My mom will be to get my shit today but u need to come over here so we can talk<br><br>**Source Extraction:** Physical | Yes |



DEFENDANT'S EXHIBIT 1081

# EXHIBIT 9

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 9-A | Letter from Lisette Adams |
| 9-B | Letter from Gerald Boddie |
| 9-C | Letter from Kelly Davis |
| 9-D | Letter from David and Thelma Dozier |
| 9-E | Letter from Diane Dozier |
| 9-F | Letter from Kim Gordon |
| 9-G | Letter from David and Lisa Hasson |
| 9-H | Letter from Robert Jamison |
| 9-I | Letter from Carmen Pia Jenkins |
| 9-J | Letter from Nicole Jenkins |
| 9-K | Letter from Konya Johnson |
| 9-L | Letter from Martha Joseph |
| 9-M | Letter from James E. Latimer |
| 9-N | Letter from Ingrid Little |
| 9-O | Letter from Aaron James Moses |
| 9-P | Letter from Annie Moses |
| 9-Q | Letter from Gwendolyn Moses |
| 9-R | Letter from Beverly Myres |
| 9-S | Letter from Marcel Myres |
| 9-T | Letter from Marlin Norman |
| 9-U | Letter from Marques Rounds |
| 9-V | Letter from Anthony and Carol Williams |

# EXHIBIT 9-A

November 11, 2019

Dear Judge Seeborg,

I have known April Myres for about 20 years. I initially meet her when we were both employees of the San Francisco Sheriff's Department. We started as co-workers and she offered assistance and guidance when I was a newly assigned supervisor. She helped me as I navigated my way through my new rank and assignment. April could be relied on to work extended hours and self-identify tasks and assignments that needed to be done with little oversight.

Over the years I saw that she often assisted new staff offering training, guidance and support. She did this in ways that increased their confidence and job knowledge.  I have heard many staff talk about her ability to deescalate tense and potentially violent situations.

April treated everyone with respect and understanding whether they be inmates, staff or the public. She would take the time to counsel inmates that were struggling with separation from their families. I saw the patience that she would give to the public who needed assistance. She would go take the extra steps to not only provide information to the public but do what she can to ensure that hey understood it and was provided information on how to follow-up.

I have also seen her weather the stresses of the job and being a single mother. I would hear her talking to her sons on extended shifts making sure homework was done, a healthy dinner was eaten and checking in on the events of the day. Her work ethic, commitment to family and friends and respect of the public made her someone that I consider a friend.

I hope that these qualities will be considered in her sentencing and she be given another chance to be reengage with society in a productive way.

Thank you for your time.

Lisette Adams

# EXHIBIT 9-B

Judge Seeborg

I've been given the oppertunity to express my honest opion on April Myres which I gladly accepted because of the tremendous change I've seen from her in putting on a christian personality. I've known April for about (my guess) fifteen years. When I first met her she had just started her work to change her life, but I can honestly say that what I now see is a difference of night and day. Something that appreciate is her expressions of regret over some of the decisions she has made in her own words it was a terrible mistake, and as I observed her facial expression she truly meant it. April has shifted her focus on helping her neighbor and this is why I am so very proud of her.

Sincerely Gerald Boddie

# EXHIBIT 9-C

Kelly Davis


October 19, 2019

Judge R. Seeborg
U.S. District Judge for Northern District of CA

Dear Judge Seeborg,

This letter is to express my support for April Myres. April is my Aunt. We were raised more like sisters, rather than Aunt and Niece, due to us being only 3 years apart in age. So I feel that I know April pretty well. She is a good and kind hearted person who doesn't do anything to intentionally hurt another. Your Honor, because we are all imperfect, we at times make mistakes and poor decisions. Some intentional and some not intentional. I sincerely believe the mistakes April has made were not intentional, nor meant to hurt anyone.

April has dedicated her life to helping others. She has before this incident (her arrest) and continues after to this day in volunteering her time and energy on a weekly basis to helping people to learn about the Bible. She takes her bible study very seriously. I know this because although we don't live in the same State, we have regular discussions through phone calls and text messages. Our communication always includes discussions about bible research/study, attending our weekly meetings at the Kingdom Hall of Jehovah's Witnesses, seeking out sincere ones through field ministry work several times a week, attending our annual Assemblies and Conventions and relying on our God, Jehovah through frequent prayer.

Judge Seeborg, if you could please find it in your heart to consider probation and/or community service rather than prison time for April's sentencing.

Thank you in advance for your consideration in this matter.

Sincerely yours,

Kelly Davis

# EXHIBIT 9-D

November 12, 2019


The Hon. Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 - 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Seeborg,

     This letter is written in support of April Myers. Ms. Myers is a kind, caring individual. She frequently helps others in our congregation; she is especially attentive to young persons. She is a warm and generous individual. I can personally say that she has helped me. I have been suffering from lack of mobility due to recent knee surgery, however, April has been checking on me, encouraging me to ice, elevate, exercise and continue my therapy. With her encouragement and help, I have been doing better. She is a friend and a caring one at that.

     My husband, David Dozier, has also benefited from April's abilities and gifts. As one in charge of a large number of people in the Kingdom Hall of Jehovah's Witnesses, she has been instrumental in helping to organize safety procedure drills and exercises which are helping to make the members safer.

     I have known April Myres for approximately 10 or so years; personally I have known her family for over 30 years. During the years I have known her, she has always been helpful. Because of her background in law enforcement, I asked for April's help with regard to security. While I expected a few ideas, she put together an entire security program for us, which we have implemented. I regularly see her in the field ministry and also at the regular scheduled meetings. She is at these times, always eager and willing to offer more assistance, if it is needed.

     Sincerely,


     David and Thelma Dozier

# EXHIBIT 9-E

November 12, 2019

The Hon. Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 - 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Seeborg,

My name is Diane Dozier I have known April Myres since high school (1979). I can vouch for April. She has been a person of morals and integrity over the time we have known each other. I can further state that April has been immensely dedicated to her family, friends, and work. April is also a loving person towards everyone. She has been known to be helpful and loving and kind with everyone in our Christian congregation and us much loved by all.

My profession a Homecare provider. I can be reached at ██████████.

Best regards,

Diane Dozier

# EXHIBIT 9-F

October 25, 2019


The Hon. Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 - 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102


Dear Judge Seeborg,

My name is Kim Gordon. I'm a father of four sons, father in-law to three of their wives and have six grandchildren. I've known April Myres since she was about 13 and I'm very good friends with her family and was a dear friend to her now deceased mother. I'm writing this letter as a personal choice to speak to the character of April as I've come to know. April has always been a very studious person going back to grade school which resulted positively into very few problems for her mother. That quality is one I saw and came to appreciate and still do appreciate today, especially being a father myself. I also appreciate her hard-working ethics. Prior to the Sheriff's Department she has always been a hard worker and when she started working for the Sheriff's Department I noticed she thoroughly enjoyed it. So much so, that she did quite a bit of overtime to provide for herself and primarily her two sons who I also have had the privilege of having a great influence on in their lives. The oldest of which is the Best Friend of my youngest.

April has always been a fine person and someone that I've I spent time with along with my family and someone we all enjoy being around as is the case for most people that I've seen meet and spend time with her. April has done much in the community with volunteer work and I know she enjoys working with young children and has done an excellent job with her grandson who I'm very proud of. I've seen her spend much time with him as well as other young ones working to ensure that she's assisting as best she can, to help them do as well as possible in school. Even to the point of inviting me to check and assist with them if and when there was some tension or areas I could be of support and help her in mentoring these young ones being a father myself.  Having observed April's commitment, diligence and growth as a young person myself along with having the privilege of being able to raise my own sons, these opportunities were ones I was delighted to take advantage of along with her. Even to the point of picking up her then two school age boys from school or home and taking them on family outings when she needed to work or just to give her some additional support as a single parent trying to raise kids in the inner city.

The Hon. Judge Seeborg
October 25, 2019
Page 2

Hard to encapsulate the positive appreciation I have for April in a letter, but I do thank you for allowing me a few words to share my view and feelings regarding April Myres. While my words, those in the community and associates that truly know her past and present I'm confident would echo my sentiments about her character and have good positive words to say regarding April, her work ethic and just the way she carries herself.

Sincerely,

Kim Gordon

# EXHIBIT 9-G

October 25, 2019

Honorable Judge Richard Seeborg
District Judge
United States District Court
Northern District of California

**April Myres**

The purpose of this letter is to provide a character reference for Ms. April Myres whom both my wife Lisa and I have known as a professional and friend for the past 25+ years.

Although we are unfamiliar with the facts of this case, due to our lengthy and long-standing friendship with April, we believe we can offer a level assessment of her character as a professional person and family friend.

As a professional person, April is reliable and dedicated to serving the needs of the people in her community while upholding her responsibilities as a Deputy Sherriff. Though a bit introverted, she is a people person and is always courteous and impartial in her dealings with others. April was a conscientious, hard-working public servant that loved her job and dutifully carried out all her duties. Her ability to remain alert at all times and react quickly and calmly during an emergency only added to her motivation to be successful in her vocation.

One reference work describes a true friend as a person who sticks closer than a brother/sister, is constant in his/her loyalty and friendliness, comes to the aid of their companion in times of misery or pain, and gives advice that is factual and genuine. We find this explanation aptly describes April Myres as a true friend. She is a funny and loving individual that has a knack of putting you at ease and making you laugh, which is an invaluable attribute.

A devoted companion and confidant at all times. Whenever called upon, April has always been there for us and helped us when we needed it. The world could certainly use more trusting, truthful people like April Myres.

Respectfully,

Donald & Lisa Hasson

**EXHIBIT 9-H**

23 October, 2019

To:     Honorable Richard Seeborg
        United States District Court
        450 Golden Gate Ave.
        San Francisco, CA; 94102

April Myres

I am writing this letter to provide a character reference for Ms. April Myres whom I've known as a friend for approximately five to six years.

I first met April shortly after I relocated to San Francisco in 2012, at the Kingdom Hall of Jehovah's Witnesses.  We've worshipped together and shared in public ministry, going door to door sharing messages from God's Word and helping those that we came in contact with grasp a better understanding of the Bible.

Over the years and since moving away from the San Francisco area, our friendship has grown, even through the more recent troubled times.  I have found April to be a compassionate and caring person, who shares those qualities to both those she knows and don't know.

Sincerely,

Robert Jamison

# EXHIBIT 9-I

10/26/2019

The Honorable Judge Richard Seeborg

U.S. District Court for the Northern District of California

450 Golden Gate Avenue

San Francisco, CA 94102

From: Carmen Pia Jenkins



Dear Judge Richard Seeborg, it is a pleasure and great honor to write to you on behalf of Ms. April Myres.

I am a female native of San Francisco for 60 years now, I am of German and African American descent, I have personally known April for over 30 years, along with her entire family.

April has always taken great pride in working for the San Francisco Sheriff's Department, as a Deputy Sheriff, as well as her two siblings have been employed in the law enforcement field, her oldest sister is now retired from the Superior Court of San Francisco County, and her middle sister worked as a Private Investigator in San Francisco for over 20 years.

April is a very confident and strong woman, she has single handedly raise two sons, with your experience as a Judge you may have had a chance to see raising African American Men in this day and age is not an easy task, but she has done it, she works hard at everything she does, and she expects nothing less from herself and her sons. April is kind and giving, she has assisted my husband and I with our own youngest daughter who is now 31 years old and respects April for her love and guidance.

April has never asked anyone for a hand out, she has always provided for her own household because of being a hard worker, she has spent many overtime hours helping the judicial system because of them being understaffed, she took care of her family at home while working hard for her former employer for many years. She is a very stable person who has served the communities in San Francisco for many years. Even with everything going on currently in her life she is still volunteering in the community in which we live, I personally find her example outstanding to follow.

Your Honor if you ever have a chance to sit down with April and talk to her, you will see she is as beautiful inside as she is out, being we are all imperfect, she deserves a chance to prove herself by remaining here in our community where she is well respected and known.

Your Honor her life is now in your hands, please consider all the good she has done, and may she remain in her volunteer work serving my community here in the Bayview Hunters Point, we need hard workers such as APRIL MYRES.

*Respectfully Yours,*

Carmen Pia Jenkins

# EXHIBIT 9-J

October 23, 2019

The Hon. Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 - 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Richard Seeborg,

I hope this letter finds you well.

I know that April Myres is coming up on her sentencing next month so I wanted to tell you about the April that I have come to know and love.

I have known April pretty much my entire life and have grown up close with her oldest Son and entire family. Even though we are different ages over the years I have come to view April as a mentor. We see and hang out with one another almost every week and have come to be great friends even like family. I am in my early 30's trying to navigate through life and find my way while taking care of my nephew which whom I've been responsible for since birth, now going on 2 1/2 years old.

With all these things I am experiencing in life it's great to have a friend like April to be able to talk to. We have great conversations about life and life's experiences and I know if I ever need anything she will have my back. April in my eyes is a hard worker who has always maintained a good job and worked hard to provide for her two boys as a single mother to give them the best life possible. She is also a very generous person always willing to give to others and has a strong love for god. She has many qualities that I admire in a person and is very strong.

Our interactions have been nothing but positive, encouraging and upbuilding.

Thank you for your time.

Sincerely,

Nicole Jenkins

# EXHIBIT 9-K

Honorable Richard Seeborg
San Francisco Courthouse, Courtroom 3 – 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

November 1, 2019

Dear Judge Seeborg,

My name is Konya Johnson and I am writing you to express my support for April Myres, my aunt.
I have known April for 50+ years. Even though April is my aunt, we grew up more like sisters being that
we are close in age. April went on family vacations with us. She and my sister went to school together.
We even help teach people the bible together, even now.

April is a generous person. One example of her generosity was when my husband of 12 years up and left
me with no warning in 2007. I had no transportation and drivers license so I had to depend on public
transportation. Going shopping on the bus is cumbersome, difficult and a nuisance. However, my aunt
would generously pick me up and take me grocery shopping with her. I even tried to reimburse her for
the gas, but she would never accept it.

I understand that April was found guilty. However, I humbly beg that you show leniency toward my
aunts sentencing. We are all human and we all make mistakes. Whether we make mistakes today,
yesterday, last year or 20 years ago, we all ask for forgiveness.

Again, I humbly beg you from the bottom of my heart to please show leniency to April.

Thank you for taking time to read my letter.

Sincerely,
Konya Johnson

# EXHIBIT 9-L

November 8, 2019

The Hon. Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 - 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Seeborg,

My name is Martha Joseph, I am one of the Christian Witnesses of Jehovah. I met April as we attended the same congregation of Jehovah's Witnesses 18 yrs ago. We got to know each other while attending meetings together and participating in the Field Ministry. I became friends with her over time as I observed her dedication and mutual love for Jehovah God and our neighbors. April has proven to be a delight to be around, a good friend because of not hesitating to give her honest opinion if asked. Known for her quiet strong faithfulness, April is very real and considerate. I am proud to have her as a friend that keeps her word and expects the same from you. She's helped me mature into a stronger woman unafraid of facing a challenge, working against the odds to success; nothing less is acceptable.

I've seen April stand on a decision well thought out and gladly share the formula for her successfully navigating through where others failed. She is a real friend, not the kind that smiles today and tomorrow doesn't want you around. If you need her, she'll help if she can and I believe in and have come to trust her in any situation to have my best interest in mind. She volunteers to help, in all types of weather, neighbors she doesn't know, to learn how to benefit from the instructions she has proven by use, work. These instructions and her way of life follow the principles, admonitions and warnings found in the bible. A Christian Witness dedicated to happily serve and obey our Heavenly Father Jehovah. April is not just my dear friend and spiritual sister, that friendship and familial tie is connected to over 9 million around the globe that also call April Myers, sister and friend.

Sincerely,

Martha Joseph

# EXHIBIT 9-M

# LAW OFFICE OF
# JAMES E. LATIMER
# & ASSOCIATES

James E. Latimer*
Cory M. Stephens*

1970 Broadway, Suite 450
Oakland, CA 94612
510.444.6555 - Telephone
510.444.5355 - Facsimile

*Certified Specialist, Workers' Compensation Law
The State Bar of California Board of Legal Specialization

11/1/19

Honorable Richard Seeborg
San Francisco Courthouse, Courtroom 3-17th floor
450 Golden Gate Ave
San Francisco, CA, 94102

Re:     April Myres

Dear Judge Seeborg:

My name is James Latimer.  I am an attorney based in Oakland, CA, and my law firm, the Law
Office of James E. Latimer and Associates, specializes in Workers' Compensation law.
I have known April Myers for just over twenty years; I met her at the dedication of her Kingdom
Hall in San Francisco.  I know her to be an industrious, hardworking, and caring woman who is
community-minded. She has worked hard, contributing greatly to both her church and her
family.

I understand that April has been convicted of mail fraud and wire fraud.  I believe that an
extended prison term will serve as a tremendous and unnecessary hardship for her and the
community that relies on her for dedicated service every month.  A more reasonable approach
with a person like April would be to place her on six month probation.

Thank you for your courtesy in this regard.

Respectfully,

James E. Latimer
Attorney at Law

**EXHIBIT 9-N**

4-5-19

Ingrid Little

CR17-00180 RS
USA V. Myres

Department of Justice
U.S. Attorney's office Northern California Dist.
Honorable Richard Seeborg, U.S. District Judge
450 Golden Gate Ave. S.F. Ca. 94102
Court Room 3 4th Floor

Re: April Myres Case

Your Honor Seeborg!

I am writing this letter on behalf
of April Myres, whom I met in the
'70's. I moved into her mother's
residence, while April was a minor
in 1980. I shared a room with
April whom I found to be warm,
quiet/shy, funny/silly, and a
bit scary.

I moved out got married and
so did she after some time. We
were reacquainted about 5 years
ago.

I felt compelled to write to you, because I believe April's character depicted by the District Attorney's office is incorrect. She too was one of the officers she was convicted of putting at risk.

During the incident at hand, April was working 12 hour days, 6 days a week, for 18 months. I believe fatigue caused a lapse in judgement. Perhaps even viewing her surroundings as family. My phone calls for association with her, were met with no time for recreation/entertainment.

Finally, April Myres and many of her siblings have more than 100 years of respectable public service linked to law enforcement. A loved profession.

Sincerely,

Ingrid Little

P.S. The Myres family is not aware of this letter

Sigrid Leslie

RECEIVED

2019 SEP -9  A 10: 40

SUSAN Y. SOONG
CLERK, US DISTRICT COURT
NO. DIST. OF CA.

Registrant of Jackson
U. S. Attorney's Office - Northern California Dist.
Honorable Richard Seeborg, U.S. Dist. Judge
450 Golden Gate Avenue, Courtbox 34 (36-38),
San Francisco, Ca. 94102

OAKLAND CA 945

05 SEP 2019 PM 4 L

USA

OFFICE OF THE CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CALIFORNIA 94102

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

Pls. Submit this letter
with your sent. memo.
When it is time to file it.
Any questions, please let
me know. Thank you,
Counselor

Michael Shepard
King & Spalding
101 2nd Street
Ste 2300
S.F. CA 94105-3664

# EXHIBIT 9-O

Honorable Richard Seeborg
San Francisco Courthouse, Courtroom 3 - 17th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

November 3, 2019

Dear Judge Seeborg:

By way of introduction, my name is Aaron Moses and I am the nephew of April Myres. I am a director
with the Bill & Melinda Gates Foundation and reside in Redmond, Washington. The purpose of this
letter is to articulate my support for my aunt as you consider the upcoming sentencing of her case later
this month.

How would I best describe my relationship with April? Well, it's not the typical nephew-aunt
relationship. She has in fact been one of my best friends my entire life. She took on the role of the eldest
sibling for myself and my two sisters since we are all so close in age. For example, when April bought her
first car it was like I had my first car, which I had access to pretty much any time I wanted. When I got
married, she accepted my wife as part of the family and treated her as such without any wavering.
When my wife needed a highly critical surgery, April was there with us when my wife was checked in for
the procedure and stayed until she was resting comfortably. I'm sharing these details because I'm
certain you have been bombarded with narratives during the trial that paints April in a different light.

In my introduction, I intentionally stated that I work for the Bill & Melinda Gates Foundation (BMGF).
One of the reasons that I uprooted my life in San Francisco and relocated to the Pacific Northwest to
work for BMGF was because of their core belief that "All Lives Have Equal Value". The most fundamental
explanation of this belief is that a person's ethnicity, gender, place of birth, etc., should not have a
bearing on the quality of life that each person deserves. Unfortunately, we live in a world where that is
not the case. There are a ton of factors that play a significant role in the quality of life that each human
has. Some of these are within a person's control, but there are so many that are not. Lots of things
happen in our lives that shape how we act, think, love, listen and forgive, and it is my hope that you take
all of this into consideration when making the sentencing decision.

Please know that I'm not naive nor blind to the fact that mistakes were made. It is also not lost on me
the weighty responsibility that you have in this situation. My sincere prayer is that when you consider all
that is before you, that you don't lose sight of that fact that April is an "imperfect human", as we all are.
She is also a daughter, sister, mother, aunt, grandmother and most importantly...a friend. One that is
dearly loved and has the capability and capacity to show and receive love from others.

Thank you for taking the time to read my letter. If you have any questions about any of my statements,
please feel free to contact me directly. I can be reached at ███████████.

Sincerely,

Aaron James Moses

**EXHIBIT 9-P**

November 4, 19

Honorable Richard Seeborg
San Francisco Courthouse, Courtroom 3-17th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Honorable Judge Seeborg,

My name is Annie Moses, I am married to the nephew of April Myres (Aaron Moses). I have known April for over 25 years. She has always occupied a secret place in my heart due to her uncanny way of making the unpopular, geeky, older, slightly mental, sickly, not so attractive, and lowly person in the room feel like they matter.

I say this because when I started dating her nephew I was in poor health. He looked passed all of my health issues, and because of that April did as well. April's ability to look past the surface was so endearing. As the years went on I realized this was the treatment everyone received. She is a true believer that one must not freeze an individual in time. Everyone makes poor decisions, in such an instance, this is not the totality of the individual. April always takes the time to forge through the layers of an individual to find out about all facets of their being.

Honesty dictates that I also acknowledge this fact as well. On the surface April may come across as having a hard exterior, and a rather dismissive demeanor. I can honestly say these qualities serve as a protective wall. She's a deep thinker, and she is more fragile than many realize. We've had many spiritual conversations and she often mentions what frightens her most is not knowing if she's ruined her relationship with God. She understands that no matter what is decided in this matter, she still must face her final heavenly judge. I remind her that his arm of mercy is longer than any of us realize.

When April stands before you it is my hope that you not just see her in the light of the evidence and testimony before you, but also see her in God's light which truly penetrates through the "secret person of the heart", which represents who we *really* are, and in doing so you find a contrite and abashed soul at your mercy.

Sincerely,

Annie Moses

# EXHIBIT 9-Q

Honorable Judge Seeborg:

I am writing to you in behalf of April Myres. I am a native San Franciscan who has recently relocated in the state of Washington. As her older sister I remember when she was born and I actually was the one who brought her and our mother home from the hospital. She was only a year old when I got married and has been like an older sister to my children. I feel she has recently made some excellent contributions to her community and because of these different acts of kindness that she has displayed voluntarily shows she cares deeply for people; young individuals as well as for those who are advanced in years. For example, I was notified of a special kindness to a friend of mine who had surgery and could not get around very well and was in need of some help. April, not having personal transportation at the time, took the bus over to help her.

Another incident was someone needing some place to live because their residence was unavailable because of mold in the the walls that was making them sick. And my little sister provided a place in her home. Persons who have been in need because of loss of employment, she has also donate her needed food. I can also recall how she even worked overtime to be able to help someone in dire distress.

I pray that these examples of kindness are taken into consideration, whereas, she will be allowed to continue in this precious service that many will be able to benefit and most of all to learn from.

I thank you in advance for your time and consideration

Sincerely,
Gwendolyn Messia

**EXHIBIT 9-R**

Beverly B. Myres



Honorable Judge Richard Seeborg
San Francisco Courthouse Courtroom 3 – 17th Floor
San Francisco, CA 94102

Re:  April Myres

Honorable Judge Seeborg:

My name is Beverly Myres and I am the sister of the above referenced defendant, April Myres. Thank you for allowing me this opportunity to tell you about my sister.  I was eleven years old when April was born and we have always maintained a close relationship.  She was taught from early childhood to have a humble view of herself and to treat others with dignity and respect.

April is a good person with a big heart.  She is sensitive to the needs of others, especially to the elderly and children.  Several years ago, after working sixteen hours straight April turned into her driveway around 11:30p.m. and saw one of her elderly neighbors walking around looking frightened and disoriented.  April took the woman home only to find the front door open and no one was home.  April called the police department to report the situation but they did not come to the residence.   April was able to locate the woman's grandson in San Carlos, CA.  The grandson did not have transportation to come to his grandmother's home.  April sent her son to San Carlos to pick up the grandson and waited with the grandmother until the grandson arrived.

April is a constant supporter of those in need.  She always encourages those who are downhearted and depressed.  One such person was a former female inmate on the 6th floor at 850 Bryant St. After serving her sentence, she walked up to April and thanked her for the encouragement and respect she was given.  She told April that she now has her own apartment, custody of her children, and a new career.

It is my belief that any prison sentence would do more harm to April's spirit and to our community.

Thank you for your consideration in this regard.

Respectfully,


Beverly Myres

# EXHIBIT 9-S

November 7, 2019

Honorable Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 – 17th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

Dear Judge Seeborg

I am April's older brother. I have seen many lifelong aspects of April's personality. I have always found her to be extremely kind, dependable and well regarded among our Family and her friends.

I am writing this letter hoping it will help you see what type of person my sister is, despite the mistakes that led us all to this point. The mistakes committed by April should not be the only factor you look at in this case. I hope you will also consider her over all interactions with our Family, her friends and the community as a whole.

I can tell you without a doubt she is very remorseful for what has occurred. She has expressed this to me many times and I believe with the support of our Family and April's friends, she will be able to move forward and lead a meaningful and productive life.

Marcel Myres

Marcel Myres

Thank you very much

**EXHIBIT 9-T**

Marlin Norman

November 11, 2019

The Hon. Judge Richard Seeborg
San Francisco Courthouse
Courtroom 3 - 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Seeborg,

I'm writing this letter on behalf of April Myres. I understand April is in trouble with the law and while I may not be able to speak to the details of her case I am able to speak to April being a good person.

I've known April for 20+ years. She and her sister Beverly Myres are like extended family members to me. We're all Jehovah's Witnesses and we regularly go out on weekends together and express our love and appreciation for God and his purpose for the earth to our community and everyone we come into contact with. Doing this kind of work is not easy. It requires time and dedication and we don't receive any money or special credits for doing it. April does it because she wants to help people find true happiness, which we believe is made possible by following advice from God, which is written in the bible.

April has also been an advocate for the younger and older ones in the congregation we attend. She takes the initiative to get recreational activities set up so we can enjoy a positive outlet with good association. Year after year I've witnessed and have been encouraged by April's selfless attitude towards her family, friends, community and others.

None of us on this earth are perfect. Many of us are trying to improve our lives and do our best every day. April is definitely one of the good examples, she deserves to be recognized for her contributions towards trying to help people and make the world a better place. She's had a positive impact on my life and the lives of others. This is something I want you and others who might read this letter to know and consider while judging her.

.

Sincerely,

Marlin Norman

# EXHIBIT 9-U

To: Judge Richard Seeborg,

I would first like to thank you for the opportunity for Ms. April Myres's friends and family to share our thoughts and impressions April has left on us through the years.

It surely saddens me that April is in this adverse position in her life being that I've only know April to be a kind hearted integrity keeper. I've known her to be sensitive to the shortcomings of others and to be empathetic to help when the opportunity presents itself. She's also a peaceful person who prides herself on avoiding unnecessary conflicts. I've shared lots of laughs with April through the years and I find that she's a person who is easy to get along with and a loving person in our congregation.

It's unfortunate that I have to write this letter under these circumstances Judge Seeborg. I know the court has found April Myres guilty of the crime that she has been charged with and it still is unbelievable to us all. She has been a stand-up citizen all her life and has been a cognitive part of our congregation through the years. Please find it in your heart to have mercy on Ms. Myres for she may have committed a crime but she's no criminal.

Thank you for taking the time to listen to my heartfelt expressions,

Sincerely,

Marques A. Rounds

# EXHIBIT 9-V

**Anthony & Carol Williams**



November 11, 2019

Honorable Judge Richard Seeborg
District Judge
United States District Court
Northern District of California

Re: April Myres

The purpose of this letter is to provide a character reference for Ms. April Myres.

My husband and I have known Ms. Myres for approximately 15 years as a friend and professional. She has displayed exemplary qualities in her professional life as a Deputy Sherriff as well as a personal friend.

As a member of the church she has always displayed a warm and loving attitude. She is always quick to assist those in need. Many of the young people are drawn to her because she takes a personal interest in them. She has proven to be a positive role model for them because she takes the time to listen to them and give them good advice. Her background in the criminal justice system affords her the opportunity to share valuable life lessons with them. She also takes time and has untiring patience with the elderly and assists them in whatever manner they may need. She is a true Christian.

As a friend Ms. Myres is a true gem and die-hard person. As the old saying states she would give you the shirt off her back. She is willing to go that extra mile to help you accomplish your goal or be there when you just need a friend. Her warmth and generosity are immeasurable. Her honesty permeates throughout every aspect of her life. We are proud to have her in our lives.

April Myres is an outstanding person and a hardworking civil servant who takes great pride in her work.

Sincerely,

Anthony and Carol Williams

# EXHIBIT 10

Honorable Judge Seaborg,

There are no words to express my sorrow and shame. The disastrous results of my bad associations and choices have greatly impacted my family, friends, fellow deputies, and for this I am truly sorry. As a child and throughout my adolescence my mother would often recite 1 Corinthians 15:33, which says, "Do not be misled. Bad associations spoil useful habits." Unfortunetly, I disregarded this sound counsel as an adult, and now faced with lifelong consequences I have no one to blame but myself. I allowed my treacherous heart to justify a wrong course.

# EXHIBIT 11
# (DOCUMENT FILED SEAL)

# EXHIBIT 12
# (DOCUMENT FILED SEAL)

# EXHIBIT 13

# KING & SPALDING

King & Spalding LLP
101 Second Street
Suite 2300
San Francisco, CA  94105
Tel:  +1 415 318 1200
Fax:  +1 415 318 1300
www.kslaw.com

Michael Shepard
Partner
Direct Dial:  +1 415 318 1221
Direct Fax:  +1 415 318 1300
mshepard@kslaw.com

October 31, 2019

**VIA EMAIL**

Jessica A. Goldsberry
U.S. Probation Officer Specialist
1301 Clay Street, Suite 220S
Oakland, CA 94612-5217

      **Re:**     **United States v. April Myres.**
                **Case No.: 3:17-CR-00180-RS**

**Response by Defendant April Myres to the Prosecution's "Response to the Proposed Presentence Investigation Report"**

Dear Ms. Goldsberry,

      The prosecution's "Response to the Proposed Presentence Investigation Report" ("Response") reaches its nadir when it accuses Ms. Myres of having "clearly abused" her position as a Deputy Sheriff when she "hugged a classmate from the police academy" who responded to the burglary at her home.  This over-the-top demonization of Ms. Myres runs through the entire response, which is filled with information that is uncorroborated and unreliable, rants about the evidence that bear no relation to the guideline standards (and that completely disregard the standards laid out weeks ago by Ms. Myres), and flip-flops that demonstrate that the prosecution has no consistent theory of what happened.

      We have therefore taken the liberty of providing this reply, in order to demonstrate that the draft Presentence Investigation Report (PSR) was correct on the issues challenged by the

October 31, 2019
Page 2

prosecution. This reply addresses the Response's "objections in page order" and, in so doing, answers the Response's hyperbolic claims about the PSR disregarding the jury's verdict and about how "public corruption is a scourge."

**Objection 1:** The prosecution asks that the PSR include more statements from Lascala. For the reasons stated in our letter of October 29, the PSR should include less from Lascala, not more. He is completely untrustworthy, he has backed off the very statements that the prosecution keeps trying to attribute to him, and the prosecutors were not willing to put him on the stand at trial. Hearsay may be permissible at sentencing, but only when it has sufficient indicia of reliability to support its probable accuracy. *See* U.S.S.G. § 6A1.3(a). All the indicia about Lascala is that he is totally unreliable.

Next, the prosecution compounds the unreliability by asking that the PSR include a statement from Lascala that is based on a statement by Fowler – someone who may be even more unreliable than Lascala. According to Lascala, *Fowler* said that Ms. Myres would get him her Glock pistol with a 30-round magazine. No one says that *Ms. Myres* ever said anything like this, and despite literally hundreds of hours of jail calls between Ms. Myres and Fowler, there is no such statement – nothing about her Glock, and nothing about any 30-round magazine. The Glock is standard issue at the SFSD, so Fowler would not need any discussion with Ms. Myres to be talking about it. Nor is there any evidence connecting a 30-round magazine to Ms. Myres, and the photos on Fowler's phone leave no doubt that he could obtain weapons and ammunition on his own. The most reasonable interpretation is that, if Fowler said this to Lascala, he was puffing about something he wanted or hoped would happen.

But even if the prosecution had proof that Ms. Myres had in fact told Fowler she would give him her Glock, it would not advance the argument the prosecution seeks to make. The evidence at trial established that Ms. Myres continued to possess her Glock because she needed it to work her overtime jobs as a bailiff. During that time, Fowler nearly shot her son with the Glock, which would only add to her reasons not to give the gun to Fowler. Then they broke up. Fowler also was supposedly promised a trip to Hawaii, but the prosecution uncovered no evidence that such a trip ever occurred. If anything, this situation would establish Fowler's motive to steal the gun, having supposedly been promised it, and not having received it (or his trip to Hawaii). In light of the other facts established at trial, in no way does it suggest that it is more likely than not that Ms. Myres gave him her gun.

The other shot taken by the prosecution in this Objection is a suggestion that there was some intimate relationship between Ms. Myres and Fowler while he was in custody. As we noted in our October 29 letter, this is based on an uncorroborated statement from Lascala, but he has backed away from it. *See, e.g.*, Lascala Deposition at p. 65 (When asked whether he "s[aw] any physical contact between the two of them" "besides the conversations" Lascala replied, "Physical contact, no."). Worse still for the prosecution, even Fowler, despite his effort to curry

October 31, 2019
Page 3

favor with the prosecution, also denies it.  *See* Fowler's post-arrest interview.  As a result, there is no basis for including any of Lascala's statements in the PSR.

**Objection 2**: The prosecution asks that the PSR include an additional statement from a Confidential Source (CS).  As with Lascala, there should be less, not more, from the CS.  The CS's sources are unreliable and have motives to lie.  There is nothing to corroborate anything said by the CS or the sources.  There is no detail that would allow Ms. Myres any opportunity to rebut the claim that she committed a different insurance fraud.  This is precisely the sort of information that should get nowhere near a courtroom under any circumstances.  *See, e.g., United States v. Ortiz*, 993 F.2d 204, 208 (10th Cir. 1993) (sentence clearly erroneous when it relied on uncorroborated out-of-court statement of confidential informant).

**Objection 3**:  In this objection the prosecution seeks to correct a statement by Fowler, in which he did not get his facts right.  Ms. Myres agrees that Fowler's statement is inaccurate, and has no objection to the prosecution's request that the Probation Office change the paragraph, as long as it notes that Fowler's recitation needed correction.

**Objections 4 and 5:**  These two lengthy and related objections overstate the jury's verdict, misstate the evidence, and twist the concept of "intended loss" beyond recognition.

According to the prosecution's objection, Ms. Myres intended to deceive SFSD in violation of "federal law as found by the jury."  This is one of several examples of the prosecution overstating the verdict, and is flat wrong.  The jury convicted Ms. Myres of defrauding Farmers.  The only charge relating to law enforcement was Count Four, on which she was acquitted.  The prosecution adds that the supposed attempt to deceive SFSD was in violation of unspecified internal regulations and an unspecified state statute, but the Crime Victim Rights Act, which the prosecution cites in its letter, defines a victim as "a person directly and proximately harmed as a result of the commission of a *federal* offense."  18 U.S.C. § 3771(e)(2)(A) (emphasis added).  The prosecution's attempt to make SFSD a victim therefore fails.

Also contrary to the prosecution's objection, Ms. Myres's contention that Fowler burgled her house and stole many items is not inconsistent with the jury's verdict.  First, as a legal matter, Ms. Myres could be convicted on Counts One and Two if the jury found that she lied about a single item on her claim form.  Second, the unrebutted evidence showed that Fowler possessed a number of the stolen possessions immediately after the burglary, and that he was texting about them with many people but not with Ms. Myres.  Third, as noted in our letter of October 1, and as the prosecution did not dispute, the jurors told us and the FBI that they believed Fowler burgled her home, but in convicting her on Counts One and Two they focused on the three items that were on her claim form but found in her home when the FBI searched it.  Far from rejecting Ms. Myres's contention as the prosecution curiously asserts, the jurors accepted it.

October 31, 2019
Page 4

The prosecution then devotes more than two pages, *see* pp. 6-7 of its Response, to an argument that the draft PSR does not understand the "basic functioning of an insurance policy," and that, once that misunderstanding is corrected, even if Ms. Myres was the victim of a burglary, the "intended loss" for sentencing is the full value of Ms. Myres's claim, $67,046.78. Put differently, the prosecution offers the startling proposition that, even if Ms. Myres was the victim of a burglary with losses of $57,473.41 (the difference between the total value of the claim, $67,046.78 and the value of the three personal items found in the search and the gun and other work related items, $9,573.37), she should be found to have intended to defraud Farmers of $67,046.78 when she filed her claim. This is based on an elaborate legal interpretation of several provisions of the boilerplate in her insurance policy.

As a sentencing argument, this is nonsense. It ignores the accepted interpretation of "intended loss" under the guidelines, which defines "intended loss" as "the pecuniary harm that the defendant *purposely* sought to inflict." U.S.S.G. § 2B1.1, Application Note 3(A)(ii) (emphasis added); *see also United States v. Manatau,* 647 F.3d 1048 (10th Cir. 2011) (holding that intended loss requires an inquiry into the defendant's subjective state mind, and is limited to the loss that the defendant "purposely sought to inflict"). Regardless of whether the prosecution's interpretation of the insurance policy is correct, "intended loss" is based on the defendant's "actual intent," as opposed to some legal interpretation of her "constructive intent." *United States v. Henderson,* 19 F.3d 917, 928 (5th Cir. 1994). Ms. Myres did not have "actual intent" to defraud Farmers out of $67,046.78 when she had a valid claim for a substantial loss.

The remainder of this objection consists of the prosecution's attempt to argue that Fowler did not commit the burglary. This is a remarkable turnaround from its position at trial, when it acknowledged the evidence suggesting that Fowler committed a revenge burglary, and even in its August 8 letter to you, in which it said that the Court need not decide this issue. Given the weakness of its position, the prosecution was right to stay away from this dispute before, and is wrong now.

To start its argument, the prosecution blithely suggests that Fowler didn't commit the burglary because he denied doing so. For all the reasons we have noted in our prior letters and will not repeat here, Fowler cannot be believed. All that needs to be added here is how disingenuous it is for the prosecution to call everything Ms. Myres says self-serving and not acknowledge for even a passing second that this might be true of Fowler.

No better is the other supposed evidence cited by the prosecution in support of the prosecution's contention that the claimed items were not stolen from her home. Before addressing the specific items argued by the prosecution, it is worth noting that if the prosecution actually had any convincing evidence that Ms. Myres gave Fowler her gun or was "in on the so-called burglary," it would have presented it at trial because that evidence would have been the best way to prove the misprison charge. It did not because there was no such evidence, and its one try to gin some up -- its reference to the "it's about to start" text -- blew up in its face as

October 31, 2019
Page 5

detailed in our October 1 letter.  Even now, when trying to suggest there was no burglary, the prosecution does not get fully behind any theory as to how Fowler ended up with Ms. Myres's gun if he did not take it in the burglary.

Unable to acknowledge the unrebutted evidence introduced at trial, the prosecution falsely attempts to dismiss what was found on Fowler's phone as "selling a couple of pairs of shoes."  In fact, the evidence of Ms. Myres's possessions that were on Fowler's phone right after the burglary were not only shoes but also a YSL large-grain chain purse, Trial Transcript pp. 853-56, a YSL lipstick print wallet, *id*., and a Versace purse, *id*. at pp. 859-860.  *See also* Ex. 1 (Defense Trial Ex. 1013.7).  Even these photos do not necessarily tell the whole story: Fowler also was texting his sister to ask her to "help me sale [sic] *all this stuff*" (emphasis added).  *See* Ex. 2 (Defense Trial Ex. No. 1013.1).  What is especially notable about these texts and photos -- and what the prosecution has never been able to address -- is that all the texts about the stolen items were primarily with Fowler's sisters, and none of them were with Ms. Myres or her son.  In fact, despite all kinds of surveillance, and despite gathering their phones, the prosecution had no evidence that Ms. Myres and Fowler had any contact of any kind after they broke up shortly before the burglary.  There is no evidence that they jointly participated in the sale of any of the stolen items, and no evidence that they jointly received a dime from the proceeds.  Given that Fowler was openly texting with those who were "in on the burglary" – his sisters, among others – the absence of any contact with Ms. Myres puts the lie to the notion that she was somehow "in on the burglary."  The same is true of her son, who was an unlikely partner in crime with Fowler in light of the fact that Fowler had nearly shot him a month earlier.

Not only is there no credible evidence that Ms. Myres was "in on the burglary" and gave Fowler her gun, but such a theory makes no sense.  Fowler had just nearly shot her son with that gun; Fowler had access to his own guns; and Ms. Myres needed her gun for her job.  *See* October 1 letter at 4.

The prosecution's reference to Lascala's statements on p. 5 of its Response is useless for the reasons stated above; the same is true of its references to the CS and to one of her sources, J.M.  They are unreliable and uncorroborated.  Even more curious is the prosecution's statement that "it makes no sense" that Ms. Myres "would predict that Fowler would steal her firearm."  She made no such prediction, and no one ever attributed such a prediction to her.

The remaining points made by the prosecution on p. 6 of its Response are recycled and do not address the evidence and responses previously offered by Ms. Myres.  Ms. Myres bought a safe for her gun at a time of increased focus in San Francisco on the theft of guns from law enforcement officers; no adverse inference should be drawn from this safety-conscious act, and there is no doubt that if she had not bought a safe the prosecution would be saying that she was at fault for not doing so.  The evidence showed that she left her house before the burglary because, as had been the case for several days at that time, she was staying at her sister's house after she had been threatened by Leonard Colvin.  The protests that law enforcement could have solved

October 31, 2019
Page 6

the burglary had they only been told that Fowler had been living at Ms. Myres's house defies credulity in light of the fact that law enforcement had followed Fowler to Ms. Myres's house and knew of their relationship.

**Objection 6:**  Given that the prosecution carefully avoids responding to it, we need not repeat the explanations and context previously offered for the conduct cited in this objection. Even more importantly, our October 1 letter set forth the law governing this objection, as outlined in the Sentencing Guidelines.  The prosecution ignores that law because it cannot satisfy it.  The Response lists a series of acts in which Ms. Myres allegedly engaged that it deems to be a "clear abuse" of her position of trust, but it does not even try to say that any of them "significantly facilitated the commission or concealment of the offense" of conviction, as the abuse of trust enhancement on its face requires.  None of the acts listed by the prosecution in the Response come close to "substantially facilitating" the offense.  In lieu of even a whiff of such evidence, the prosecution ramps up its rhetoric, going so far as to declare that "public corruption is a scourge," that Ms. Myres's hugging an old friend during a difficult day is a "clear abuse" of her position, and that Ms. Myres's wearing her uniform to an insurance company interview was "public corruption so corrosive" that it "should be vigorously stamped out," even though the insurance company and the investigator already knew she was a Deputy Sheriff, the interview was scheduled right after the end of Ms. Myres's work shift, and she arrived directly from work.

Rather than respond in kind to this overblown rhetoric, we respectfully submit that hugging a friend, faxing from the office when one's home fax is broken, and rushing to an interview from one's job while still in uniform, not only did not "substantially facilitate" any offense but also fall short of qualifying as a "scourge of public corruption."  In any event, all have reasonable explanations, as we have noted in our prior letters -- which the prosecution has never even attempted to answer.

**Objection 7:**  The prosecution's quibble with what defines "shortly after he was released" and who broke up with whom is symptomatic of its entire approach to this case.  Ms. Myres has never disputed that she had a relationship with Fowler after he was released, or that that relationship continued until shortly before the burglary, *i.e.*, for just over two months. Whether a two-month period qualifies as "shortly after he was released" in the eyes of the prosecution is meaningless.  As is the prosecution's interpretation of text messages that it did not identify that supposedly "*suggest* that Mr. Fowler ended the relationship, not Ms. Myres."  The last text between the two leaves little doubt that she broke up with him.  *See* Ex. 3 (Defense Trial Ex. 1081, where Fowler texts Ms. Myres on March 24, 2016, the day before the burglary: "My Mom will be to get my shit today but u need to come over here so we can talk.").

**Objection 8:**  The prosecution disputes Beverly Myres's statement that her sister didn't need to commit a fraud to get money; the objection is based solely on financial information provided three and a half years after the burglary.  For the vast bulk of that three-and-a-half year period, Ms. Myres was unemployed, having lost her job and was no longer a Deputy Sheriff

October 31, 2019
Page 7

(despite the prosecution's insistence on writing as if she still holds the position). As a result, the financial information she supplied in 2019 says nothing about her financial position in 2016. This objection is baseless.

Equally baseless is the prosecution's challenge to Beverly Myres's statement describing her siblings as "very close." The evidence showed that they were: Ms. Myres stayed frequently at her sister's home around the time of the burglary, and she lives with her sister now. The fact that she did not know at the time of Ms. Myres's relationship with Fowler merely confirms, as the PSR suggests elsewhere, that Ms. Myres made a mistake in entering that relationship, borne of being in an extremely stressful environment at the time, and felt badly enough about it that she did not mention it to her sister until after the fact. In any event, the "very close" language in paragraph 46 of the PSR to which the prosecution objects was offered in a financial context – it was offered to explain that if Ms. Myres had needed money, she could easily have obtained it from her family. Nothing about her relationship with Fowler in any way undermines that explanation.

For all these reasons, and the ones submitted by Ms. Myres previously, Ms. Myres submits that the draft PSR was correct on the issues challenged by the prosecution in its Response, and that the Guidelines calculations reflected in the draft PSR should not be revised. Despite all the prosecution's rhetoric and its failed effort to prove a bigger case, all it has is a small insurance fraud. The PSR more than sufficiently sets forth the prosecution's case in its current form.

Again, thank you very much for the time and attention you have already given to this matter, and please let us know if you have any questions.

Respectfully submitted,

Michael J. Shepard

Attorney for Defendant April Myres