1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MICHAEL J. SHEPARD (State Bar No. 91281)
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, California 94105
Telephone:     (415) 318-1221
Facsimile:      (415) 318-1300
Email:           mshepard@kslaw.com

JAMIE A. LANG (State Bar No. 253769)
KING & SPALDING LLP
633 W. Fifth Street, Suite 1600
Los Angeles, CA  90071
Telephone:     (213) 443-4325
Facsimile:      (213) 443-4310
Email:           jlang@kslaw.com

Attorneys for Defendant
APRIL DIANE MYRES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

APRIL DIANE MYRES,

    Defendant.

Case No.:  3:17-CR-00180-RS

**DEFENDANT APRIL MYRES'S
REPLY TO GOVERNMENT'S
SENTENCING MEMORANDUM**

Judge:   Hon. Richard Seeborg

Hearing Date:   11/19/19 at 2:30 p.m.

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................- 1 -

II. THE PROSECUTION'S ATTEMPTS TO ENHANCE MS. MYRES'S
    SENTENCE AND SEEK JAIL TIME ARE ALL BASELESS ........................- 2 -

    A.  Ms. Myres Did Not Engage In a Scheme to Hide that Fowler Had Her
        Firearm ................................................................................- 3 -

        1.  The Statements on which the Prosecution Bases Its Argument
            Are Embarrassingly Unreliable................................................- 3 -

        2.  The Notion That Ms. Myres Knew That Only Fowler Could
            Have Burgled Her House is Nonsense.........................................- 5 -

        3.  The Prosecution's Inability to Prove This Supposed Scheme
            Puts The Lie To Much of its Overblown Rhetoric .......................- 7 -

    B.  Ms. Myres Did Not Abuse A Position of Trust That "Significantly
        Facilitated The Commission or Concealment of the Offense" Under
        Section 3B1.3 ..........................................................................- 8 -

        1.  Hugging, Faxing, and Wearing A Uniform on the Way Home
            From Work Do Not "Significantly Facilitate" the Offense, and
            the Cases the Prosecution Cites Take Its Argument Backward,
            Not Forward ..........................................................................- 9 -

        2.  The Other Conduct of Which the Prosecution Complains Is
            Irrelevant to the Abuse of Trust Enhancement ............................- 10 -

    C.  The Prosecution's Sentencing Memorandum Contains Other Errors......- 12 -

III. GIVEN THE MAGNITUDE OF THE INCREASES FROM THE
     "INTENDED LOSS" CALCULATION AND THE ABUSE OF TRUST
     ENHANCEMENT, ADDITIONAL PROTECTIONS SHOULD BE
     TRIGGERED .................................................................................- 13 -

IV. CONCLUSION................................................................................- 16 -

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Crawford v. Washington*,
  541 U.S. 36 (2004)......................................................................................14, 15

*United States v. Adams*,
  2006 WL 229904 (E.D.N.Y. Jan. 31, 2006) (unpublished) ......................................12

*United States v. Cross*,
  121 F.3d 234 (6th Cir. 1997)......................................................................................11

*United States v. Duran*,
  15 F.3d 131 (9th Cir, 1994)......................................................................................11

*United States v. Foreman*,
  926 F.2d 792 (9th Cir. 1990)......................................................................................9, 10

*United States v. Garrison*,
  133 F.3d 831 (11th Cir. 1998)......................................................................................12

*United States v. Hopper*,
  177 F.3d 824 (9th Cir. 1999)......................................................................................13

*United States v. Jordan*,
  256 F.3d 922 (9th Cir. 2001)......................................................................................14

*United States v. Ragland*,
  72 F.3d 500 (6th Cir. 1996)......................................................................................12

*United States v. Reddick*,
  34 F.3d 1067 (9th Cir. 1994)......................................................................................10

*United States v. Spear*,
  491 F.3d 1150 (10th Cir. 2007)......................................................................................12

*United States v. Sykes*,
  7 F.3d 1331 (7th Cir. 1993)......................................................................................11

**Statutes**

18 U.S.C. § 3553(a) ......................................................................................2

U.S.S.G. § 3B1.3......................................................................................1, 8, 12

U.S.S.G. § 6A1.3(a) ......................................................................................14

**Other Authorities**

Sixth Amendment ................................................................................................................12, 14

Bill of Rights..........................................................................................................................14

https://www.justice.gov/usao-cdca/pr/ex-la-county-sheriff-s-deputy-sentenced-
    one-year-federal-prison-lying-fbi-part-cover...........................................................16

https://www.justice.gov/usao-cdca/pr/former-la-county-sheriff-lee-baca-sentence-
    3-years-federal-prison-leading-scheme.......................................................................15

https://www.justice.gov/usao-cdca/pr/six-current-and-former-los-angeles-sheriff-s-
    deputies-sentenced-federal-prison; https://www.fbi.gov/contact-us/field-
    offices/losangeles/news/press-releases/seventh-los-angeles-sheriffs-deputy-
    guilty-of-obstructing-justice-for-interfering-with-civil-rights-investigation-
    sentenced-to-prison ....................................................................................................15

Shaakirrah R. Sanders, *Making the Right Call for Confrontation at Felony
    Sentencing*, 47 U. MICH. J. L. REFORM 791 (2014).............................................14

DEFENDANT MYRES'S REPLY TO GOVT. SENTENCING MEMORANDUM
Case No. 3:17-CR-00180-RS

## I.    INTRODUCTION

Reading the prosecution's sentencing memorandum triggers memories of a moment in L. Frank Baum's classic children's novel, *The Wonderful Wizard of Oz.*  That moment is when Dorothy's dog Toto trips over a screen to reveal that the Wizard, previously believed to be the source of grand pronouncements and abilities, turns out to be an ordinary man.  The prosecution's Sentencing Memorandum repeatedly tosses around grand accusations like "corruption," "giv[ing] no thought whatsoever to what the risks of arming Mr. Fowler were to public safety," and seeking to gain "from the same conduct that led her firearm to be on the streets in the hands of a convicted felon."  Gov. Sent. Memo ("GSM") at 2, 4.  But when the proverbial screen is flattened, these grand statements are unsupported: the claimed "corruption" relevant to this sentencing turns out to be hugs and faxes, the claimed "arming" of Fowler turns out to rest on facts that the prosecution expressly refuses to defend, and whatever factual support that is offered depends on the statements of scoundrels that the prosecution was too embarrassed (and too afraid of the rigors of cross examination) to call at trial.

Lacking credible support and depending on assumptions that the prosecution cannot justify or defend, the prosecution's overwritten, grandiose statements seeking enhanced punishment not only fail to get near even a preponderance of the evidence standard, but they have even less legal support.  The prosecution's guideline discussion cannot bring itself even to acknowledge the language in Section 3B1.3 that defeats its abuse of trust enhancement, just as the PSR does not address the definition of "intended loss" in the guidelines that shows that the $67,000 loss figure cannot be correct.

This is not to say that Ms. Myres is without fault.  She has acknowledged making mistakes and, without seeking to excuse them, placed them in the mitigating context in which they arose.  But once the screen has been flattened, none of those mistakes come close to a justification for taking a small and unsuccessful insurance fraud -- one that would not have been prosecuted in federal court at all absent the disproven and largely abandoned allegation that she gave her gun to a felon – into an offense worth jail time, let alone anything close to the sentence proposed in the PSR, or the even more draconian proposal in the prosecution's Sentencing

1   Memorandum.  That the prosecution makes so many overblown claims with so much pejorative

2   language should encourage the Court to look behind the screen, rather than to give the

3   prosecution something for its vehement and repetitive efforts to drive up the sentence.

4          An equally critical error in the prosecution's Sentencing Memorandum is its unwillingness

5   to accept that there is anything mitigating about Ms. Myres and her circumstances under 18

6   U.S.C. § 3553(a).  It is not mitigating to the prosecution that Ms. Myres has been a hard-working

7   and caring single mother.  Her longstanding volunteering to benefit others, and the compassion

8   with which she has treated neighbors and members of her community, is also not mitigating to the

9   prosecution.  Nor is the fact that among all the stressful and challenging tasks for prison guards,

10  Ms. Myres for twenty years was the Deputy who would take on extra work and shifts, while

11  finding time to mentor other guards and counsel inmates.  For the prosecution, her lack of

12  criminal history is not mitigating either; the prosecution also does not care that the mistakes she

13  made occurred during a period in which she was under extreme stress, not only at the jail but also

14  outside work.

15         Rather, the prosecution would dismiss all these measures of a good person with another

16  line of overblown rhetoric:  a statement that "the insurance fraud was an attempt to gain

17  financially from her own corrupt conduct."  GSM at 9.  That this unjustified linking of

18  "corruption" to an insurance claim that followed an actual burglary at her home is the best the

19  prosecution can do to wipe away a lifetime of care and compassion for others leaves no doubt that

20  mitigating factors substantially outweigh the prosecution's claims, and counsel in favor of a non-

21  custodial sentence.

22  **II.    THE PROSECUTION'S ATTEMPTS TO ENHANCE MS. MYRES'S SENTENCE
            AND SEEK JAIL TIME ARE ALL BASELESS**
23

24         Stripped of most of the rhetoric, the prosecution appears to offer two main arguments to

25  justify its draconian recommendation of 24 months of incarceration: first, that Ms. Myres engaged

26  in a "scheme to hide that her felon ex-boyfriend had her service firearm," GSM at 2; *see also id.*

27  at 2-4, and second that Ms. Myres "abused [her] position in committing her crimes." *Id*. at 5; *see*

28  *also id*. at 4-7.  Both arguments are baseless.

### A.    Ms. Myres Did Not Engage In a Scheme to Hide that Fowler Had Her Firearm

Ms. Myres did not know that Fowler had her firearm.  He stole it without her knowledge. The jury acquitted her of misprision of a felony, the central element of which was that she knew he had her firearm.  The prosecution's claim to the contrary is wrong many times over, and should not be a part of this sentencing.

First, for the reasons explained at pages 37-41 of Ms. Myres's Sentencing Memorandum, even if it is permissible to rely on acquitted conduct, the Court should not do so in light of the constitutional and jurisprudential considerations opposed to the use of acquitted conduct.  Second, each part of the prosecution's evidence that Ms. Myres engaged in a "scheme to hide that her felon ex-boyfriend had her service firearm," GSM at 2, is vacuous.

### 1.    The Statements on which the Prosecution Bases Its Argument Are Embarrassingly Unreliable

In large part, the prosecution relies on statements from Fowler, *see* GSM at 3:13-14, whose comedic series of lies on the subject were set forth in Ms. Myres's Sentencing Memorandum. What is not funny about Fowler's repeated lies on the subject of how and when he got the gun is the prosecution's decision, despite his total lack of credibility, to rely on one statement from Fowler's interview that it finds helpful.  Even more deadly serious is the prosecution's election to proffer this statement, first to the USPO and now to the Court, without mentioning all the other lies he told about the gun and the burglary.  *See* Ms. Myres's Sentencing Memorandum at 18-20.  The prosecution was too afraid to call Fowler (and Lascala) at trial and expose them to the rigors of cross-examination.  That Fowler is now a featured portion of the prosecution's argument speaks volumes to how little evidence of this supposed scheme that the prosecution possesses.

Attempting to bolster Fowler's non-existent credibility, the prosecution claims that Lascala had previously reported "that Deputy Myres intended to give her firearm with a 30 round 'clip' in it to Mr. Fowler upon his release from custody."  GSM at 3, n.1.  Leaving aside all of

1   Lascala's credibility issues described in Ms. Myres's Sentencing Memorandum, this is hopelessly

2   inaccurate and does not advance the prosecution's theory.

3       First, Lascala never claimed that *Ms. Myres* intended anything.  He spoke only of what

4   Fowler had claimed.  Not only is Fowler demonstrably a serial liar, but as described in Ms.

5   Myres's Sentencing Memorandum, if Fowler made such a statement to Lascala, he most likely

6   was expressing what he wanted or was hoping for, as opposed to reporting anything Ms. Myres

7   said.  Tellingly, Fowler also supposedly claimed to Lascala that he would be traveling to Hawaii

8   with Ms. Myres, but that never happened -- it was more false bragging by Fowler.

9       Second, according to the prosecution's rendition of Lascala's report, the firearm was to be

10   given to Fowler "upon his release from custody," *id.* -- which would make sense given that the

11   supposed rationale for the gift was that he needed the gun for his protection and that he would

12   need it immediately upon his release given his history as a snitch.  But the evidence at trial

13   conclusively established that Fowler did *not* get the gun upon his release from custody; instead, it

14   showed that Ms. Myres needed her gun to work overtime as a courtroom bailiff, which she

15   continued to do after Fowler's release.

16       Third, despite ample evidence of purchases by Ms. Myres, and despite subpoenas by the

17   prosecution to stores where she purchased equipment, there is nothing to show that Ms. Myres

18   ever purchased a 30-round clip or possessed one, let alone that she gave one to Fowler.  Rather,

19   the evidence leaves no doubt that Fowler had his own plentiful sources of guns and ammunition.

20   *See* Ex. 3 to Ms. Myres's Sent. Mem. (photos extracted from Fowler's phone).

21       Fourth, none of the hundreds of hours of recordings of conversations between Ms. Myres

22   and Fowler say anything about a gun.

23       Finally, if Lascala can be believed, he did report one statement from Fowler, a statement

24   not based on some supposed unreliable attribution to Ms. Myres but rather on Fowler's own

25   plans, and a statement that explained exactly what happened in this case: according to Lascala,

26   Fowler told him that "if she breaks up with me I'm going to her house I know where she lives. I

27   know everything. . . ." Ex. 2 to Ms. Myres's Sent. Mem. (Transcript of 12/16/2015 Statement of

28   Eduardo Lascala) at 16.  In other words, and unbeknownst to Ms. Myres (but well known to the

prosecution), Fowler allegedly promised to go to her house after a breakup and commit unspecified acts of retaliation -- like the burglary he later committed.  For all the reasons set forth here, this is by far the most likely explanation of how Fowler ended up with Ms. Myres's gun.[1]

### 2.    The Notion That Ms. Myres Knew That Only Fowler Could Have Burgled Her House is Nonsense

As an alternative, the prosecution baldly asserts that Ms. Myres must have known that Fowler was the burglar who stole her gun because anything else "is inconsistent with the . . . jury verdict" and "defies common sense" in light of the fact that she and Fowler had just had a dramatic fight.  GSM at 3.  This is myopic nonsense.

First, the jury *acquitted* Ms. Myres of concealing knowledge that Fowler had her gun.  It is the prosecution's argument that is flatly inconsistent with the jury's verdict.

Second, the night before the burglary was hardly the first fight between Ms. Myres and Fowler.  There were many other fights, and the one on March 23, 2016 was hardly the most dramatic.  For example, it pales in comparison to the one on February 26, 2016, where a gun was drawn and a shot was fired -- the one that nearly hit Ms. Myres's son.  Yet none of those fights had caused Fowler to burgle her house or steal her gun.

Third, the prosecution curiously and repeatedly contends that Ms. Myres had somehow abused the public trust even after Fowler had paid his debt to society by continuing to have a (now fully consensual) relationship with him after his release.  No support is offered for this contention, and in any event the contention does not help the prosecution's argument.  The prosecution criticizes the relationship because it supposedly gave Fowler access to Ms. Myres's gun -- effectively a claim by the prosecution that Fowler had easy access to the gun for months but did not take it (as is established by Ms. Myres's continued use of it at work).  If the prosecution is correct in this claim, it would further suggest to Ms. Myres that Fowler would *not*

---

[1] The points made in the text are not intended to be a complete catalogue of all that is wrong with the prosecution's claim. For example, as noted in Ms. Myres's Sentencing Memorandum, even if Ms. Myres wanted Fowler to have a gun, there would be no reason to promise him her service revolver, which she needed for work.  And any interest she could ever have had in providing a gun to Fowler would have dissolved when he nearly shot her son with her service revolver on February 26, 2016.

be a prime suspect in the burglary because he could have easily taken the gun if he actually

needed it (which he did not, as shown by the evidence on his phone).

Fourth, the notion that Ms. Myres must have known that Fowler was the burglar flies in

the face of the fact that there are a lot of burglaries in San Francisco, and, as a result, quite a few

potential burglars:  San Francisco police statistics show 468 burglaries or attempted burglaries in

the city in March, 2016 alone.  *See* Ex. 1 (SFPD COMPSTAT_March 2016).

Fifth, neighbors who were interviewed by the police were aware that people were

obtaining access to Ms. Myres's backyard through the route of entry described by the defense at

the trial.  If neighbors knew it, and if friends of Ms. Myres's son Aaron knew it, then the list of

potential opportunistic burglars grows exponentially.

Finally, if the theory is that someone recently bearing a grudge could be the only possible

suspect -- despite the fact that burglaries happen frequently, particularly when there is opportunity

--  that list would still not be limited to Fowler.  It would include the man who threatened Ms.

Myres earlier that same month, and it would include Leonard Colvin, the man who initiated that

threat.  For a prison guard, the list of those with a grudge -- recently released inmates, family

members of inmates, and their friends -- is probably quite a lot longer.

For all these reasons, the notion Ms. Myres must have known right after the burglary that

of all the people in the world, only one -- Fowler -- was definitively the burglar is a complete

flop, borne only out of hindsight and myopia.[2]  In reality, it was not until over a year later, after

the FBI recovered and produced to Ms. Myres the evidence from Fowler's phone (showing him a

day after the burglary in possession of items stolen from Ms. Myres's home) that Ms. Myres

knew Fowler was the burglar.

While Ms. Myres believes that the weight of the evidence firmly establishes that she was

the victim of a burglary, and, as her acquittal on Count Four suggests, that she did not know that

---

[2] In a fit of backwards reasoning from the erroneous assumption that Ms. Myres had to know that only Fowler could
have been the burglar, the prosecution claims that "the best evidence of her knowledge are [sic] her repeated lies and
omissions designed to hide Mr. Fowler's presence in her life and his access to her home and firearm."  GSM at 4.
This reasoning does not help the prosecution's argument one iota, because Ms. Myres knew – as Sergeant Ambat
made clear – that if she admitted she had a relationship with Fowler, she would be fired.  This fact, and not the
disproven assumption that she knew Fowler had her gun, explains what she said.

1   Fowler had her gun after the burglary, in case the Court has any doubt, we ask it consider Part III

2   below.  There we argue that clear and convincing evidence should be required, and confrontation

3   rights should be respected, on pivotal claimed enhancements that multiply a sentence and that are

4   based on sketchy second and third-hand evidence; this would be true even if those enhancement

5   did not run counter to a jury verdict as they would here (in light of the misprision acquittal). But

6   no matter what standard of proof or process the Court determines to be correct for this case, at

7   worst for Ms. Myres in light of the poor quality of evidence, the Court should say that it cannot

8   accept any version as more likely than not, and that it should not find that the prosecution

9   established anything about the proposed burglary or enhancements as being more likely than not.

10              **3.      The Prosecution's Inability to Prove This Supposed Scheme Puts The
                          Lie To Much of its Overblown Rhetoric**

11

12         This evidence puts a lie to much of the over-the-top accusations in the Sentencing

13   Memorandum.  It shows that the prosecution is flat wrong when it accuses Ms. Myres of

14   "giv[ing] no thought whatsoever to what the risks of arming Mr. Fowler were to public safety,"

15   GSM at 4 -- a statement that not only is wrong because she did not know he had her gun, but also

16   because even the prosecution elsewhere walks away from contending that she actually "armed"

17   Fowler.  Nor did she seek to gain "from the same conduct that led her firearm to be on the streets

18   in the hands of a convicted felon," *id*.; instead, Fowler stole her gun, as the prosecution elsewhere

19   avoids contesting.  See *id*. at 3 (prosecution claims that the court "does not need to resolve any

20   factual dispute regarding how Mr. Fowler came into possession of Deputy Myres's firearm for

21   sentencing purposes.").  Similarly, the prosecution accuses her of seeking reimbursement for "a

22   long list of items that she cannot account for given her fraudulent scheme," *id*. at 4, but those

23   items were in fact stolen from her home; the prosecution avoids contesting this fact because it

24   lacks the evidence to do so and, although it never so acknowledges, its own telephone evidence

25   demonstrates it.  Likewise, Ms. Myres did not "allow[] her service firearm to remain on the

26   streets of the Bay Area held by a dangerous felon," *id*. at 2, or, in an even more hyperbolic

27   characterization, that she was responsible for a "pervasive and long standing undermining of the

28   public trust and endangerment of public safety," *id*. at 3, because Fowler possessed the gun from

1    March 25, 2016 until February, 2017.  These accusations are wrong because Fowler stole her gun

2    without her knowledge, and, in any event, the FBI knew about Fowler from the start.  *See* Trial

3    Tr. at 926:7-8.

4         **B.    Ms. Myres Did Not Abuse A Position of Trust That "Significantly Facilitated
              The Commission or Concealment of the Offense" Under Section 3B1.3**
5

6         The lesson from the prosecution's Sentencing Memorandum is that once the public

7    corruption squad investigates a case, it will remain a public corruption case – even if the jury

8    rejected the most relevant count, even if it requires the prosecution to call a hug or a fax an abuse

9    of public trust, even if the Probation Office rejects the application of the abuse of trust

10   enhancement to this case, and even if the Sentencing Commission itself agrees with the Probation

11   Office.[3]

12        What is striking about the prosecution's request for an abuse of trust enhancement is that

13   it cannot bring itself to even mention the portion of the guideline that renders the enhancement

14   unavailable in this case: the requirement in Section 3B1.3 that the alleged abuse of a position of

15   public trust must have "significantly facilitated the commission or concealment of the offense."

16   U.S.S.G. § 3B1.3.  It is not as if the fact that this guideline language is disqualifying escaped the

17   prosecution's attention:  Ms. Myres so argued to the USPO, with copies to the prosecution, and

18   the PSR cites to it as the sole reason that it did not add the abuse of trust enhancement.

19        The prosecution does not mention this portion of the guideline because it cannot satisfy it.

20   Instead, it misstates the law, asserting that "the only question as to the applicability of U.S.S.G. §

21   3B1.3 is whether Deputy Myres abused that position in committing her crimes."  GSM at 5.  Not

22   so.  To trigger the enhancement, the prosecution must show much more than something like

23   hugging (even if the hugging was more than an act of friendship and reflected poor judgment or

24   even constituted, as the prosecution asserts, an abuse of public trust).  Rather, the supposed

25   hugging or abuse of trust must have "significantly facilitated the commission or concealment of

26   the offense," U.S.S.G. § 3B1.3, and there is no argument that it did so.

27   _____

28   [3] Ms. Myres notes that when the USPO went against the prosecution on the abuse of trust enhancement, it ran its
     decision past the sentencing commission, but when it reversed field from the draft PSR to the final PSR on "intended
     loss," it did not do so.

1.   **Hugging, Faxing, and Wearing A Uniform on the Way Home From Work Do Not "Significantly Facilitate" the Offense, and the Cases the Prosecution Cites Take Its Argument Backward, Not Forward**

Consistent with its unwillingness to acknowledge the existence of the "significant facilitation" requirement, the prosecution relies on *United States v. Foreman*, 926 F.2d 792 (9th Cir. 1990), devoting almost a page of its seven and a half pages of briefing to the case, which it says addresses "the functional equivalent" to the conduct of Ms. Myres.  GSM at 7:9.  But *Foreman* is not functional or equivalent.  In *Foreman*, the defendant, an off-duty Wellston Missouri police officer was running through LAX with a substantial amount of cocaine when law enforcement officers asked to speak with her.  She showed the officers her badge, said she was an active sworn police officer, denied carrying drugs and attempted to keep going -- using her position as a police officer to dissuade the investigating officers from stopping her while she was in possession of drugs.

It is easy to see that in *Foreman*, the officer's use of her badge would have allowed her a free pass -- the ability to walk right past the police, without them having any opportunity to detect that she was carrying drugs.  Compare that to the prosecution's list of "corruption" in this case, which actually includes Ms. Myres giving a hug to one of the police officers who responded to the burglary at her house, an officer she knew from training many years earlier.  The hugs, faxes and other conduct in the prosecution's Sentencing Memorandum are easily explained – unlike the flashing of a badge -- as part of normal human interaction, particularly from someone who was just the victim of a burglary, and who was under time pressures to submit a claim.  *See, e.g.,* Gov. Exs. 43-48 (multiple letters from Farmers requesting additional information).  And none of them would result in a guaranteed pass with no scrutiny.[4]  Only by trying to pretend the word

---

[4] To bolster the notion that a hug could somehow constitute an abuse of trust, the prosecution's Sentencing Memorandum asserts that after the hug at the scene of the burglary, Ms. Myres "later called that same police officer to complain about her treatment by the investigating sergeant *in an attempt to get the sergeant removed*" (emphasis added).  GSM at 6:3-6.  This was a conversation between friends with no hint of "badging," and would not be an abuse of trust even if the prosecution's description of the conversation were accurate, but the prosecution's carefully phrased rendition is misleading.  As Officer Kellogg testified at trial, he was a "port in the storm" for Ms. Myres, Trial Tr. at 338:22-23, who was "pretty shaken up" when he saw her after the burglary, so he gave her his cellphone number.  *Id.* at 337:10-14.  When she was upset and called, *id.* at 337:21-24, it was Kellogg who suggested that Ms. Myres call the station and ask for a different sergeant.  *Id.* at 337:25-338:4.

DEFENDANT MYRES'S REPLY TO GOVT. SENTENCING MEMORANDUM
Case No. 3:17-CR-00180-RS

"significantly" right out of existence can the prosecution suggest that *Foreman* says anything about this case.

The other case cited by the prosecution, *United States v. Reddick*, 34 F.3d 1067 (9th Cir. 1994) is even less helpful.  In that case, a police officer who was part of a drug distribution conspiracy used her police car and uniform to conduct a traffic stop and threaten a person who stole drugs from a member of the conspiracy.   Unlike Ms. Myres's hugs and faxes, this was core corrupt conduct that furthered a criminal conspiracy.

Nothing in the remainder of the prosecution's list of supposed horrible abuses of trust is materially better for its argument, and some of the list is even worse.  In addition to the hugging, the prosecution also cites two other acts:  Ms. Myres sending documents to Farmers via her work fax when her home fax was not working, and Ms. Myres wearing her work uniform to an interrogation by Farmers, which was scheduled for right after work.  No attempt is made to establish that either of these acts significantly facilitated the mail or wire fraud, or that they are more like an officer flashing a badge to bypass a search than they are like hugging an old friend; rather, the prosecution merely seems to cite them as acts it believes Ms. Myres should not have done.  Attempting to bolster the faxing as an abuse of trust, the prosecution adds that "there was no requirement that she use a fax cover sheet on letterhead to submit her claim," GSM at 7, but whether or not there was such a requirement has no impact on whether the conduct significantly facilitated the crime.  Regardless of whether a cover sheet is required, it is general practice to use one, designed not for criminal purposes but to make sure the fax gets to the intended recipient.

The Probation Office and the Sentencing Commission made the only conceivable call in denying this enhancement.  It may be that everyday conduct by public employees should be given more thought to avoid any appearance of impropriety, but that is a long way from "significantly facilitating" a crime, and the prosecution offers no authority to make the two indistinguishable.

**2.      The Other Conduct of Which the Prosecution Complains Is Irrelevant to the Abuse of Trust Enhancement**

The remaining three items on the prosecution's list are even worse.  They are not abuses of trust, or do not have anything to do with facilitating the mail and wire frauds of which Ms.

1    Myres was convicted, or both.

2            This erroneous series of arguments begins with the prosecution's notion that Ms. Myres

3    abused her position of trust by hiding her phone calls with Fowler and speaking in code.  Leaving

4    aside that none of this required special knowledge, these acts have nothing to do with facilitating

5    mail or wire fraud.

6            Perhaps the prosecution was attempting to address this flaw by its otherwise unexplained

7    reference to *United States v. Duran,* 15 F.3d 131, 133 (9th Cir, 1994), and relevant conduct.  But

8    *Duran* is of no help to the prosecution.  In *Duran,* the abuse of trust was part of a "common

9    scheme or plan" with the offense of conviction.  Duran was a Sheriff's Deputy in Los Angeles

10   who was actually corrupt: he stole money from arrested drug dealers and then structured

11   transactions to avoid having to report the funds.  He was convicted of structuring and the jury

12   hung on a charge of conspiracy to commit theft.  The court recognized that the defendant was not

13   abusing his position of trust when he structured transactions to hide the stolen money, but the

14   court allowed an abuse of trust enhancement for the thefts (of money from drug dealers the

15   sheriffs arrested, money that was later hidden through the structuring) because that offense was

16   part of a "common scheme or plan."[5]

17           *Duran* has nothing to do with this case, and the prosecution makes no attempt to connect

18   the two.  It calls Ms. Myres's relationship with Fowler "the foundation for this entire criminal

19   scheme," GSM at 5, but there is no evidence suggesting that her relationship with Fowler was

20   part of a "common scheme or plan" with the insurance fraud for which she was convicted.  Not

21   only has nothing been offered to establish such a common scheme, but the weight of the evidence

22   was that Ms. Myres was the victim of a burglary by Fowler -- a fact that the prosecution still

23   avoids contesting because it has insufficient basis to do so*, see* GSM at 3:9-12, and a fact that

24

25   [5] Far from supporting the prosecution's view, before treating it as part of a common scheme or plan, courts require a
     strong relationship between the uncharged conduct and the convicted offense, focusing on whether the prosecution
26   has demonstrated a significant "similarity, regularity, and temporal proximity [between] the uncharged acts and the
     offense of conviction."  *United States v. Sykes,* 7 F.3d 1331, 1336 (7th Cir. 1993). The prosecution has not done so
27   here, and does not even try.  *See United States v. Cross,* 121 F.3d 234 (6th Cir. 1997) (rejecting government's
     contention that the defendant's torture of an individual he believed stole his crack cocaine on one day constituted
28   relevant conduct as to the defendant's conviction for distribution of crack cocaine on a different day).

DEFENDANT MYRES'S REPLY TO GOVT. SENTENCING MEMORANDUM
Case No. 3:17-CR-00180-RS

1    eviscerates any common scheme or plan connecting her relationship with Fowler and the offense

2    of conviction.

3            Without explaining what the abuse of trust could be, the prosecution next finds fault with

4    Ms. Myres allowing Fowler to live in her home after he had served his debt to society. This

5    unquestionably was bad judgment, but it was not an abuse of an official position -- unless the

6    prosecution believes that the felons are not allowed to reintegrate into society and have

7    relationships with law enforcement officers.  In any event, this too was not part of any common

8    scheme or plan with an insurance fraud, so it is of no help in establishing an abuse of trust.

9            As a last attempt, the prosecution cites that Ms. Myres never reported to those

10   investigating the burglary that a convicted burglar had been living with her.  This was the essence

11   of the conduct for which she was acquitted,[6] and it cannot justify an abuse of trust enhancement

12   anyway.  Ms. Myres was not using her official position when she omitted information about

13   Fowler and her position did not substantially contribute to anything related to the interviews;

14   rather, she was being questioned in her capacity as the victim of a burglary.[7]

15   **C.      The Prosecution's Sentencing Memorandum Contains Other Errors**

16           The prosecution's Sentencing Memorandum cries fowl because Ms. Myres "does not

17   appear to have accepted any responsibility for her actions."  GSM at 9.  Ms. Myres has a Sixth

18   Amendment and due process right to trial and appeal, and should not be punished for exercising

19   those rights and maintaining her innocence of the crimes charged (while expressing remorse for

20

21   [6] Of course, those investigating the burglary knew of Fowler's relationship with Ms. Myres and had followed him to
     her house.  The fact that Fowler had been living with her would not have been a basis to deny her claim; her desire to
22   keep Fowler out of it was designed to save her job.  Both things were true and were not mutually exclusive – that she
     was the victim of the burglary and reported losses from it to her insurance company, and that she knew implicating
23   Fowler in the investigation or the claim would cause her to lose her job.

24   [7] *See, e.g.*, *United States v. Adams*, 2006 WL 229904, *6 (E.D.N.Y. Jan. 31, 2006) (unpublished) (defendant must
     have discretionary authority with respect to the wrongdoing, and that discretion must have been entrusted to the
25   defendant by the victim of the wrongdoing for which the enhancement is sought); *United States v. Ragland*, 72 F.3d
     500, 502 (6th Cir. 1996)("For the enhancement to apply, defendant must have been in a position of trust with respect
26   to the victim of the crime"); *United States v. Garrison*, 133 F.3d 831, 838 (11th Cir. 1998) ("Because 'there is a
     component of misplaced trust inherent in the concept of fraud' . . .a sentencing court must be careful not to be 'overly
27   broad' in imposing the enhancement for abuse of position of trust or 'the sentence of virtually every defendant who
     occupied any position of trust with anyone, victim or otherwise, would receive a section 3B1.3 enhancement.'");
     *United States v. Spear*, 491 F.3d 1150, 1157 (10th Cir. 2007) ("a position of trust for purposes of § 3B1.3 turns upon
28   discretionary authority, not on one's veracity or a pledge to fulfill a position honestly"); § 3B1.3, App. n. 1 (the
     defendant's position "must have contributed in some significant way" to facilitating or concealing the offense).

other aspects of her conduct).  She has already effectively been punished by the guidelines for not

accepting responsibility -- unfairly, for the reasons set forth in her Sentencing Memorandum --

and the Court should not accept the prosecution's invitation to punish her further for the exercise

of her constitutional right to trial and appeal, especially in light of her statement expressing

remorse.

The prosecution's Sentencing Memorandum quotes from what it calls a victim impact

statement from the Sheriff, Vicki Hennessey.  This is a misnomer, because the SFSD is not as a

legal matter a victim of a federal offense -- a proposition determined by the USPO in the draft

PSR and not objected to by the prosecution.  As noted in Ms. Myres's Sentencing Memorandum,

Sheriff Hennessy joins the prosecution in making overstatements about Ms. Myres.

### III.   GIVEN THE MAGNITUDE OF THE INCREASES FROM THE "INTENDED LOSS" CALCULATION AND THE ABUSE OF TRUST ENHANCEMENT, ADDITIONAL PROTECTIONS SHOULD BE TRIGGERED

Ms. Myres demonstrated in her Sentencing Memorandum and Part II above that each of

the efforts by the PSR and the prosecution to increase Ms. Myres's sentence do not come close to

satisfying any standard of proof.  However, now that the PSR and the prosecution's Sentencing

Memorandum together are seeking increases of seven (or even eight) offense levels that would

raise the top end of the range by four times, now that the prosecution is seeking those

enhancements based in part on hearsay from scoundrels, and now that the prosecution is seeking a

sentence that is out of kilter with far more culpable defendants, several additional protections

should be triggered.

First, in addition to the reasons stated in Ms. Myres's Sentencing Memorandum, Ninth

Circuit law requires that, if the Court were to consider increases of the size proposed by the

prosecution, the clear and convincing evidence standard would govern those determinations. *See*

*United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (for factors that have a

disproportionate effect on the sentence relative to the offense of conviction, due process requires

that the government prove the facts underlying the enhancement by clear and convincing

evidence).  Because the increase sought in offense levels is more than four, and the potential

enhanced sentence is more than doubled from the initial guideline range – in addition to negating

DEFENDANT MYRES'S REPLY TO GOVT. SENTENCING MEMORANDUM
Case No. 3:17-CR-00180-RS

1  the presumption of innocence by seeking punishment for acquitted conduct – the clear and

2  convincing standard should apply here.  *See United States v. Jordan*, 256 F.3d 922, 928 (9th Cir.

3  2001).

4       Second, the magnitude of the increases now being sought also should trigger Ms. Myres's

5  Sixth Amendment rights.  *See Crawford v. Washington*, 541 U.S. 36 (2004).  The guidelines

6  allow the Court to "consider relevant information without regard to its admissibility under the

7  rules of evidence applicable at trial," but to do so "*provided that the information has sufficient*

8  *indicia of reliability to support its probable accuracy*."  U.S.S.G. § 6A1.3(a) (emphasis added).

9  The need for "sufficient indicia of reliability" is especially vital when the prosecution asks the

10  Court to multiply a sentence based on sketchy witnesses who were not subject to cross-

11  examination.  Concerning criminal trials, the Supreme Court has stated that the Sixth

12  Amendment's right of confrontation was included by the Framers in the Bill of Rights because

13  they recognized cross-examination's unparalleled effectiveness as a truth-generating "crucible,"

14  and abhorred the use of "*ex parte* examinations as evidence against the accused." *Crawford*, 541

15  U.S. at 50.  As the Supreme Court added, "[a]dmitting statements deemed reliable by a judge is

16  fundamentally at odds with the right of confrontation." *Id.* at 61.

17       *Crawford* is logically at odds with existing caselaw allowing judges at sentencing to

18  consider evidence not admitted at trial or subjected to cross-examination.[8]  Ms. Myres contends

19  that the reasoning of *Crawford* should control under these circumstances, but in light of contrary

20  law, she asks the Court to keep these concepts close at hand when considering the evidence in

21  support of the prosecution's arguments for a draconian sentence.  Ms. Myres has not had an

22  opportunity to confront the witnesses on whom the government relies.  The source (such as a

23  convicted felon seeking to help his own lot in life by slinging mud at Ms. Myres), the manner in

24  which these statements were collected (by law enforcement officers seeking to build a case

25  against Ms. Myres), and the timing of their introduction (at sentencing instead of at trial) are all

26

27

28  [8] *See generally*, Shaakirrah R. Sanders, *Making the Right Call for Confrontation at Felony Sentencing*, 47 U. MICH. J. L. REFORM 791 (2014).

- 14 -

1    devastating to any notion of reliability and/or accuracy on which this Court should lean when

2    considering such a dramatic change in Ms. Myres's sentence.

3         Finally, the sentence now proposed by the prosecution is so out of kilter with those given

4    to far more culpable defendants from Sheriff's Departments that the Court must consider Section

5    3553(a)(6).  In 2017, the actual Sheriff himself for Los Angeles County, Lee Baca, was convicted

6    by a jury of overseeing a scheme designed to obstruct a federal investigation into corruption and

7    civil rights abuses at county jail facilities, and of lying to federal investigators.[9]  Baca also

8    ordered a criminal investigation of the FBI agents conducting the investigation, as well as

9    directed and conspired with his underlings to conceal the FBI's informant (who was an inmate at

10   the Men's Central Jail) from federal investigators and engage in witness tampering in an effort to

11   prevent information from being shared with federal authorities, and also threatened to arrest the

12   lead FBI agent on the case.  And when Baca watched a recording of his deputies confronting the

13   FBI agent, he reacted by stating "it was the best laugh he had in some time."  *Id*.  For this job-

14   related corruption and obstruction, Baca received all of three years in custody – just one year

15   more than the prosecution insists Ms. Myres should receive.  He was given credit for his "lengthy

16   history of public service" – which the prosecution would deny to Ms. Myres – as well as for his

17   medical condition.  *Id*.

18        Three of Baca's Deputies, Gerard Smith, Mickey Manzo, and James Sexton, received 21

19   months, 24 months, and 18 months, respectively, after juries convicted them for their roles in the

20   scheme -- equal to or less than the prosecution is asking for Ms. Myres, for far worse (and truly

21   corrupt) conduct.[10]  In addition, earlier this year another Sheriff's Deputy, Byron Dredd, was

22   convicted of lying to the FBI about the beating of an inmate (a cover-up that initially resulted in

---

[9] *See* https://www.justice.gov/usao-cdca/pr/former-la-county-sheriff-lee-baca-sentence-3-years-federal-prison-leading-scheme.

[10] *See* https://www.justice.gov/usao-cdca/pr/six-current-and-former-los-angeles-sheriff-s-deputies-sentenced-federal-prison; https://www.fbi.gov/contact-us/field-offices/losangeles/news/press-releases/seventh-los-angeles-sheriffs-deputy-guilty-of-obstructing-justice-for-interfering-with-civil-rights-investigation-sentenced-to-prison.

false criminal charges against the victim).  He received 12 months – again, a year less than the prosecution asks for Ms. Myres – for far more serious conduct.[11]

By contrast, Ms. Myres was convicted of a small, unsuccessful non-job related insurance fraud after she was a burglary victim.  The supposed aggravating circumstances consist of omitting mention of her relationship with Fowler (who she did not know to be the burglar), along with hugging, faxing, and wearing her uniform.  The seriousness of wrongdoing in Los Angeles, and its connection to the Sheriff's Department, was light years worse than this case, yet most of the sentences were *lower* than what the prosecution demands.  These sentences further confirm that the prosecution recommendation is so inordinately harsh that it bears no consideration at all, and that the appropriate sentence for Ms. Myres is not a custodial one.

## IV.    CONCLUSION

For the reasons set for above and in Ms. Myres's Sentencing Memorandum, she respectfully requests a non-custodial sentence.

---

[11] https://www.justice.gov/usao-cdca/pr/ex-la-county-sheriff-s-deputy-sentenced-one-year-federal-prison-lying-fbi-part-cover.

DEFENDANT MYRES'S REPLY TO GOVT. SENTENCING MEMORANDUM
Case No. 3:17-CR-00180-RS

# Exhibit 1



**COMPSTAT**
**CITY WIDE PROFILE**
**03/01/2016 to 03/31/2016**



**Chief Greg Suhr**



**Population:** 837, 442
**Area:** 48.1 square miles
**Total Sworn:** 2217

Figures reported in this document are accurate as of the query or extraction date. They are subject to change as new reports are submitted and become available.

| | | | |
|---|---|---|---|
| **Chief of Staff:** | **Deputy Chief Hector Sainez** |
| **Administration:** | **Deputy Chief Mikail H. Ali** |
| **Field Operations:** | **Deputy Chief Michael Redmond** |
| **Special Operations:** | **Deputy Chief Garret Tom** |
| **Field Operations:** | **Commander Rob O'Sullivan** |
| **Field Operations:** | **Commander Robert Moser** |
| **Investigations:** | **Commander Greg McEachern** |

| CLASSIFICATION OF OFFENSE | 2015 MARCH ACTUAL OFFENSES | 2016 MARCH ACTUAL OFFENSES | % Change | 2016 FEBRUARY ACTUAL OFFENSES | 2016 MARCH ACTUAL OFFENSES | % Change | 2015 YTD ACTUAL OFFENSES | 2016 YTD ACTUAL OFFENSES | % Change |
|---|---|---|---|---|---|---|---|---|---|
| **1. CRIMINAL HOMICIDE          TOTAL:** | **3** | **4** | **33%** | **4** | **4** | **0%** | **14** | **9** | **-36%** |
| **2. FORCIBLE RAPE** | | | | | | | | | |
| A.  Forcible Rape | 32 | 29 | -9% | 26 | 29 | 12% | 101 | 101 | 0% |
| B.  Assault to Rape (Attempt) | 3 | 1 | -67% | 1 | 1 | 0% | 7 | 4 | -43% |
| **TOTAL FOR FORCIBLE RAPE:** | **35** | **30** | **-14%** | **27** | **30** | **11%** | **108** | **105** | **-3%** |
| **3. ROBBERY** | | | | | | | | | |
| A.  Firearm | 51 | 31 | -39% | 46 | 31 | -33% | 152 | 137 | -10% |
| B.  Knife or Cutting Instrument | 39 | 27 | -31% | 18 | 27 | 50% | 100 | 70 | -30% |
| C.  Other Dangerous Weapon | 24 | 18 | -25% | 12 | 18 | 50% | 83 | 52 | -37% |
| D.  Strongarm (no weapon) | 224 | 137 | -39% | 164 | 137 | -16% | 639 | 445 | -30% |
| **TOTAL FOR ROBBERY:** | **338** | **213** | **-37%** | **240** | **213** | **-11%** | **974** | **704** | **-28%** |
| **4. ASSAULT** | | | | | | | | | |
| A.  Firearm | 21 | 27 | 29% | 26 | 27 | 4% | 71 | 69 | -3% |
| B.  Knife or Cutting Instrument | 39 | 33 | -15% | 26 | 33 | 27% | 101 | 92 | -9% |
| C.  Other Dangerous Weapon | 105 | 68 | -35% | 83 | 68 | -18% | 253 | 234 | -8% |
| D.  Hands, Fists, Feet, Etc. | 65 | 71 | 9% | 90 | 71 | -21% | 230 | 244 | 6% |
| **TOTAL FOR ASSAULT:** | **230** | **199** | **-13%** | **225** | **199** | **-12%** | **655** | **639** | **-2%** |
| **5. HUMAN TRAFFICKING** | | | | | | | | | |
| A.  Sex Act | 6 | 4 | -33% | 8 | 4 | -50% | 22 | 23 | 5% |
| B.  Involuntary servitude | 0 | 0 | 0% | 0 | 0 | 0% | 0 | 0 | 0% |
| **TOTAL FOR HUMAN TRAFFICKING** | **6** | **4** | **-33%** | **8** | **4** | **-50%** | **22** | **23** | **5%** |
| **6. BURGLARY** | | | | | | | | | |
| A.  Forcible Entry | 177 | 181 | 2% | 169 | 181 | 7% | 550 | 525 | -5% |
| B.  Unlawful Entry - No force | 264 | 240 | -9% | 247 | 240 | -3% | 703 | 728 | 4% |
| C.  Attempted Forcible Entry | 22 | 47 | 114% | 32 | 47 | 47% | 76 | 104 | 37% |
| **TOTAL FOR BURGLARY:** | **463** | **468** | **1%** | **448** | **468** | **4%** | **1,329** | **1,357** | **2%** |
| **7. LARCENY THEFT          TOTAL:** | **3,745** | **2,760** | **-26%** | **3,094** | **2,760** | **-11%** | **10,667** | **9,158** | **-14%** |
| **8. MOTOR VEHICLE THEFT** | | | | | | | | | |
| A.  Autos | 457 | 332 | -27% | 342 | 332 | -3% | 1,309 | 1,046 | -20% |
| B.  Trucks and Buses | 33 | 45 | 36% | 26 | 45 | 73% | 98 | 105 | 7% |
| C.  Other Vehicles | 51 | 65 | 27% | 63 | 65 | 3% | 155 | 177 | 14% |
| **TOTAL FOR MOTOR VEHICLE THEFT:** | **541** | **442** | **-18%** | **431** | **442** | **3%** | **1,562** | **1,328** | **-15%** |
| **9. ARSON          TOTAL:** | **19** | **23** | **21%** | **24** | **23** | **-4%** | **79** | **67** | **-15%** |
| **GRAND TOTAL** | **5,380** | **4,143** | **-23%** | **4,501** | **4,143** | **-8%** | **15,410** | **13,390** | **-13%** |

Data Extraction Date: 4/11/16 8:12 AM

Other Assaults (Misdemeanors) is a Part II crime and listed on Page 2.

Data Sources: Crime Data Warehouse, SFPD IT Unit, Homicide Unit,
Special Victims Unit, Arson Task Force