1  KING & SPALDING LLP
   MICHAEL J. SHEPARD (SBN 091281)
2    *mshepard@kslaw.com*
   50 California Street, Suite 3300
3  San Francisco, CA 94105
   Telephone:    +1 415 318-1221
4  Facsimile:    +1 415 318-1300

5  JAMIE A. LANG (SBN 253769)
     *jlang@kslaw.com*
6  633 W. Fifth Street, Suite 1600
   Los Angeles, CA 90071
7  Telephone:    +1 213 443-4325
   Facsimile:    +1 213 443-4310

8  Attorneys for Defendant
   APRIL DIANE MYRES
9
10            **UNITED STATES DISTRICT COURT**

11         **NORTHERN DISTRICT OF CALIFORNIA**

12            **SAN FRANCISCO DIVISION**

13  UNITED STATES OF AMERICA,            Case No. 17-CR-00180-RS

14                      *Plaintiff*,     **DEFENDANT APRIL MYRES'S**
                                         **SENTENCING MEMORANDUM**
15        v.
                                         Date:        October 4, 2022
16  APRIL DIANE MYRES,                   Time:        9:30 a.m.
                                         Judge:       Hon. Richard Seeborg
17                      *Defendant*.     Courtroom:   3, 17th Floor

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................. **Error! Bookmark not defined.**

I.    INTRODUCTION ............................................................................................ 2

II.   BACKGROUND ON THE LOSS CALCULATION ........................................ 2

III.  THE INTENDED LOSS IS $3,184.62 OR, AT MOST, $9,573.37 ..................... 8

      A.    As a factual matter, none of Ms. Myres's alleged lies were false
            statements intended to defraud the insurer.................................... 9

      B.    As a matter of law, none of the factual arguments can justify including
            the entire value of the claim as intended loss. ......................... 12

      C.    The Section 3553(a) factors also favor a non-custodial sentence. ........................... 15

IV.   CONCLUSION .......................................................................................... 17

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM        CASE NO. 17-CR-00180-RS

**Page(s)**

**Federal Cases**

*Jones v. United States,*
  574 U.S. 948 (2014)................................................................8

*United States v. Alphas,*
  785 F.3d 775 (1st Cir. 2015) ......................................... *passim*

*United States v. Bell,*
  808 F.3d 926 (D.C. Cir. 2015) ...............................................8

*United States v. Cochran,*
  No. 1:16-cr-00808, (N.D. Ill June 26, 2019) ......................17

*United States v. Dartt,*
  No. 1:16-cr-00683, (N.D. Ill. Feb. 26, 2018) .....................17

*United States v. Dawkins,*
  202 F.3d 711 (4th Cir. 2000) ..............................12, 14, 15

*United States v. Henderson,*
  19 F.3d 917 (5th Cir. 1994) .....................................................3

*United States v. Jimenez Martinez,*
  83 F.3d 488 (1st Cir. 1996) ....................................................8

*United States v. Lonich,*
  23 F.4th 881 (9th Cir. 2022) ..................................................12

*United States v. Manatau,*
  647 F.3d 1048 (10th Cir. 2011) ..............................................3

*United States v. Myres,*
  844 F. App'x 987 (9th Cir. 2021) .................................. *passim*

*United States v. Pollock,*
  700 F. App'x 577 (9th Cir. 2017) ....................................3, 10

*United States v. Presta,*
  No. 1:20-cr-00475, (N.D. Ill. Apr. 25, 2022).......................16

*United States v. Roberts,*
  14 F.3d 502 (10th Cir. 1993) ..................................................8

*United States v. Taylor,*
  No. 15-cr-568-1, (N.D. Ill. Aug. 8, 2016)............................17

*United States v. Torlai*,
    728 F.3d 932 (9th Cir. 2013) ............................................................................12

*United States v. Treadwell*,
    593 F.3d 990 (9th Cir. 2010) ............................................................................11

*United States v. Valensia*,
    222 F.3d 1173 (9th Cir. 2000) ..........................................................................11

*United States v. Watts*,
    519 U.S. 148 (1997)............................................................................................8

**Federal Statutes**

USSG § 2B1.1 cmt. n.3(A)(i)–(ii) ...........................................................................3

USSG § 5C1.1(c) ......................................................................................................2

**Constitutional Provisions**

Sixth Amendment .....................................................................................................8

## I.    INTRODUCTION

This matter is before the Court for resentencing, following the Ninth Circuit's remand for findings on intended loss. *United States v. Myres*, 844 F. App'x 987, 990-91 (9th Cir. 2021). For the reasons set forth below, Defendant April Myres respectfully requests that the court sentence her to a non-custodial sentence. This request is based on the following arguments:

- The Ninth Circuit's decision requires a fresh look at Ms. Myres's sentence, and the approach urged by the government and the Probation Office cannot be squared with the facts or controlling law. Properly calculated in light of the Ninth Circuit's reasoning, Ms. Myres's Guideline level is 7 or, at worst, 9. With a criminal history level of I, either Guideline level would permit a non-custodial sentence, with the Guideline level 9 calling for a period of home detention. *See* USSG § 5C1.1(c).

- Any sentence of incarceration will subject her to danger given her prior service as a prison guard and, worse still (due to the Bureau of Prisons' efforts to mitigate that danger),[1] will take her far away from her home and family at a time when her brother, who is battling cancer, needs her emotional support and physical assistance for activities ranging from transportation for medical care to feeding. *See* Letter of David Dozier, attached as Ex. 1.

- As reflected in the letter from Mr. Dozier, Ms. Myres has spent the nearly three years since her conviction devoted to the service of others. This was a continuation of her pre-offense conduct, which, as numerous letters to the Court attested, was characterized by consistent service to her church and community. She has already suffered as a result of her offense and the poor decision that preceded it, including the loss of her job and a reduction in her pension. Although the government has emphasized the fact that she was an employee of the Sheriff's Department at the time of her offense, she was a line employee working many of her hours in unattractive work as a prison guard; the insurance fraud for which she was convicted was not related to her job; and even job-related crimes committed by higher-level employees earn lower sentences than fourteen months incarceration. In any event, her long record of public service, both to the Sheriff's Department and to her church, should offset the fact that she committed her offense while she was employed as a prison guard.

## II.    BACKGROUND ON THE LOSS CALCULATION

While this sentencing, like any other, should not turn exclusively on the Guideline calculation, the essential Guideline question for the Court is whether Ms. Myres can be found to have "purposely sought to inflict" on her insurer a loss in the amount of the full value of her policy when the evidence showed that she was seeking to recover for numerous items that were actually

---

[1] Following this court's original sentence of 14 months incarceration, Ms. Myres was designated to the FCI in Pekin, IL. She was allowed bond pending appeal and has remained on bond without incident — for nearly five and one half years. Acknowledging the usual practice of imposing a three-year term of supervised release, Ms. Myres's performance during this extended term on bond should minimize the need for any substantial term of supervised release.

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM          CASE NO. 17-CR-00180-RS

stolen from her home and covered by her policy. USSG § 2B1.1 cmt. n.3(A)(i)–(ii). What she "purposely sought to inflict" is controlling under the Guidelines because there was no actual loss — the insurer never paid her claim — and because a calculation of her "intended loss" depends on her subjective intent. *Myres*, 844 F. App'x at 990-91; *see United States v. Pollock*, 700 F. App'x 577, 577 (9th Cir. 2017) (requiring an "inquiry regarding [the defendant's] subjective intent"); *United States v. Manatau*, 647 F.3d 1048, 1050-56 (10th Cir. 2011) (holding intended loss requires an inquiry into defendant's subjective intent); *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir. 1994) (holding "intended loss" is based on the defendant's "actual intent, not constructive intent"). That the loss she purposely sought to inflict was far less than the full value her policy is demonstrated by the evidence at trial and the initial determination of the Probation Office.

Ms. Myres established at trial that Mr. Fowler burgled her home. The Court will recall that, although the government did not include these facts in its case, Ms. Myres proved that data on Mr. Fowler's phone (which the government seized from Mr. Fowler) included screenshots and texts from March 26 through April 4, 2016 — just after the burglary, which occurred on the night of March 24-25 — in which Mr. Fowler advertised and tried to fence items stolen from Ms. Myres's home. Def. Exs. 1013.5, 1013.7, 1013.8, 1013.10, 1013.11, 1013.12. He did *not* share those screenshots and texts with Ms. Myres or her family; rather, he was communicating with his sisters and others. In fact, despite phone records and surveillance, there is no hint that Mr. Fowler and Ms. Myres had any communication after they broke up, which occurred before the burglary.

This evidence was substantial enough that the government made the unusual concession in closing argument at trial that there was evidence to support Ms. Myres's contention that Mr. Fowler had committed a revenge burglary. Trial Tr. at 1137. The government had little choice but to make this concession after not contesting the proof of Mr. Fowler's burglary at trial and instead waffling between, on one hand, saying that it did not matter if there had been a burglary and, on the other hand, implying that Ms. Myres was in on the burglary. *E.g.*, Trial Tr. at 163:22-164:1, 1115:4-5, 1136:9. But the government had no actual evidence that Ms. Myers was in cahoots with Mr. Fowler. The most it could offer was a text from her to him that read, "It's about

to start," which the defense proved did not refer to the start of a burglary scheme but rather to Ms. Myres's attendance at an important religious event. Trial Tr. at 946:13-23, 1078:10-1080:19.

After trial, defense counsel and an FBI agent met with the jurors. The jurors shared their conclusion that Mr. Fowler had burgled Ms. Myres's home and that he had done so without her involvement. The jurors explained that they found her guilty of insurance fraud because she sought reimbursement for three items found in her home during an FBI search a year after the burglary.[2] The claimed value of these items was $3,184.62.

Following the verdict convicting Ms. Myres of mail and wire fraud but acquitting her of misprision of felony, the Probation Office prepared a draft Pre-Sentence Report that assessed Ms. Myres's intended loss as $9,573.37, which was the sum of the value of the three items found in her home and several other items that the government contended belonged to the Sheriff's Department rather than to Ms. Myres.[3]

In response to the draft PSR, the government argued that "the calculation of loss fails to account for the basic functioning of an insurance policy." *See* Gov. Letter at 6-8 (Oct. 29, 2019). The government based this argument on its claim that "a fraudulent insurance claim is denied in its entirety, not item by item." As a result, it argued, "even if some of the items she listed were actually stolen without her consent, she still would not be entitled to payment for them."[4] In other

---

[2] *See* Defense Letter to Probation (Oct. 1, 2019): "Explaining the acquittal on the misprision charge to defense counsel and the FBI case agent afterwards, a number of jurors reported that they were convinced that Fowler did commit a burglary at Ms. Myres's home on the night of March 24/25, 2016, and that he stole a number of items, including her gun. Their guilty verdicts on the mail and wire fraud counts were apparently based on evidence offered by the government to suggest that some of the items in Ms. Myres's insurance claim were knowingly false, most notably that three of the forty-three items on her insurance claim were found by the FBI in a search of her home in February, 2017." (The government also asserted that the Sheriff's Department owned five or so items Ms. Myres included in her insurance claim, which were worth $6,388.75.)

[3] There was evidence that Ms. Myres had a good-faith basis to include these other items (the ones the government claimed were the property of the Sheriff's Department) in her insurance claim. The Sheriff's Department's own forms, which Ms. Myres signed upon receipt of the items, established that she was "liable for any loss or damage" to those items. Trial Tr. at 286:10-287:4; Gov. Ex. 12. And Captain Lisette Adams, the "go to person within the department on policies," advised Myres that after a certain period of time, equipment issued to a San Francisco Sheriff's Department employee became that employee's property. Trial Tr. at 1024:13-1025:2, 1038:7-12.

[4] The government also contended in that letter (1) that the Probation Office's calculation of loss "wrongly rejects the jury's verdict," *id.* at 4, which was wrong in two different ways: the jury's verdict could have been based on only one fraudulently claimed item, and the jurors told defense counsel and an FBI agent afterwards that they believed Fowler had burgled Ms. Myres's home; (2) that the Probation Office's calculation of loss "is untethered to the facts of this matter," *id.* at 5-6, which erroneously asserted that the claimed items were not actually stolen from Ms. Myres's home — the support for which were three completely unreliable scoundrels, all of which the government declined to call at trial, and one of which the government has never identified; and (3) that the Probation Office's calculation of loss

words, the government argued that intended loss should be calculated based on the amount Ms. Myres was objectively entitled to receive on her actual claim, not based on the amount she subjectively intended to obtain from Farmers due to fraud.

The Probation Office's final report accepted the government's legal theory and calculation of intended loss.[5] Its explanation for the change from the draft PSR led with the statement that "[t]he Farmers policy clearly indicates the insurance claim is taken as a whole, thus the entire intended loss is the proper amount for the offense level calculation." Like the government, the Probation Office treated the void-for-fraud clause as dispositive, without any consideration of Ms. Myres's subjective intent. At the sentencing, following considerable discussion, the Court decided that "the Probation recommendation on the calculation is the right one," producing an offense level of 13 (7 for the offense and a six-level enhancement for a fraud value in excess of $40,000) and a Guideline range of 12-18 months. The Court sentenced Ms. Myres to 14 months incarceration.

On appeal, Ms. Myres challenged this Court's calculation of intended loss. The government acknowledged that the Probation Office "apparently relied on the void-for-fraud clause" but elected not to defend that argument, even though the government had urged that argument to the Probation Office in the first place. CA9 Gov. Br. at 51, 58-59. Instead, the government defended the sentence based on its argument that Ms. Myres' other alleged lies rendered her claim void "ab initio." *Id*. at 56-57. At oral argument, the government likewise argued

---

"misapplies the sentencing guidelines," *id*. at 8, an argument that was entirely conclusory except for assertions that appear to refer to its argument about "the basic functioning of an insurance policy." The only assertions in support of this conclusion were that "it is no defense that she did not understand how insurance policies work, as it was reasonably foreseeable that her claim could be denied under the circumstances," and "it is no defense that – if true – some of the items were actually stolen." *Id*. Here too, the government treated Ms. Myres's subjective intent as irrelevant.

[5] *See* Addendum to Report ¶ 14, which reads in full: "After review of the government's objection to this issue, the probation officer changed the report. The Farmers policy clearly indicates the insurance claim is taken as a whole, thus the entire intended loss is the proper amount for the offense level calculation. Specifically, the policy notes, 'We reserve the right to void this policy if you or any insured, at any time, either before or after a claim or loss, has intentionally concealed or misrepresented any material fact or circumstances in the application.' In sum, since Ms. Myres misrepresented her claim, she was not entitled to any insurance reimbursement. Furthermore, there were numerous lies that were presented to Farmers during the claims process. She lied about who lived with her, which items were stolen and whether there was surveillance camera footage. She also failed to mention her relationship with Fowler. She also told Farmers she owned her Sheriff's Office equipment (thus, adding the cost of replacing the items to her claim) when in fact the items were still owned (and later replaced free of charge) by the San Francisco Sheriff's Department. She lied about who her direct supervisor was in a fax to Farmers when she told them to confirm with her supervisor about her owning her gun and other stolen work-related items. Therefore, the undersigned properly calculated the offense level using the intended loss of $67,046.78."

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM          CASE NO. 17-CR-00180-RS

that Ms. Myres' claims were "rife with fraud," and that as a result the court could not determine "what amounts represent legitimate claims" and could thus "use the face value of the claims as a starting point." *See* Oral Argument, https://www.ca9.uscourts.gov/media/video/?20210114/19-10415/ (quoting *United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015)).

Not accepting the government's effort to preserve the sentence, the Ninth Circuit affirmed Ms. Myres's conviction but remanded for resentencing. It explained that "[t]he amount of 'intended loss' is equivalent to 'the pecuniary harm that the defendant *purposely sought* to inflict,'" and that a district court may "impose sentencing enhancements only for losses that '*resulted from*' the defendant's fraud." *Myres*, 844 F. App'x at 990-91 (emphasis added and citations omitted). Applying those principles, the Ninth Circuit vacated the sentence because this Court had "suggested that [it] considered Myres' motives irrelevant" and "did not provide explicit reasoning or factual findings to support its conclusion that the intended loss was the entire claim." *Id*. at 991.[6]

Following remand, both the government and Ms. Myres made submissions to the Probation Office. Despite eschewing reliance in the Court of Appeals on the void-for-fraud language on which the Probation Office's original calculation was based, in its September 8, 2022 letter the government embraced that argument again.[7] In addition, the government offered a variant of the "rife with fraud" theory that the Court of Appeals did not accept, claiming that Ms. Myres told other lies to Farmers and/or law enforcement unrelated to the specific items for which she sought reimbursement from her insurer, and that this evidence "proved her intent as to the full claim." Gov. Letter at 2 (Sept. 8, 2022). The only specifics provided about alleged lies that "proved her intent as to the full claim" were claims that she intended to defraud her insurer of the full claim by lying about "who lived with her, that she no disgruntled ex-boyfriend, which items were stolen, and whether the surveillance camera had recorded the time of the burglary." *Id*.

On September 20, the Probation Office made small revisions to the PSR used at the first sentencing, but left the loss calculation unchanged. Even though the Ninth Circuit vacated the

---

[6] A full copy of the Ninth Circuit's opinion is attached as Ex. 2.

[7] The letter states: "[T]he Addendum to the original PSR referenced the Farmers Insurance Policy clause reserving the right to void the policy for fraud. See Addendum ¶ 14. *Factually, then, the original PSR is accurate in listing various facts that go to the loss calculation.*" Gov. Letter at 2 (Sept 8, 2022) (emphasis added).

Court's calculation of intended loss, the Probation Office explained that "there is no finding that the probation office erred in its calculation of the loss. Rather, the case was remanded for sentencing so that the Court could explain its reasoning. As such, no change was made to the loss calculation in the presentence report." Letter from Probation (Sept. 20, 2022). In so stating, the Probation Office did not engage with the fact that the Ninth Circuit had no cause to consider the Probation Office's original reasoning because the government abandoned reliance on the void-for-fraud clause that, as the government acknowledged, formed the basis for the original PSR's intended loss calculation. CA9 Gov. Br. at 58. Instead, the Probation Office repeated its reliance on the void-for-fraud clause, while adding language from the government's September 8, 2020 letter. Specifically, the Probation Office cited Ms. Myres's supposed lies about "who lived with her, which items were stolen, and whether there was surveillance camera footage." It also asserted that Ms. Myres "told Farmers she owned her Sheriff's Office equipment (thus, adding the cost of replacing the items to her claim) when in fact the items were still owned (and later replaced free of charge) by the San Francisco Sheriff's Department. She lied about who her direct supervisor was in a fax to Farmers when she told them to confirm with her supervisor about her owning her gun and other stolen work-related items."

The Probation Office's revised report does not address why it did not return to its original finding that the loss was $9,573.37, especially in light of the Ninth Circuit's holding that intended loss must be calculated based on Ms. Myres's subjective "motives" and limited to "losses that 'resulted from' the defendant's fraud." *Myres*, 844 F. App'x at 990-91. The revised report does not take any position on Ms. Myres's motives. Nor does it not explain how the void-for-fraud clause or Ms. Myres's other lies reflected a subjective intent to defraud Farmers out of the entire amount of her insurance claim, explain how the entirety of her insurance claim could constitute the loss that "resulted from" her fraud, or address the significance of the fact that Ms. Myres sought recovery for numerous items that were in fact stolen.[8]

---

[8] Also left behind in the Probation Office's revised report and its recommendation of an 18-month sentence is this Court's prior determination to impose a sentence of 14 months.

## III.    THE INTENDED LOSS IS $3,184.62 OR, AT MOST, $9,573.37

The Probation Office's and the government's positions on intended loss are incorrect as a matter of fact, and, in two different ways, disregard the Ninth Circuit's mandate to recalculate intended loss.[9]  First, they ignore the requirement to limit intended loss to the amounts Ms. Myres subjectively and "purposely" intended to defraud Farmers out of.  *Id.*  Second, they ignore the legal requirement that "[a] district court may 'impose sentencing enhancements only for losses that "resulted from" the defendant's fraud.'"  *Id.* (quoting *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009)).  The arguments on which the Probation Office and the government rely barely touch those issues.  As a result, nothing in the Government's arguments or the Probation Office's revised report justifies their calculation of intended loss.  To the contrary, the facts and law compel the conclusion that someone who was seeking compensation for numerous items that were actually stolen did not subjectively or purposely seek to defraud her insurer out of the full value of her claim.[10]

---

[9]  Ms. Myres reiterates all of her objections to the original PSR, but she acknowledges that the Court has already ruled on those objections. In this Sentencing Statement, Ms. Myres focuses on the issues encompassed by the Ninth Circuit's remand.

[10]  In its draft PSR, the Probation Office effectively agreed that Ms. Myres had been burgled and lost, at a minimum, all but $9,573.37 of the amount she sought to recover from Farmers.  At various times, the government has suggested that Ms. Myres was in on the burglary, citing Lascala, Fowler, and a still-unidentified confidential source.  In her original sentencing memorandum, Ms, Myres explained why each of those information sources deserve no weight whatsoever — and why, if they do, the one statement worth crediting is Lascala's report that Fowler told him that "if she breaks up with me I'm going to her house I know where she lives. I know everything." Ex. 2 to Ms. Myres's Sent. Mem. (Transcript of 12/16/2015 Statement of Eduardo Lascala) at 16.  The government has never responded to that explanation and, given that silence and the evidence the defense presented at trial, the issue should now be dead.

If there were any question based on Lascala, Fowler, and the confidential source about whether Ms. Myres was in fact a victim of the burglary, that issue could only be resolved through an evidentiary hearing.  *See, e.g., United States v. Jimenez Martinez,* 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); *United States v. Roberts,* 14 F.3d 502, 521 (10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination).  At any such hearing, given the relationship between this claim and the conduct for which Ms. Myres was acquitted on the misprision charge, developing case law strongly supports the conclusion (not yet embraced by the Ninth Circuit or the Supreme Court as a whole) that the government must establish its assertions by clear and convincing evidence. *See, e.g., Jones v. United States,* 574 U.S. 948, 949-50 (2014) (Scalia, J., joined by Thomas & Ginsburg, JJ., dissenting from denial of cert.) (noting that it violates the Sixth Amendment when the conduct used to increase a defendant's penalty is found by a judge rather than by a jury beyond a reasonable doubt, particularly when the facts leading to the sentence are ones for which a jury has acquitted the defendant); *United States v. Watts,* 519 U.S. 148, 170 (1997) (Kennedy, J., dissenting) ("[T]o increase a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal"); *United States v. Bell,* 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial").

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM        CASE NO. 17-CR-00180-RS

### A. As a factual matter, none of Ms. Myres's alleged lies were false statements intended to defraud the insurer.

The reliance of the Probation Office and the Government on Ms. Myres's alleged lies is meritless as a factual matter because the alleged lies were either true, not part of a fraud on the insurer, or both.

*First*, the Probation Office and the Government contend that Ms. Myres lied about "who lived with her" and that "she had no disgruntled ex-boyfriend." These are different ways of asserting that Ms. Myres was untruthful in not mentioning Mr. Fowler as someone who had been living with her, and that he was a disgruntled ex-boyfriend. But anything untrue said on either subject reveals nothing about Ms. Myres's subjective intent to defraud Farmers because Ms. Myres's statements were designed not to defraud Farmers, but to save her job. The evidence left no doubt that at the time she was questioned by Farmers, she knew that she was under investigation by the Sheriff's Department and that the Department would use any admission of a relationship with Mr. Fowler against her. Trial Tr. at 276:6-25, 295:13-296:7.

In addition, there is no basis to conclude that any losses could have "resulted from" her alleged lies about Mr. Fowler, as the Ninth Circuit required. *Myres*, 844 F. App'x at 990 (internal quotation marks omitted). The fact that Ms. Myres had a disgruntled ex-boyfriend with whom she used to live would have provided Farmers no basis to deny her claim. And any untrue statements about Mr. Fowler could not have impaired any efforts to catch the burglar because law enforcement already knew about Ms. Myres' relationship with Mr. Fowler and apparently was surveilling him. Trial Tr. at 276:6-13, 277:16-19, 295:13-16, 296:8-297:6.

*Second*, Ms. Myres's alleged lies about "which items were stolen" are what led to her conviction. But those lies do not reflect any subjective intent to defraud Farmers out of the entire amount of Ms. Myres's insurance claim because, as the Probation Office previously recognized, the maximum total value of the items that she falsely claimed were stolen was $9,573.37. The rest of the items were stolen by Mr. Fowler, and Ms. Myres could not have purposely sought to defraud her insurer out of the value of items that were actually stolen and for which she could honestly and lawfully seek compensation. That these lies are included on the Probation Office's list at all merely

serves to underscore that it continues to rely on the void-for-fraud clause, rather than undertake the analysis into Ms. Myres's subjective intent required by the Ninth Circuit's mandate.[11]

The same is true of the Probation Office's addition of alleged lies about whether the Sheriff's Department or Ms. Myres owned some of the items listed on her claim. Although the defense and the Probation Office disagree on whether Ms. Myres's lied about those items (as opposed to honestly but mistakenly believing that she was financially responsible for them), the Probation Office has already added those items to the intended loss in its calculation in the draft PSR. If the Probation Office is correct that Ms. Myres intended to defraud her insurer when she listed those items because she knew she did not own them, then it follows that those items should be included in the intended loss. But that says nothing about whether the value of items that Ms. Myres unquestionably *did own* and were in fact stolen can somehow be included in intended loss.

*Third*, the Probation Office and the government both assert that Ms. Myres lied about "whether the surveillance camera had recorded the time of the burglary," but this assertion is wrong. What Ms. Myres said, according to the contemporaneous report of the arresting officer, was "that there was no video activation at the time of the incident." Trial Tr. at 433:3-11. That statement is true. Her video activated only on motion directed to the front door or the garage, and the weight of the evidence showed that the burglar likely got into Ms. Myres's house through the back door, by jumping over a railing from her neighbor's stairs, which allowed access into her backyard. *Id*. at 416:2-418:8, 429:14-432:7; Def. Exs. 1001.3, 1004.1, 1004.2. Tellingly, when the police came to her home after the burglary, the sliding door entrance from the backyard into

---

[11] The government had good reason for disclaiming reliance on the void-for-fraud provision on appeal. Contrary to the government's attempt to revive that argument on remand, the void-for-fraud clause is legally irrelevant to calculating intended loss. *Alphas*, 785 F.3d at 782-83; CA9 Gov. Br. at 58. That is because, as explained in more detail below, the calculation of intended loss must "exclude[] any sums that the fraudster would have been paid absent the fraud." *Alphas*, 785 F.3d at 783. Had Ms. Myres submitted an entirely truthful claim "absent the fraud," the void-for-fraud clause would never come into play and thus would not have prevented her from recovering $57,473.41 for her "legitimate losses." *Id.* at 782-83. In any event, for judging her subjective intent, the Government has never introduced any evidence that Ms. Myres read or even knew about the void-for-fraud clause, so the clause reveals nothing about her subjective intent. *See Myres*, 844 F. App'x at 991; *Pollock*, 700 F. App'x at 577. The void-for-fraud clause may have meaning in civil disputes over insurance coverage, but it has none in a determination of intended loss. *Alphas*, 784 F.3d at 782 & n.3.

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM       CASE NO. 17-CR-00180-RS

the home was found open.  Def. Ex. 1014.1-1.  The most reasonable interpretation of the evidence is therefore that when she said her camera did not activate, she was correct.

*Finally*, the Probation Office adds an alleged lie about the identity of Ms. Myres's supervisor, but this was not a knowing false statement either.  The evidence showed that at the Sheriff's Department, the identity of a supervisor "depends on the shift and the site," especially for deputies like Ms. Myres who worked a lot of overtime at different locations (e.g., the hospital, the courthouse).  Trial Tr. at 1016:6-18, 1021:15-16.  Given that Ms. Myres had a shifting set of supervisors, and that the question was intended to verify her employment and the ownership of department-issued items, *id.* at 1123:18-25, she acted in good faith when she initially left the name of her supervisor blank and later identified Captain Adams, the go-to person on these issues, *id.* at 1023:11-20, 1037:22-25.  In any event, for purposes of assessing intended loss under the governing law, a false statement about Ms. Myres's supervisor could only be relevant to whether Ms. Myers intended to defraud Farmers out of the value of the Sheriff-owned items — which the draft PSR already included in its calculation of intended loss.  Any such lie has no relevance to whether Ms. Myres subjectively intended to defraud Farmers out of the value of other items that Ms. Myres undisputedly owned, that were actually stolen, and for which she honestly sought compensation. In sum, the government cannot establish that Ms. Myres knowingly made false statements with the motive to defraud her insurer for any items other than those totaling $9,573.37 in value that were found in her house or were determined by the Probation Office to belong to the Sheriff's Department.[12]

---

[12]  This is true under any standard of proof.  In the event the Court makes factual determinations on these issues, however, it should require proof by clear and convincing evidence in light of the fact that, compared to sentencing Ms. Myres based on the value of the three items found in her home, the enhancements proposed by the government and Probation would triple the high end of her guideline range. *Compare United States v. Valensia*, 222 F.3d 1173, 1181-83 (9th Cir. 2000). There is language in Ninth Circuit cases suggesting that this principle is inapplicable to enhancements relating to the offense of conviction (as opposed to enhancements based on relevant conduct), but that language appears to be derived from conspiracy cases in which the scope of the conspiracy was or could have been addressed at trial, so the verdict of guilt beyond a reasonable doubt, in the court's view, sufficiently satisfied due process on those issues.  *See, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010) (noting that "sentencing enhancements based entirely on the extent of the conspiracy do not require the heightened standard of proof," and that "the distinction between a quantity determination and uncharged criminal conduct places [a defendant convicted of conspiracy] on a fundamentally different plane than a defendant who has not been convicted of conspiracy" (internal quotation marks omitted)), *overruled on other grounds*, *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM          CASE NO. 17-CR-00180-RS

**B.      As a matter of law, none of the factual arguments can justify including the entire value of the claim as intended loss.**

Even if the Probation Office and the Government were correct in claiming that Ms. Myres lied and that she did so to defraud her insurer, those lies are irrelevant as a matter of law to whether Ms. Myres's intended loss is equal to the full amount of her insurance claim.  As the Ninth Circuit held, "[a] district court may "impose sentencing enhancements only for losses that '*resulted from*' the defendant's fraud." *Myres*, 844 F. App'x at 990 (emphasis added).  The phrase "resulted from" requires the government to prove that the fraud was both a "but-for" and "proximate" cause of the loss. *United States v. Lonich*, 23 F.4th 881, 916 (9th Cir. 2022).  This requires a court calculating intended loss to first determine what the defendant subjectively expected to receive in the event of a successful fraud, then "*exclude[] any sums that the fraudster would have been paid absent the fraud.*" *Alphas*, 785 F.3d at 783 (emphasis added).  Payments that a defendant would have received in the absence of fraud cannot have "resulted from" the fraud as a matter of law, and thus cannot be included in intended loss. *Id.*; *United States v. Dawkins*, 202 F.3d 711, 715 (4th Cir. 2000).

This means a court must "determine[] whether and to what extent legitimate claims were embedded in the fraud." *Alphas*, 785 F.3d at 783.  Those "legitimate losses" cannot be included in intended loss. *Id.* at 781-83. Here, therefore, the only way Ms. Myres's "intended loss" could be the full amount of her insurance claim is if the Government can prove that, "absent the fraud," she suffered no "legitimate losses" and would not have been entitled to receive any portion of her claim. *Id.*

The government cannot satisfy that burden — and has never really tried to do so.[13]  Had Ms. Myres not engaged in any of the fraud proven by the government, as found by the jury, she would not have sought compensation for, at most, the three items found in her home and other items arguably owned by the Sheriff's Department — out of the forty-three items she listed on her insurance claim.  She still would have honestly sought compensation for the remaining items,

---

[13]  On appeal, the government incorrectly relied on *United States v. Torlai*, 728 F.3d 932 (9th Cir. 2013), to argue that *Alphas* is incorrect. Not so: *Torlai* is perfectly consistent with the rule in *Alphas*. Unlike Ms. Myres, the defendant in *Torlai* did not have *any* losses that fell within the coverage of his insurance policy, and he had committed fraud to procure his policies in the first place. *Id.* at 941-43. "[A]bsent the fraud," therefore, the defendant in *Torlai* "would have been paid" nothing. *Alphas*, 785 F.3d at 783-84 (distinguishing *Torlai* because the "Ninth Circuit found sufficient evidence that the defendant had suffered no reimbursable losses").

DEFENDANT APRIL MYRES'S SENTENCING MEMORANDUM          CASE NO. 17-CR-00180-RS

which were actually owned by Ms. Myres, stolen by Mr. Fowler, and covered by her policy. "Absent the fraud," therefore, Ms. Myres would have been entitled to a payment of at least $57,473.41 for her legitimate losses. That $57,473.41 in losses could not have "resulted from" Ms. Myres's fraud and cannot be included in intended loss. *Myres*, 844 F. App'x at 990 (internal quotation marks omitted).

None of the Probation Office's or the government's arguments show otherwise, because they all misunderstand the Guidelines' causation requirement. First, the Probation Office and the government rely on the void-for-fraud clause. But, as *Alphas* held (and the government tacitly conceded on appeal), a void-for-fraud clause cannot be considered when calculating intended loss because it is irrelevant to what a defendant would have received "absent the fraud." 785 F.3d at 782-83; CA9 Gov. Br. at 58. Second, the Probation Office and the government rely on the other alleged lies they say Ms. Myres told. But to show that those lies could have caused losses equal to the full amount of Ms. Myres's claim, the government must prove that, had Ms. Myres *not* told those lies, Farmers would have denied her entire claim. Neither the Probation Office nor the government has ever offered any evidence showing that if Ms. Myres had answered any of the other questions in a manner that the government deems truthful, Farmers could or would have denied her claim for $57,473.41 in legitimate losses.

Instead, the Probation Office and the government contend that Ms. Myres was not entitled to any payment on the actual claim she submitted. *E.g.*, Addendum to Report ¶ 14. In other words, the Probation Office and the government erroneously argue that intended loss depends on "what an objectively reasonable fraudster standing in [Myres's] shoes would have expected to be paid were the fraud discovered" — exactly the reasoning that courts have determined to "approach[] intended loss from the wrong angle." *Alphas*, 785 F.3d at 782-83. Intended loss depends on a defendant's subjective intent, and "no fraudster sets out to swindle sums that he would have been paid anyway" in the absence of fraud. *Id*. at 783. For purposes of intended loss, therefore, it does not matter whether a defendant's actual claim could be denied in its entirety. *Id*. at 782-83. The "relevant inquiry" is whether, "absent the fraud," the defendant would still have "legitimate

claims" for which she was entitled to payment. *Id*. The calculation of intended loss cannot include any amounts attributable to those legitimate claims. *Id*. at 781-82; *Dawkins*, 202 F.3d at 715.

As noted, the government also argues that Ms. Myres's claim was "rife with fraud," based on its narrative of her alleged lies. That argument is factually wrong for all the reasons given above, but it fares no better legally. The government raised its "rife with fraud" argument in the Ninth Circuit, which did not adopt it. If the Ninth Circuit thought the argument had merit (and satisfied the requirements of addressing Ms. Myres's subjective motives and the Guidelines' causation requirement), then it would not have remanded the case for resentencing. In any event, the alleged lies the government cites have nothing to do with determining which portions of Ms. Myres' insurance claim were legitimate. There is no difficulty in distinguishing the outer bounds of the legitimate from illegitimate portions of Ms. Myres' insurance claim. Indeed, the draft PSR did so with ease, correctly determining that Ms. Myres' intended fraud was no more than $9,573.37. In these circumstances, "the government bears the burden" to prove that none of Ms. Myres' losses were legitimate. *Alphas*, 785 F.3d at 783-84. It cannot come close to satisfying that burden.

Unable to justify the Guideline range it seeks under either as a factual or a legal matter, the Government's letter to the Probation Office retreats to a "culpability" argument that has nothing to do with intended loss. It asserts that "any loss calculation that failed to account for the scope of her fraud — including her attempts to mislead Farmers Insurance and law enforcement — would dramatically underestimate her relative culpability." Gov. Letter at 2 (Sept. 8, 2022). Her "culpability" explains why she is here to be resentenced, and her "relative culpability" is measured through an application of the Guidelines' definition of "intended loss" as the "pecuniary harm" she "purposely sought to inflict" — which is the question the Ninth Circuit remanded for this Court to decide. *Myres*, 844 F. App'x at 991 (internal quotation marks omitted); *see Alphas*, 785 F.3d at 781-83 (explaining that excluding legitimate losses from "intended loss" accurately measures relative culpability). Because the alleged lies on which the Government relies do not reflect a subjective intent to defraud Farmers out of any money, they do not bear on any "culpability" relevant to intended loss.

For all of these reasons, the inaccurate portion of Ms. Myres' claim inflated her claim by $3,184.62 or, at most, $9,573.37, the intended loss initially calculated in the draft PSR. That is the maximum permissible calculation of intended loss, even if the Government were factually correct about Ms. Myres's conduct. *Alphas*, 785 F.3d at 781-83; *Dawkins*, 202 F.3d at 715. In light of the legal principles government the calculation of intended loss, in light of government's failure to establish any knowing false statements made to defraud Ms. Myres's insurer (except for the items that should not have been on her claim form), and in light of the Ninth Circuit's rejection of the government's attempt to ignore Ms. Myres's subjective intent through a "treat the claim as a whole" theory of loss, this Court should at a minimum return to the Probation Office's original calculation, reflected in the draft PSR, which resulted in a total offense level of 9. However, that calculation is itself too high; any enhancement should be limited to the three items found in Ms. Myres's home, which would place the offense level at 7. Simply put, Ms. Myres did not have "actual intent" or "motive" to defraud Farmers out of $67,046.78 when she made a claim seeking to recover for numerous items actually stolen from her home.

### C. The Section 3553(a) factors also favor a non-custodial sentence.

Even if the proper Guidelines ranges did not allow for a non-custodial sentence, Section 3553(a) factors would counsel for such a sentence. Other than her offense of conviction and the events that led up to it, Ms. Myres has led a law-abiding life devoted to public service and service to others in her community. Numerous individuals submitted letters to the Court attesting to this fact. Myres Sentencing Mem. Ex. 9 (Dkt. 250, Nov. 12, 2019). She "has dedicated her life to helping others," for example by "volunteering her time and energy on a weekly basis to helping people to learn about the Bible." *Id.* Ex. 9-C. She "frequently helps others in [her] congregation," including by "organiz[ing] safety procedure drills and exercises" and "put[ting] together an entire security program." *Id.* Ex. 9-D; *see also* Ex. 1 to this Sentencing Memorandum.

In contrast to this history of service, the aberrant conduct that led to Ms. Myres's offense occurred during a very challenging period in her life. In addition to the death threats she was receiving (which resulted in her having a protective detail from the Sheriff's Department until shortly before the burglary, Trial Tr. at 1003:10-1004:8, 1005:17-1006:5; Myres Sentencing Mem.

15

Ex. 12 (Dkt. 250, Nov. 12, 2019)), she had just broken up with Mr. Fowler.  Before the break up, Mr. Fowler had almost shot her son.  Trial Tr. at 971:10-24.  On top of all those events, her home was burgled, possessions for which she had worked substantial amounts of overtime were stolen, and her home was ransacked and in shambles.  While none of this excuses her conduct, it at least suggests some reasons why her conduct deviated from the constructive way in which she has otherwise lived her life.

Just as her offense occurred at a difficult time in her life, so too does this sentencing. Since her conviction, she lost her sister Beverly, with whom she was very close, and now is devoted to taking care of her brother, who has cancer.  She is her brother's sole caretaker. She ferries him back and forth to the hospital in Vallejo — more than an hour drive each way — feeds him, arranges for his medications, and takes responsibility for other needed tasks.  Sending her to jail will punish her brother more than it will punish Ms. Myres.

Against these mitigating factors, at the sentencing in 2019, this court emphasized Ms. Myres's position as a public employee in a role associated with law enforcement.  But the aggravating quality of her position should be considered in light of the fact that she was acquitted on the only job-related offense with which she was charged, and that she has already been punished for engaging in a relationship with Mr, Fowler — she lost her job, her pension was reduced, her son was nearly shot, she lost valuable possessions, and her home was ransacked.  Not only was the offense of conviction unrelated to her position was a public official, but she was not a high-level official; she was a line-level employee performing unattractive work.  *See* Myres Sentencing Mem. at 26 (Dkt. 250, Nov. 12, 2019).  In any event, and especially as limited for the reasons set forth above, the fact that she was a deputy sheriff at the time of she committed an insurance fraud should be offset by the twenty good years of public service that she did provide.

Any remaining doubt about the reasonableness of a non-custodial sentence is resolved by a comparison between Ms. Myres and public employees who, unlike Ms. Myers, are convicted of job-related offenses.  Even elected and supervisory public employees (including law enforcement officers) who have committed job-related offenses commonly get sentenced to less than 14 months incarceration. *See, e.g.*, *United States v. Presta*, No. 1:20-cr-00475, Dkt. 54 (N.D. Ill. Apr. 25,

16

2022), *discussed at* https://bit.ly/3xX9FOx (former mayor sentenced to one year for filing a false tax return and for taking a bribe to corruptly increase the number of red-light camera tickets issued in his city); *United States v. Cochran*, No. 1:16-cr-00808, Dkt. 91 (N.D. Ill June 26, 2019), *discussed at* https://bit.ly/3UMXygP (City of Chicago Alderman — equivalent to a member of the San Francisco Board of Supervisors — sentenced to a year and a day for stealing $14,285 from a charitable fund intended to help families and children in his South Side ward); *United States v. Dartt*, No. 1:16-cr-00683, Dkt. 47 (N.D. Ill. Feb. 26, 2018), *discussed at* https://bit.ly/3BQQHu6 (Sheriff Lieutenant sentenced to four months for assaulting a jail inmate who was being transferred for a psychiatric evaluation); *United States v. Taylor*, No. 15-cr-568-1, Dkt. 27 (N.D. Ill. Aug. 8, 2016), *discussed at* https://bit.ly/3raoZUa (former clerk at Cook County Recorder of Deeds sentenced to one day time served for taking a bribe to prepare a fraudulent real estate deed). A prison term for Ms. Myers would be disproportionate to these other sentences.

## IV.    **CONCLUSION**

For all the reasons set forth above, defendant April Myres respectfully requests that the court impose a non-custodial sentence.


DATED:  September 27, 2022                     KING & SPALDING LLP


                                               By: */s/ Michael J. Shepard*
                                                   MICHAEL J. SHEPARD
                                                   JAMIE A. LANG

                                                   Attorneys for Defendant
                                                   APRIL DIANE MYRES

EXHIBIT 1

David Dozier
1379 Hudson Avenue
San Francisco, CA  94124
(650) 338-9695
dozierdavid38@gmail.com


September 23, 2022


rscrd@cand.uscourts.gov – Corrine Lew (Judge Seeborg's Clerk)
Honorable Richard Seeborg, Chief District Judge
Northern District of California
San Francisco Courthouse, Courtroom 3, 17th Floor
450 Golden Gate Avenue
San Francisco, California 94102

Re:      **April Myres**

Dear Judge Seeborg,

      This letter is written in support of April Myres.  Let me first mention to you who I am.  My name is David Dozier and I am one of the Elders in the Bayview Congregation of Jehovah's Witnesses, located at 1255 Thomas Avenue, San Francisco, California.  I have known April since she became one of Jehovah's Witnesses since July 2009.  April is very active in the Bayview Congregation, attending all the meetings, which are held twice weekly and attending field service (community service) on a daily basis. April is very active in our congregation, auxiliary pioneering several times over the years and achieving an average of over 20 hours and more each month, even during the Pandemic, with a total for 2020 of over 200 hours.

      April is also very supportive and thoughtful.  She cares for family members when they are ill. She is currently taking care of a brother who has cancer and needs ferrying back and forth to the hospital, in Vallejo!  That is a multiple hour drive for her each way to care for this family member.  Not stopping at transporting her relative to and from the Hospital, Home and any other errands, but also feeding her family member and arranging for the medicine and cleaning of the house and anything else that is needed and necessary.

      My wife and I can personally attest to April's kindness and loving encouragement.  My wife has had total knee replacement surgery twice and April has been available to help, while my wife was preparing to have the surgery and then later, as she was recovering and more recently, as my wife's health has improved.  She would run errands to bring us food and any other items we needed.  She would take my wife out exercising to keep her knees in as good a shape as possible.

      As April has an extensive background in Law Enforcement, our congregation has been able to utilize these skills.  April has been accommodating insofar as helping with the security needs of the

Bayview Congregation.  We are so appreciative of her examining the property and then creating a plan for the Bayview Congregation so that we can be safe in these dangerous times.

She is a wonderful person and fully deserving of any and all mercy and compassion with regards to any sentence or punishment that might be given to her.

I am ready and willing to speak with you, Judge Seeborg, if you would like to discuss this letter personally.  Thank you for your humanity in her behalf.


Very Truly Yours,



David Dozier

ADD/tld

EXHIBIT 2

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

FEB 16 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 19-10415 |
| Plaintiff-Appellee, | D.C. No. 3:17-cr-00180-RS-1 |
| v. | |
| APRIL DIANE MYRES, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted January 14, 2021
San Francisco, California

Before: WALLACE and M. SMITH, Circuit Judges, and LASNIK,** District Judge.

April Myres was convicted by a jury for mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. Myres' convictions stemmed from an insurance claim she filed after she reported a burglary at her home. Myres was sentenced to fourteen months' imprisonment. On appeal, Myres argues

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.
\*\* The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

that the district court made four errors in evidentiary rulings at trial and that the court erred in sentencing. Because the parties are familiar with the facts, we do not recount them in detail, except as necessary to provide context to our ruling. We have jurisdiction under 18 U.S.C. § 1291.

I.  Evidentiary Admissions at Trial

We review evidentiary rulings to admit or exclude evidence for abuse of discretion. *United States v. Alvirez*, 831 F.3d 1115, 1120 (9th Cir. 2016). Where an evidentiary error has occurred in a criminal prosecution, this Court reviews *de novo* whether the error "rises to the level of a constitutional violation." *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015). We conclude that the district court properly denied Myres' evidentiary objections and constitutional challenges.

First, the district court did not commit constitutional error in allowing testimony from an insurance claims adjuster regarding his impression of Myres' response to a request that federal law enforcement agents made during a visit to Myres' home. Myres contends that admitting this testimony amounted to constitutional error based on *United States v. Prescott*, 581 F.2d 1343 (9th Cir. 1978). We held in *Prescott* that a "passive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing." *Prescott*, 581 F.2d at 1351. Unlike testimony regarding law enforcement's breaking down of a door in *Prescott*, which we determined "would

2

lead to the conclusion that [the defendant] had refused permission to enter," *id.* at 1353, testimony about Myres' comment to the agents that "she didn't have time" for "something" they had asked her, does not lead to the conclusion that Myres refused a warrantless search. We decline to extend *Prescott* to testimony so vague that the jury could not reasonably connect it to constitutionally protected conduct.

Even if, *arguendo*, the testimony in question were considered a comment on the exercise of Myres' Fourth Amendment rights, the testimony was admitted for a proper purpose: to undermine Myres' theme that she was the victim of a burglary. *See Leavitt v. Arave*, 383 F.3d 809, 828 (9th Cir. 2004) (holding that a prosecutor was entitled to question a defendant's theme of cooperation by showing that defendant was in fact uncooperative).

Second, the district court did not commit constitutional error in allowing testimony from a law enforcement officer regarding Myres not responding to the officer's calls after she had invoked her right to counsel. Myres relies upon two cases that concern comments referencing a defendant's retention of counsel. *See Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983); *United States v. Kallin*, 50 F.3d 689 (9th Cir. 1995). The witness testimony Myres takes issue with, however, does not contain any comments regarding Myres' retention of counsel. Moreover, the government did not elicit testimony regarding Myres retaining an attorney, and the government never implied that retaining an attorney was a sign of guilt. *Cf. Kallin*, 50 F.3d at 693–94;

*Bruno*, 721 F.2d at 1194–95. Therefore, the district court did not err in admitting this testimony.

Third, the district court did not abuse its discretion in admitting a recording of a jail call between Myres and her ex-boyfriend, Antoine Fowler. A district court has "'wide latitude' in determining admissibility of evidence under Rule 403 . . . and its decision is accorded considerable deference." *United States v. Joetzki*, 952 F.2d 1090, 1094 (9th Cir. 1991) (citation omitted). Myres made statements in the call that tended to show that she was aware that Fowler faced danger upon his release from jail. These statements had probative value because they made it more likely that Myres knew Fowler would seek out a firearm for protection, which was relevant to the charges the government was trying to prove. Although other witness testimony established that Fowler was a known "snitch," it did not get as directly at Myres' expectation that Fowler would face danger upon his release. Myres argued that the call was unfairly prejudicial, but when viewed in the context of Fowler's own behavior toward Myres, the call did not unfairly vilify Myres.

Fourth, the district court did not abuse its discretion when it permitted testimony regarding a court order prohibiting Myres from possessing a firearm. In particular, the testimony concerned Myres' employer, the San Francisco Sheriff's Department (SFSD), repossessing a firearm from Myres as a result of a court order. This testimony was probative because it tended to show that Myres was aware she

was not the owner of the firearm; rather, she understood that SFSD was the owner. Given that Myres wrote on her second proof of loss to her insurer that SFSD equipment became hers after four years of service, her understanding of the firearm's ownership was relevant to evaluating her intent in making this statement. Additionally, the likelihood of unfair prejudice was slight because the reference to the court order was brief, and it was unlikely to provoke an emotional response where the jury learned that the confiscated firearm was eventually returned to Myres. *See United States v. Fagan*, 996 F.2d 1009, 1015 (9th Cir. 1993) (concluding that a "brief reference to [the defendant's] gang membership was not likely to provoke an emotional response in the jury").

The district court did not commit constitutional error, and it acted within its discretion to admit the evidence Myres challenges on appeal. While the district court faced challenging legal questions, it issued thoughtful rulings to ensure Myres received a fair trial. *See Ross v. Oklahoma*, 487 U.S. 81, 91 (1988) (observing that the "Constitution entitles a criminal defendant to a fair trial, not a perfect one").

II. <u>Sentencing</u>

We review the district court's interpretation of the Guidelines issued by the United Sentencing Commission (the Guidelines) *de novo*, application of the Guidelines to the facts for abuse of discretion, and factual findings for clear error. *United States v. Staten*, 466 F.3d 708, 713 (9th Cir. 2006). We conclude that the

district court erred when it failed to make findings on the record regarding Myres' intent with respect to the amount of intended loss.

When a defendant has committed fraud, the base offense level increases consistent with the amount of "loss." *See* U.S.S.G. § 2B1.1. The Guidelines define "loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3 (A). The amount of "intended loss" is equivalent to "the pecuniary harm that the defendant purposely sought to inflict."[1] U.S.S.G. § 2B1.1, cmt. n.3 (A)(ii). The government must "prove the loss by a preponderance of the evidence." *United States v. Walter-Eze*, 869 F.3d 891, 912 (9th Cir. 2017) (quoting *United States v. Torlai*, 728 F.3d 932, 946 n.13 (9th Cir. 2013)). A district court may "impose sentencing enhancements only for losses that 'resulted from' the defendant's fraud." *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009) (quoting *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000)).

The district court's responses to defense counsel during sentencing suggested that the court considered Myres' motives irrelevant, and the court did not provide explicit reasoning or factual findings to support its conclusion that the intended loss was the entire claim. Accordingly, we must vacate the sentence and remand for the

---

[1] The amount of intended loss also "includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1, cmt. n.3 (A)(ii).

district court to explain fully its reasoning. *See United States v. Jimenez-Ortega*, 472 F.3d 1102 (2007) (remanding where sentencing court failed to make a finding about the materiality of defendant's false statements).

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**