STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS J. WALSH (CABN 314290)
Assistant United States Attorneys

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-7200
> Laura.Vartain@usdoj.gov
> Nicholas.Walsh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-CR-00180 RS |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| APRIL MYRES, | Hearing Date: October 4, 2022 |
| Defendant. | Time: 9:00 a.m. |

1
2

# TABLE OF CONTENTS

3

**INTRODUCTION**..................................................................................................1

4

5

**FACTS AND HISTORY RELEVANT TO RESENTENCING** ............................................1

6

    I.      Myres' Lies to Farmers Insurance ................................................1

7

    II.     The Dispute Over the Loss Amount at Sentencing..........................3

8

    III.   The Appeal and Current Case Posture ........................................4

9

10

**ARGUMENT** ......................................................................................................5

11

    I.      The Guidelines Require Only a Reasonable Estimate of the Loss ....5

12

    II.     A Reasonable Estimate of the Loss is the Full Value of Myres' Claim ............6

13

14

**CONCLUSION** ...................................................................................................9

15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

The Court sentenced former San Francisco Sheriff's Department ("SFSD") Deputy Sheriff April Myres ("Myres") to 14 months in custody after she was convicted at trial, and the United States respectfully requests that the Court impose the same sentence at resentencing. The case has been remanded for additional fact finding as it concerned the loss calculation under U.S.S.G.§ 2B1.1. *See* Dkt. 330 (Memorandum of Disposition) at 5-7. The Court properly found the loss amount to be the entire amount of Myres' claim to Farmers Insurance: $67,046.78. The trial evidence was abundant that Myres intended to defraud Farmers Insurance by lying to Farmers Insurance in (1) the claim forms that she submitted by mail and fax to support her claim that her house was burglarized in March 2016; (2) a recorded statement Myres made on May 25, 2016, to Farmers Insurance employee Kimberly Hoiting; and (3) in an additional sworn examination with Farmers Insurance on September 19, 2016. At each opportunity, Myres lied to Farmers Insurance and the evidence showed that she intended to defraud Farmers Insurance.

In short, because Myres' claim was rife with lies, it was wholly fraudulent. Although Myres wishes she were a lesser fraudster—one who filed a genuine claim with certain illegitimate items—that is not supported by the record, including her own self-serving lies in May to September 2016. Below, the government reviews key relevant facts, certain law, and concludes with proposed findings that show Myres' intention as to defrauding Farmers of the entire claim.

**FACTS AND HISTORY RELEVANT TO RESENTENCING**

**I.     Myres' Lies to Farmers Insurance**

In June 2019, a jury convicted Myres of 18 U.S.C. §§ 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) for her fraudulent submissions to Farmers Insurance, which purported to arise from a March 24, 2016 burglary of Myres' residence.

The primary exhibits at trial were the claim form that Myres submitted to Farmers Insurance on May 4, 2016 by mail and by fax on May 14, 2016. The trial evidence proved the following categories of lies and half-truths in Myres' claims submissions. In the form, Myres said she did not suspect anyone, and yet trial evidence showed co-defendant and boyfriend Antoine Fowler at her residence the morning

of the burglary, following a heated argument between Fowler and Myres in her driveway. Trial evidence also showed that Myres was aware that Fowler was a thief. Separately, on the claims form, Myres said that Lissette Adams was her supervisor at the time of loss. Trial evidence disproved that statement and proved who was her supervisor at the time of loss. Myres claimed that all the stolen items except for her son's badge were solely owned by her, and trial evidence proved that the Sheriff's Department purchased and owned her service firearm and radio and in fact ultimately replaced them at no cost to Myres. Myres also claimed that her house had been unoccupied for 14 hours before the so-called burglary, but the video footage from her neighbors showed that when she left the home the night of the purported burglary, there were three men who had arrived while she was there and stayed after she left, all the while acting in a furtive manner.

Trial evidence also proved that Myres lied further in May 2015 to Farmers insurance employee Kimberly Hoiting. Here, Myres' lies continued about who was in her home around the time of the burglary (she said no one), that she did not suspect anyone, and that she owned the San Francisco Sheriff's Department items that she claimed on the proof of loss. In addition to these lies, she refused to provide her cell phone number and lied that she used a work cell phone; in fact, Farmers Insurance later learned that Myres had no work-issued cell phone. Myres also claimed to Hoiting that the burglar had entered through the kitchen window, even though the police had found no signs of forced entry.

Months later, Myres perpetuated these lies and added still more in her September 2016 Examination Under Oath to Farmers Insurance. At this time, Myres reiterated that no one was at her house when she left it on March 24, 2016. Significantly, Farmers Insurance asked Myres under oath whether she had "any begrudged ex-boyfriend's [sic] or ex-husband's [sic] you think could have been involved in this incident?" Myres answered "No." However, the trial evidence included a video of Fowler and Myres fighting on March 23, 2016, the day before the burglary in Myres' garage. When Myres left her home during the fight, the video showed Fowler throwing two trash cans at her car.

In the same examination, Myres also swore under oath that she did not have home security at the time of the burglary, but the trial evidence proved that she had a home video system that was motion activated and she told the San Francisco Police Department two conflicting stories about it. She told Officer Larson that she deleted any footage of it; she told Sergeant Dicroce that her motion sensor

1    cameras had captured nothing.

2           Myres said that her sons were at her house the day of the burglary but only in the garage, and

3    that there were no friends present, and thus her house was empty when she left it on the night in

4    question. That conflicted dramatically with her neighbors' surveillance video footage showing persons

5    inside Myres' home while she was still there and after she left.

6           When the FBI searched Myres' home after arresting Fowler with her firearm on February 2,

7    2017, they found a Louis Vuitton purse, a blue fox fur vest, and Gucci rain boots, each of which Myres

8    had claimed as stolen in her May 2016 claims to Farmers Insurance.

9           At trial Farmers Insurance representatives confirmed that they had relied on Myres' statements to

10   determine the nature of the loss and try to recover the stolen property. Farmers Insurance denied the

11   claim in full.

12   **II.     The Dispute Over the Loss Amount at Sentencing**

13          The Presentence Investigation Report ("PSR") applied a six-level enhancement based on

14   intended loss of just over $67,000. *See* Dkt. 256 (PSR) ¶ 25. In doing so, the Probation Officer agreed

15   with the government's submissions and arguments that Myres deliberately concealed the burglar's

16   identity and intended to defraud Farmers Insurance of every dollar she claimed. The PSR detailed many

17   of the fraudulent statements that Myres made. *See* PSR ¶¶ 15, 16, and 18. In an addendum to the PSR,

18   the Probation Officer explained her justification for including the entire claim as the loss amount, which

19   relied on the void for fraud clause of Myres' insurance policy. *See* Addendum to PSR ¶ 14.

20          The parties briefed and argued about the loss amount in their respective sentencing memoranda

21   and at the sentencing hearing held on November 22, 2019. The government's principal argument

22   regarding the loss amount focused on the many lies Myres made to Farmers Insurance in the claim

23   inception and processing.

24          In response to the Court's questions as to whether it needed to find that Myres was complicit in

25   the burglary of her own home to find her responsible for the full loss amount, the government said:

26              I don't think the Court has to make a finding on complicity in the
                burglary. I think the Court – it is sufficient for the Court to find that her
27              failure to truthfully answer the questions Farmers posed to her regarding
                access to her home meant that the whole entire thing was a fraud on
28              Farmers.

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS

1  Dkt. 266 (Sentencing Transcript) at 20.

2          The Court responded: "I understand. So at that point because of the deception and lies associated

3  with that claim, you put in a $68,000 claim. You are defrauding the insurance company, and the $68,000

4  is the intended loss." *Id.* at 20-21. The government responded, "yes." *Id.* at 21. The defense argued that

5  there was

6          no purposeful intent to make the entire fraudulent claim. The purposeful
7          intent was she had a bona fide claim for at least a substantial amount of
           that claim, and she was not purposefully trying to undermine that claim in
           any way when she didn't walk about Fowler because there would have
8          been nothing wrong in terms of talking about Fowler, in terms of getting
           her claim paid.
9

10  *Id.* at 23. The Court concluded that "the Probation recommendation on the calculation is the right one."

11  *Id.* at 24. The Court did not make additional factual findings.

12          The Court then moved onto the parties' sentencing recommendations. In the course of that

13  discussion, the Court engaged with defense counsel about Myres' abuse of trust, and quoted from the

14  PSR's view as it concerned abuse of trust, and said it was "right on." *Id.* at 39. That quotation is on page

15  2 of the Amended Sentencing Recommendation:

16          It cannot be understated that the Defendant was a Sheriff's Deputy at the
           time of the incident offense. One cannot separate her job in law
17          enforcement from her conduct. She was trusted by the San Francisco
           Sheriff's Department and by her community, the community which she
18          had taken an oath to protect. The officer does not see the defendant's
           career as a mitigation factor in this case; rather, with a successful career as
19          a sheriff's deputy, the defendant should have known better. When those
           sworn to uphold the law become the very ones who break the law, the
20          entire criminal justice system is undermined.

21  Dkt. 256 at 2; *see also* Dkt. 266 at 43.

22          Ultimately, the Court sentenced Myres to a term of 14 months on each count, to be served

23  concurrently. In announcing the sentence, the Court weighed various factors, but at the outset articulated

24  that the criminal conduct was "shameful" and not warranted by the stress under which Myres said she

25  was operating. Dkt. 266 at 43.

26  **III.    The Appeal and Current Case Posture**

27          Myres appealed her conviction and sentencing. The Ninth Circuit affirmed the convictions and

28  remanded the matter to the Court for further findings on sentencing. *See* Dkt. 330 at 5-7. Myres' petition

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS

4

for certiorari was denied. *See* Dkt. 351.

The Probation Office has issued a revised PSR to reflect additional health conditions that Myres requested for inclusion, but did not alter its recommendation as to sentencing. *See* Dkt. 364. Instead, it bolstered it's reasoning in paragraph 14 of the addendum in support of the Probation Office's conclusion that the whole amount of the claim was the appropriate loss amount. *See* Dkt. 364, Addendum to Revised PSR ¶ 14.

The matter is now set for further findings at the resentencing of Myres on October 4, 2022.  This Sentencing Memorandum is therefore filed in conformity with Local Rule 32-5(b) (sentencing memoranda due no later than seven days before sentencing hearing).

## ARGUMENT

The Court properly calculated the loss amount as the full value of the claim. At resentencing, the Court should support the calculation with the factual finding that Myres intended to defraud Farmers Insurance of the full amount of her claim, as evidenced by her repeated lies in the claim and in subsequent statements to Farmers Insurance regarding the items claimed, facts surrounding the burglary, and other miscellaneous facts such as who supervised her at the time of loss. By lying about critical and foundational elements of what happened and who owned her property, Myres filed an entirely fraudulent claim, as distinguished from exaggerating the amount of value of legitimately stolen items. In short, there is no amount that Farmers Insurance could legitimately pay, because Myres concealed the true circumstances of the so-called burglary and other facts that Farmers Insurance asked about and relied upon in assessing the claim.

In the alternative, the Court could require Myres to prove up the veracity of any amount she claimed as genuine, but the Court should not engage in that course because it would be futile for the same reason the whole claim was fraudulent: there was no valid portion of the claim because Myres lied at every turn.

## I.     The Guidelines Require Only a Reasonable Estimate of the Loss

A defendant's base offense level in a fraud case increases with the amount of loss. *See* U.S.S.G. § 2B1.1. A loss between $6,500 and $15,000 equates to a two-point enhancement and a loss between

$40,000 and $95,000 equites to a six-point enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(B) and (D). Here, "intended loss" is defined as the "pecuniary harm that the defendant purposely sought to inflict," including any harm "that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).

"[A]ll that is required is that the government prove the loss by a preponderance of the evidence." *United States v. Walter-Eze*, 869 F.3d 891, 912 (9th Cir. 2017). The sentencing court "need only make a reasonable estimate of the loss," which is "entitled to appropriate deference" given the court's "unique position to assess the evidence." U.S.S.G. § 2B1.1 cmt. n.3.

## II.   A Reasonable Estimate of the Loss is the Full Value of Myres' Claim

In assessing what a claimant intended, the Ninth Circuit in *United States v. Torlai* upheld a sentence where the district court based the loss amount on Torlai's full claim amounts, rather than crediting Torlai's argument that some parts of his claim were legitimate. 728 F.3d 932, 937 (9th Cir. 2013). Torlai was convicted of false claims for crop insurance payments under the Federal Crop Insurance Act. *See id.* at 932. Torlai lied to procure his insurance policy, and so could not show that he was an intended recipient of the government policy. *See id.* at 940. But the Ninth Circuit went beyond this threshold determination and found that Torlai was not entitled to any portion of his indemnity payment, taking each of the claimed losses in turn. For example, Torlai had claimed that he planted 449 acres of wheat on Stoney Creek Ranch in 2001 on non-irrigated land. *See id.* at 941. But the record showed that he purchased only enough wheat to plan about 120 acres of non-irrigated land. *See id.* As it concerned this loss, the Ninth Circuit found that on top of Torlai failing to show that he was an intended beneficiary, he also had not shown that the loss he suffered was a covered event: "the absence of a legitimate cause of loss means that Torlai was not an intended beneficiary of any indemnity for Stoney Creek Ranch in 2001, regardless of other factors." *Id.* at 941. Importantly, the Court did not parse whether Torlai should have been paid for 120 acres. The Court found other such examples in other payments that Torlai claimed, including one in which Torlai claimed a loss of safflower five days after planting, despite evidence that safflower would not have emerged from the soil by the claimed date of loss. *See id.* at 942-43.

The instruction of *Torlai*, albeit in a government benefits case as opposed to private insurance

1   fraud, is that when a fraudster pursues an insurance claim based on losses that could not in fact be

2   covered, the district court can properly find that the fraudster is not entitled to a partial recognition of

3   part of the claim. *See also* United States v. Munoz, 233 F.3d 1117 (9th Cir. 2000) (holding that total

4   investment money generated in Ponzi scheme is not offset by any value received by defrauded parties);

5   *United States v. Dehaan*, 896 F.3d 798, 807-08 (7th Cir. 2018) (finding loss calculation properly

6   included entire amount paid by Medicare for patients who were not properly certified, even though some

7   patients would have qualified had they been certified); *United States v. Crawley*, 533 F.3d 349 (5th Cir.

8   2008) (holding intended loss properly included salary and pension of union president convicted of voter

9   fraud even though he performed legitimate services while in office: "[P]rocuring a union office by

10  fraud…renders any service valueless *ab initio*."); *United States v. Triana*, 468 F.3d 308, 311 (6th Cir.

11  2006) (holding defendant who was barred from participating in Medicare was not entitled to reduction

12  for loss amounts attributable to Medicare-eligible doctors' reimbursements at sentencing for his fraud

13  conviction running a company that billed Medicare).

14          This case is not a case in which a fraudster merely augments a legitimate claim with items that

15  should not be on it; instead, in this case Myres initiated and perpetuated the claim based on fraud about

16  what happened. Although Myres had a valid policy not procured through fraud (and so not entirely like

17  the government benefit cases cited above), the reasoning of those cases is useful. The cases declined to

18  engage in a hypothetical of what might be a genuine claim, finding that the root of the claim was

19  fraudulent. Here, Myres' *claim* was invalid *ab initio* because Myres' submission of the claim was based

20  in her multiple misstatements intended to deceive Farmers Insurance into paying an invalid claim—

21  invalid because it intentionally concealed relevant facts through outright lies and omissions.

22          Myres previously has claimed that this Court cannot rely on the void for fraud clause, and the

23  government is not and did not at sentencing rely on it for the principle that the whole claim is fraudulent.

24  The government's argument is not rooted in contract but in the evidence of what Myres intended, which

25  was to perpetrate lies about the circumstances of the burglary to ensure that Farmers Insurance paid her.

26  This connection is the type of causation requirement that the Guidelines requires. *See* U.S.S.G. § 2B1.1

27  cmt. n.3(A)(ii).

28          Myres also claimed, at sentencing, that her lies about her disgruntled ex-boyfriend were meant to

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS

7

1  deceive her employer, not Farmers Insurance. Myres made the lies to Farmers Insurance under oath,

2  after having already told Farmers Insurance a whole set of lies about who was at her house, and so this

3  assertion falls flat. Further, Myres asks the Court to find her to be a fraudster only in part: one who

4  suffered a legitimate loss but artificially inflated her claim. There is no support in the factual record for

5  that assertion. Instead, the evidence shows that Myres is more akin to the fraudster who invented a claim

6  out of thin air. *See United States v. Alphas*, 785 F.3d 775, 781 (1st Cir. 2015). In *Alphas*, the First

7  Circuit rejected the government's reliance on a void for fraud clause, and reasoned that "the relevant

8  inquiry, then, is what the fraudster reasonably expected to euchre out of his victim." *Id.* at 783 (citations

9  and quotations omitted). Under *Alphas*, the Court should exclude any sums that the fraudster would have

10  been paid absent the fraud. *Id.*

11        Here, there is no evidence that Myres was entitled to any portion of the claim. Engaging in

12  hypotheticals, consider these: if Myres had told Farmers Insurance the truth that when she left her home,

13  there were three men in it, or even her version of the truth, that Fowler was a disgruntled ex-boyfriend

14  who she claimed had burgled her home, would Farmers insurance have done nothing to investigate and

15  simply paid Myres? It seems unlikely, but the Court need not engage in hypotheticals, only the inquiry

16  as to what Myres intended by her deception of Farmers Insurance. The trial evidence proved that she

17  intended to convince Farmers Insurance to pay her $67,046.78, and that her lies were intended to

18  achieve that.

19        Should the Court have any pause about using the full amount of the insurance claim as the loss

20  amount, in *Alphas* the First Circuit articulated a burden shifting approach in which a sentencing court

21  can use as a starting point the face value of the claims of the loss amount where an insurance claim is

22  "rife with fraud." *United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015) (citing cases). The burden

23  then shifts to the defendant to offer evidence of what amount was a legitimate claim. *Id.* Once the record

24  is complete, the court makes the sentencing determination based on the reasonable estimate of loss. *Id.*

25  *See also United States v. Rivera-Ortiz*, 14 F.4th 91, 102-04 (1st Cir. 2021). In *Rivera-Ortiz*, the First

26  Circuit looked at the balance shifting approach, started with the face value of the claims and found that

27  Rivera had failed to identify any evidence showing any amount that was legitimate. *See id* at 104. Here,

28  there is no evidence that any portion of the claim was legitimate, and so Myres would have to produce it

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS

1  if she wants to do so. The government respectfully submits that this parsing is not warranted by the facts

2  of this case, where the nature of the fraud claim was not in *what amounts* were due, but went to the heart

3  of what happened. Accordingly, Myres is situated more with Torlai and the benefit fraudsters than with

4  Alphas, who lied about what produce he had lost but was in fact a produce seller. Should the Court

5  disagree, it should shift the burden to Myres to show that she has some portion of her claim that is

6  legitimate.[1]

7

8  **CONCLUSION**

9  For the reasons set forth above, the United States recommends that the Court impose the same

10  sentence that it did in 2019: (1) 14 months incarceration concurrent on Counts 1 and 2; (2) three years

11  supervised release with the conditions set out in the PSR; and (3) a $200 mandatory special assessment.

12  The United States further respectfully requests that in imposing that sentence, the Court find by a

13  preponderance :

14  • The trial evidence proved that Myres intended to deprive Farmers Insurance of the full value of

15    her claim because her claim documents and statements in support of them were riddled with lies.

16  • Specifically, the evidence that proved her intent to defraud the full value were:

17    o Myres' lies on the claims forms in May 2016 about the circumstances of the burglary;

18    o Myres' lies in a May 2016 recorded interview regarding the circumstances of the

19      burglary; and,

20    o Myres' lies in her September 2016 Examination Under Oath regarding the circumstances

21      of the burglary, including, for example, that she did not have a disgruntled ex-boyfriend.

22  • The record does not support Myres' contention that the burglary was genuine—*i.e.*, that it went

23    as Myres said it did to Farmers Insurance in that she did not have a suspect, did not have a

24    disgruntled ex-boyfriend, and did not leave anyone at her house. Instead, the evidence was

25

26

27  [1] At sentencing, Myres argued that photos of her items on Fowler's phone when the FBI seized it in February 2017 was evidence that the burglary in fact happened. Even if that were true—a stretch—as the Court noted at the time, it does not preclude Myres' complicity in the so-called burglary, and in any event, those photos constitute a small minority of the 65 items Myres claimed.

28

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS

9

1     contrary to what Myres said, particularly as to the disgruntled ex-boyfriend and who was at her

2     home when she left it.

3 Accordingly, the Court should find that Myres intended the entire $67,046.78 loss she claimed.  With

4 those findings, the Court's original sentence should be reimposed.

5

6 DATED: September 27, 2022                       Respectfully submitted,

7                                         STEPHANIE M. HINDS
      United States Attorney

8

9

10                                   */s/*
      LAURA VARTAIN HORN
      NICHOLAS J. WALSH

11                                           Assistant United States Attorneys

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' SENTENCING MEMORANDUM
17-CR-00180 RS