**KING & SPALDING LLP**
MICHAEL SHEPARD (SBN 091281)
　mshepard@kslaw.com
50 California Street, Suite 3300
San Francisco, CA 94105
Telephone: +1 415 318-1221
Facsimile: +1 415 318-1300

JAMIE ALLYSON LANG (SBN 253769)
　jlang@kslaw.com
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: +1 213 443 4355
Facsimile: +1 213 443 4310

Attorneys for Defendant
APRIL D. MYRES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>APRIL D. MYRES, et al.<br><br>　　　　　Defendant. | Case No. 17-CR-00180-01-RS<br><br>**DEFENDANT APRIL MYRES'S REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**<br><br>Date:　October<br>Time:　8:30 A.M.<br>Dept.:　3, 17th Floor<br>Judge:　Richard Seeborg |

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. THE GOVERNMENT'S FACTUAL ARGUMENTS MISSTATE THE
RECORD AND DO NOT SUPPORT ITS CALCULATION OF
INTENDED LOSS. ......................................................................................... 2

    A. The government does not identify any lies Ms. Myres's told to
defraud Farmers out of the full amount of her claim. ......................... 2

    B. The government largely ignores Ms. Myres's personal conduct
and circumstances. ............................................................................. 4

III. THE GOVERNMENT'S ARGUMENT IS LEGALLY IMPROPER
BECAUSE IT DISREGARDS THE GUIDELINE'S CAUSATION
REQUIREMENT. ........................................................................................... 5

    A. The government misstates the standard of review and burden of
proof. .................................................................................................. 6

    B. The government's theory of intended loss violates the Guideline's
causation requirement. ....................................................................... 7

IV. CONCLUSION............................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Pepper v. United States*,
    562 U.S. 476 (2011)...........................................................................................................5

*United States v. Alphas*,
    785 F.3d 775 (1st Cir. 2015) ..................................................................................... *passim*

*United States v. Crawley*,
    533 F.3d 349 (5th Cir. 2008) ................................................................................................8, 9

*United States v. Dehaan*,
    896 F.3d 798 (7th Cir. 2018) ................................................................................................8, 9

*United States v. Diaz*,
    884 F.3d 911 (9th Cir. 2018) ...................................................................................................6

*United States v. Hardy*,
    289 F.3d 608 (9th Cir. 2002) ...................................................................................................6

*United States v. Harms*,
    442 F.3d 367 (5th Cir. 2006) ...................................................................................................9

*United States v. Lonich*,
    23 F.4th 881 (9th Cir. 2022) ...........................................................................................6, 10

*United States v. Munoz*,
    233 F.3d 1117 (9th Cir. 2000) .................................................................................................8

*United States v. Myres*,
    844 F. App'x 987 (9th Cir. 2021) ............................................................................................7

*United States v. Smith*,
    683 F.2d 1236 (9th Cir. 1982) .................................................................................................5

*United States v. Suarez*,
    655 F. App'x 549 (9th Cir. 2016) ............................................................................................6

*United States v. Torlai*,
    728 F.3d 932 (9th Cir. 2013) ................................................................................................8, 9

**Federal Statutes**

18 U.S.C. § 3553(a) ......................................................................................................................5

I.  **INTRODUCTION**

The government's sentencing memorandum essentially doubles down on the erroneous position that it encouraged the Probation Office to take before the initial sentencing, and that it repeated in its recent submission to the Probation Office. It keeps trying and failing to fit its argument,[1] which rests on its narrative of Ms. Myres's alleged lies to Farmers and law enforcement, into the rule of *United States v. Alphas*, 785 F.3d 775 (1st Cir. 2015). But no matter how the government characterizes its argument, and no matter whether its argument would justify Farmers' decision to deny Ms. Myres's claim, it does not address the calculation of "intended loss" required by the Guidelines. That is because the Ms. Myres's alleged misstatements, if false at all, were not designed to defraud Farmers, and could not have been the but-for and proximate cause of any loss. The claim in *Alphas* was even more "rife with fraud" than the government claims Ms. Myres's was, but the court there still held that the calculation of intended loss must exclude the legitimate portions of the claims. *Id.* at 784.

In its latest filing, the government still cannot grapple successfully with, or fit its version of the facts of this case into, the governing law. It adds a few additional claims of fraud—none supported by any record citations—all of which are either incomplete, oversold, or both. It also adds one final, vacuous waffle on whether Mr. Fowler committed a burglary,[2] and then builds to an incomplete hypothetical that confirms its failure to meet the intended loss standard. In so doing, it confirms that the intended loss is at most $9,573.37, as the Probation Office correctly determined at the outset.

///

///

---

[1] As well as its related "void-for-fraud" claim, which it included in its most recent submission to the Probation Office, *see* Gov. Letter at 2 (Sept. 8, 2022), but now renounces in its Sentencing Memorandum, Gov. Mem. (Dkt. 366) at 7.

[2] The most the government says this time about the issue is to assert that Ms. Myres's contention is "a stretch," and to assert that the fact that Mr. Fowler burgled the home "still does not preclude Myres' complicity in the so-called burglary." Mem. at 9 n.1  It offers no evidence to support its position, provides no answer to the lack of any contact between Mr. Fowler and Ms. Myres after they broke up, and does not address Ms. Myres's absence from communications about selling the loot. *See* Trial Tr. at 962-64.

## II. THE GOVERNMENT'S FACTUAL ARGUMENTS MISSTATE THE RECORD AND DO NOT SUPPORT ITS CALCULATION OF INTENDED LOSS

### A. The government does not identify any lies Ms. Myres's told to defraud Farmers out of the full amount of her claim.

At the outset, the government offers a section devoted to what it calls "Myres' lies to Farmers Insurance." Gov. Mem. at 1-3. Many of these supposed lies are recycled and have already been answered by Ms. Myres (including on appeal and in her Sentencing Memorandum), explaining that her statements were either true or not part of an effort to defraud Farmers, and could not have been the but-for or proximate cause of Farmers' loss. With at most only one (quite unsuccessful) exception, the government ignores Ms. Myres's responses.[3]

Instead, the government tries to come up with some new alleged lies. Because these new alleged lies are offered without a single record citation, it is not easy to track them all down in the limited time available for this reply, but as best as can be determined they are no more convincing, and likely far less so, than the earlier set of alleged lies.[4]

- The government alleges that Ms. Myres told the San Francisco Police Department (not Farmers) "two conflicting stories" about her home video system. According to the government, she "told Officer Larson that she deleted any footage" of the burglary, and she told Sergeant Dicroce that her motion sensor cameras captured nothing." Gov. Mem. at 2-3. That is wrong. In fact, what Ms. Myres said was consistent and accurate; the government's version is a rehash of its sleight-of-hand that was exposed at trial. The first of Ms. Myres's statements was made to Officers Kerrigan and Larsen. Officer Kerrigan wrote the report of the interview, but the government chose Officer Larsen as its witness. He attributed to Ms. Myres the

---

[3] The government notes Ms. Myres's contention that her lack of mention of Mr. Fowler was to deceive her employer, rather than Farmers. Gov. Mem. 7-8. But rather than offer any reason why it was not her intent to deceive Farmers, the government merely responds that she "made the lies to Farmers Insurance under oath," and adds that this was part of a "whole set of lies." None of that is relevant to whether those supposed lies were in fact false, intended to defraud Farmers, the but-for or proximate cause of Farmers' potential loss, or some combination of the three.

[4] Several of the alleged lies appear to be mentioned more than once, in different places in the less than two pages devoted to this effort. See, e.g., Gov. Mem. at 2-3 (separate mentions of statements about her home being empty when she left).

2

DEFENDANT APRIL MYRES'S REPLY TO GOVERNMENTS SENTENCING MEMORANDUM     CASE NO. 17-CR-00180-RS

statement that she deleted the footage. But what Kerrigan's report attributed to Ms. Myres is that she said *there was no video activation*. Trial Tr. at 432-33. Ms. Myres said the same thing to Dicroce, and her statement is consistent with the evidence that the burglar entered from the stairway to the neighbor's house, away from where the video cameras were aimed. Trial Tr. at 430:7-432:7; Def. Exs. 1004.1, 1004.2. When Larsen was confronted with Kerrigan's description, he conceded: "that may be so." Trial Tr. at 433:3-11. Ms. Myres was correct, and the government's accusation is wrong.

- On a related issue, the government asserts that Ms. Myres said that she did not have a home security system at the time of the burglary, even though she had a home video system. Gov. Mem. at 2. Even without the context of the statement attributed to Ms. Myres, this is purely semantics, and not a lie or a fraud. Ms. Myres made no secret that she had a home video system, as the government's own argument above also reflects. Trial Tr. at 826, 1213-14. But she did not actually purchase a *security* system (including an alarm) until *after* the burglary. *Id.*; Def. Ex. 1016 at 3.

- Noting that the police found no evidence of forced entry (but did find an open door), the government accuses Ms. Myres of lying by telling Farmers that the burglar entered through a kitchen window. Gov. Mem. at 2. But that is not what she said: she said "they got in through a window, I mean, *or the sliding glass back door*." Def. Ex. 1016 (emphasis added). These were necessarily guesses rather than a lie if wrong—and the part that likely was wrong (the window entry) was based on what the *police told her*. It was the *police* who referenced the kitchen window, and Ms. Myers told Farmers that the police had said so. Trial Tr. at 677:23-678:2. In any event, Ms. Myres's statement about entry through the rear sliding door proved to be accurate. *Id.* at 412; Def. Exs. 1014.1-1.

- Although Ms. Myres had acknowledged that her son and his friend Jonathan were in the home in the afternoon before the burglary, the government claims that she

3

lied when she said no one was home when she left; the government adds that some did remain and that they were "acting furtively." Gov. Mem. 2. Neither witness who testified about the videos showing Ms. Myres's home made any such claim, Trial Tr. at 398-401, 405-12, 918-23, and video shows that everyone who remained left emptyhanded, *id.* at 967-70; Gov. Ex, 26.7. Whether Ms. Myres knew who remained in the two-floor, multi-room home was unproven, and in any event any statement was not intended to defraud Farmers, but rather to protect her son and his friends, who had not had good experiences with the police, and whom she feared were being profiled. Trial Tr. at 1193-94. In any event, the evidence from Mr. Fowler's phone shows the likely participants in the burglary had no connection to Ms. Myres's son or his friend, so this would not have been a basis to deny her claim anyway.

- The government also accuses Ms. Myres of refusing to supply her cell phone numbers, Gov. Mem. 2, but she provided one in her initial call to Farmers, Def. Ex. 1016, and the other in her Proof of Loss, Gvt. Ex. 1. If she failed to respond to a different request from Farmers for the same information, this is hardly a fraud and has nothing to do with intended loss.

Ms. Myres was asked well over a thousand questions by Farmers. Trial Tr. at 667-71. Only a small percentage of her answers have been challenged by the government, and many of those were true. The remainder were either not intended to defraud Farmers, or not a but-for and proximate cause of Farmers' potential loss, or both. Neither the alleged lies offered to the Probation Office by the government, nor the new ones proffered by the government in its sentencing memorandum, provide any basis to conclude that Ms. Myres intended to defraud Farmers out of the full value of her claim.

**B. The government largely ignores Ms. Myres's personal conduct and circumstances.**

The government's brief pays almost no attention to anything but its claimed facts of the offense, even though no sentencing is complete without considering the circumstances of the

4

defendant. "[P]unishment[s] should fit the offender and not merely the crime," so sentencing judges should consider "the fullest information possible concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S. 476 (2011) (internal quotation marks and citations omitted). This is especially true of a resentencing, where post-sentencing conduct is especially relevant. *Id.* at 490-93; *see* Dkt. 348 at 5 n.3.

Ms. Myres's post-sentencing conduct confirms that she is a valuable, caring member of her community—and one especially needed now given her irreplaceable support for her brother as he battles cancer. She has already suffered considerable collateral consequences, including a felony conviction, the loss of her job, and a reduction in her pension. *See United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) (noting permanent and pervasive stigma of a felony conviction). She presents no danger to anyone, and is at no risk of reoffending. The government mshdoes not address any of this. The only possible consideration on the other side of the balance is that she was a Sheriff's Deputy when she committed the offense, but her offense was not related to her job, and even far more serious and job-related offenses by sheriff's deputies have resulted in lesser punishment than what the government and the Probation Office propose here.[5]

In short, imprisoning Ms. Myres is not necessary to punish, deter, or rehabilitate her; will do nothing to protect the public; is disproportionate to sentences imposed on public officials who committed more serious, genuinely job-related crimes; and is more than necessary to comply with the purposes of sentencing in 18 U.S.C. § 3553(a). A custodial sentence is therefore inappropriate.

### III. THE GOVERNMENT'S ARGUMENT IS LEGALLY IMPROPER BECAUSE IT DISREGARDS THE GUIDELINE'S CAUSATION REQUIREMENT.

In addition to its numerous factual errors, the government's calculation of intended loss suffers from fundamental flaws that render it impermissible as a matter of law. The government's arguments start with an incorrect statement of the governing standard, and compounds that error

---

[5] Myres Mem. (Dkt. 365) at 16-17; *see also* https://www.justice.gov/usao-cdca/pr/ex-la-county-sheriff-s-deputy-sentenced-one-year-federal-prison-lying-fbi-part-cover (LA County Sheriff's Deputy sentenced to 12 months for lying to the FBI about the beating of an inmate, a cover-up that initially resulted in false criminal charges against the victim).

by adding incorrect factual assertions and by failing to respect the Guideline's causation requirement. This Court should reject them.

### A. The government misstates the standard of review and burden of proof.

The government begins its legal argument by incorrectly stating the applicable standard. A calculation of loss, the government argues, need only be a "reasonable estimate." Gov. Mem. at 6. But that ignores that the calculation of loss must be based on a *legally correct* interpretation of the Guidelines—not merely a reasonable interpretation. *See, e.g.*, *United States v. Diaz*, 884 F.3d 911, 918 (9th Cir. 2018) (explaining that while a "district court has considerable latitude" at sentencing, sentences that "rest on incorrect interpretations of the . . . Guideline" must be vacated); *United States v. Suarez*, 655 F. App'x 549, 551 (9th Cir. 2016) ("Because the district court misinterpreted the guidelines . . . we reverse and remand the case for resentencing."). For example, in calculating intended loss, neither the government nor the Court can include losses that were not caused, both actually and proximately, by the fraud. *See United States v. Lonich*, 23 F.4th 881, 916-19 (9th Cir. 2022) (reversing loss calculation that violated causation requirement).[6]

Not only does the government fail to grapple with the aspects of its proposed enhancements that should be governed by a clear and convincing evidence standard, Myres Mem. at 8 n.10, 11 n.12; *Lonich*, 23 F.4th at 914-16, but it also bolloxes up the question of which party bears the burden of proof, Gov. Mem. at 8. Citing *Alphas*, the government suggests a "burden shifting approach"—but even under *Alphas*, the *burden of proof* always remains on the government. *Alphas*, 785 F.3d at 784. Even if the government were correct that Ms. Myres's claim were "rife with fraud," at most this would mean that a "burden *of production* would then shift to the defendant to offer evidence to show (if possible) what amounts represent legitimate claims." *Id.* (emphasis added). Having provided ample evidence that Mr. Fowler burgled her home—so much evidence that the government was forced to acknowledge it in its closing argument—Ms. Myres more than

---

[6] The government also ignores that the rule of lenity applies to the loss calculation. *United States v. Hardy*, 289 F.3d 608, 614 (9th Cir. 2002). "Where, under the Guidelines, two prices are equally good measures of the actual or intended loss to the victim, the district court should select the value bringing the lesser punishment." *Id.* Here, even if the government's calculation of loss were reasonable—and it is not—Ms. Myres's calculation is at least equally reasonable. Lenity thus requires adopting Ms. Myres's calculation.

satisfied that burden of production, leaving no doubt that the burden of proof rests with the government.

The government's assertion that "there is no evidence that any portion of the claim was legitimate," Gov. Mem. at 8, is hard to fathom given the proof that Mr. Fowler possessed and was trying to fence items stolen from Ms. Myres without her participation. Def. Exs. 1013.5, 1013.7, 1013.8, 1013.10, 1013.11, 1013.12. Only slightly better is the government's suggestion that the items on Mr. Fowler's phone were a minority of the items on Ms. Myres's claim, and the court should require Ms. Myres to "prove up the veracity of any amount she claimed as genuine." Mem at 5, 9 n.1. The government understandably backs quickly away from this suggestion, since it bears the burden of proof of showing that Mr. Fowler did not steal the other items. In any event, as outlined in Ms. Myres's Sentencing Memorandum, the weight of the evidence is that Mr. Fowler burgled her home: the rear sliding door to her home was found open, and Mr. Fowler was fencing items stolen from her home, without her participation, shortly after the burglary. The items stolen were designer items that Ms. Myres both treasured and worked overtime to purchase. Trial Tr. at 995:21-24, 1021:15-25. The government found only three items in her home; if the remainder had not been stolen, the FBI would have found them when it executed its search warrant.

### B. The government's theory of intended loss violates the Guideline's causation requirement.

Under any standard of proof, the government's arguments must be rejected because they rely on a legally incorrect interpretation of intended loss. As Ms. Myres explained in her Sentencing Memorandum, the government disregards the Ninth Circuit's requirement that that a district court may "impose sentencing enhancements only for losses that 'resulted from' the defendant's fraud." *United States v. Myres*, 844 F. App'x 987, 990-91 (9th Cir. 2021) (quoting *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009)) (internal quotation marks omitted). To meet this standard, a court calculating intended loss must first determine what the defendant subjectively expected to receive in the event of a successful fraud, and then "exclude[] any sums that the fraudster would have been paid absent the fraud." *Alphas*, 785 F.3d at 783 (emphasis added). This means a court must "determine[] whether and to what extent legitimate claims were

7

embedded in the fraud" and exclude the value of those claims from its calculation of intended loss. *Id.* at 781-83. If a defendant's claim is partially fraudulent and partially legitimate, payments for the legitimate portions categorically *cannot* be caused by the fraudulent portions. *Id.*

None of the cases the government cites supports its erroneous interpretation of "intended loss" because, contrary to the government's argument, none of them hold that "when a fraudster pursues an insurance claim based on losses that could not in fact be covered, the district court can properly find that the fraudster is not entitled to a partial recognition of part of the claim." Gov. Mem. at 7. Nor did any of the government's cases calculate intended loss as the full amount of the defendant's claim merely because "the root of the claim was fraudulent" or because "misstatements" can render an entire claim "invalid *ab initio*." *Id.* at 6-7. To the contrary, the government's cases engaged in exactly the inquiry *Alphas* requires: they all asked whether the defendant suffered any legitimate losses, and they all determined that the answer was no. *United States v. Torlai*, 728 F.3d 932, 940-43 (9th Cir. 2013); *United States v. Dehaan*, 896 F.3d 798, 804-06 (7th Cir. 2018); *United States v. Crawley*, 533 F.3d 349, 357-58 (5th Cir. 2008).[7] The intended loss in those cases was the entire amount of the defendant's claim, but *only* because the defendant would not have been entitled to recover *anything* from an honest claim.

First, the evidence in *Torlai* proved that "the defendant had suffered *no* reimbursable losses." *Alphas*, 785 F.3d at 783-84 (emphasis added). Unlike Ms. Myres, Torlai committed fraud on his insurance application, meaning that, absent the fraud, he never would have received coverage in the first place. *Torlai*, 728 F.3d at 940; *Alphas*, 785 F.3d at 784. On top of that, Torlai's insurance claims did not include *any* legitimate losses—he sought compensation only for crops that did not exist, were not damaged, or were not covered by his policy. *Torlai*, 728 F.3d at 941-43. The problem with his claim was not, as the government incorrectly says, that Torlai sought compensation for 449 acres of wheat when he only could have recovered for 120 acres.

---

[7] *United States v. Munoz*, 233 F.3d 1117 (9th Cir. 2000), is irrelevant. It held that Ponzi scheme defendants should not get credit for "value received by the defrauded parties" because the defendants' "fraudulent or misleading statements" still "lead[]"—that is, *cause*—"unwitting investors to put their money at risk." *Id.* at 1125-26. *Munoz* did not hold that the loss calculation should include money that a defendant received as a result of *non-fraudulent statements*, which is the government's position here.

DEFENDANT APRIL MYRES'S REPLY TO GOVERNMENTS SENTENCING MEMORANDUM

CASE NO. 17-CR-00180-RS

Gov. Mem. at 6. To the contrary, his claim was entirely fraudulent because he had "no crop to be impacted" and because "the weather events asserted in the filed claim could not have caused any damage." *Torlai*, 728 F.3d at 941 (internal quotation marks omitted). As a result, he "was entitled to *no* indemnity" absent the fraud. *Id.* (emphasis added). *Torlai*, therefore, was a "[c]ase[] in which an insurer would have paid nothing absent the fraud." *Alphas*, 785 F.3d at 784. That is "materially different" from a case like this one, where "the insurer would have paid something (but less than the full amount claimed) absent the fraud." *Id.*

The same is true of *Dehaan* and *Crawley*. The defendant in *Dehaan* was a doctor who fraudulently billed Medicare for patients he did not treat. *Dehaan*, 896 F.3d at 804-06. The government's assertion that the problem with his claim was merely that some patients "were not properly certified" is inaccurate. Gov. Mem. at 7. Even if "some patients would have qualified had they been certified," *id.*, the defendant could never have received any payments for their treatment because *he did not treat them*, *Dehaan*, 896 F.3d at 804-06. Similarly, the defendant in *Crawley* fraudulently received benefits from a union job to which he would not have been elected absent fraud. 533 F.3d at 352, 356-57. Whether "he performed legitimate services while in office," Gov. Mem. at 7, was beside the point because he never would have been "in office" had he not committed fraud. Like *Torlai*, both *Dehaan* and *Crawley* are cases in which, absent the fraud, the defendants would not have had *any* legitimate claims and would not have received *any* payments. *See Alphas*, 785 F.3d at 784; *see also United States v. Harms*, 442 F.3d 367, 379 (5th Cir. 2006) (holding loss cannot "include any benefits to which [defendant] would have been entitled absent fraud").

As Ms. Myres has explained, therefore, her intended loss cannot be the full amount of her claim unless the government proves that, had she not told any lies to Farmers or law enforcement, Farmers would have denied her entire claim. The government offers no evidence to support that conclusion. Instead, it offers a failed hypothetical, and then resorts to a statement that is flatly contradicted by the evidence.

Its hypothetical asks whether, if Ms. Myres has said that Mr. Fowler had been at her home, "would Farmers have done nothing and simply paid Myres?" Gov. Mem. at 8. This hypothetical

9

DEFENDANT APRIL MYRES'S REPLY TO GOVERNMENTS SENTENCING MEMORANDUM

CASE NO. 17-CR-00180-RS

evades the requirement that to qualify as proof of "intended loss" the statement must have been designed to defraud Farmers out of money. It ignores the government's burden to prove, rather than to guess, that if Ms. Myres had answered differently, Farmers would have determined that Ms. Myres suffered no covered losses. More importantly, the evidence leaves no doubt that the answer to the government's question is *yes*: if Ms. Myres had told the truth, Farmers *would* have paid her. Farmers was working closely with the FBI, which knew of Ms. Myres's relationship with Mr. Fowler and had been surveilling Mr. Fowler, and the government does not claim Ms. Myres obstructed *the FBI*'s investigation. Trial Tr. at 276:6-13, 277:16-19, 295:13-297:6, 685:22-690:21. With far more investigative resources than Farmers, the FBI did not gather evidence of Mr. Fowler's involvement until well after Farmers denied Ms. Myres's claim, and even to this day the government resists the notion that Mr. Fowler committed the burglary. Because law enforcement already knew about Ms. Myres's relationship with Mr. Fowler and were investigating him for the burglary, none of Ms. Myres's alleged lies could have impaired Farmers' investigation.

Not only does the government's hypothetical fail, but so does its assertion that "there is no evidence that Myres was entitled to any portion of her claim." Gov. Mem. at 8. It is the *government's* burden to prove that she was *not* entitled to any portion of her claim, not Ms. Myres's burden to prove that she *was*. *Lonich*, 23 F.4th at 914-16. But more importantly, the government *conceded at trial* that "there *is* evidence" that Ms. Myres suffered "a revenge burglary." Trial Tr. at 1137:3-4 (emphasis added). The unrebutted evidence showed that Mr. Fowler stole items from her house, then promptly sent text messages to his sister and others trying to sell those items. Def. Exs. 1013.5, 1013.7, 1013.8, 1013.10, 1013.11, 1013.12. The government never found those items (other than Ms. Myres's gun, which it found in Mr. Fowler's possession) or introduced any evidence that they had not, in fact, been stolen. Nor did it introduce any evidence that, as it now again suggests with no support, she participated in the burglary.[8] The government's evidence

---

[8] If the government wants the Court to sentence Ms. Myres based on its insinuations that she faked her own burglary, it must substantiate those insinuations at an evidentiary hearing. Myres Mem. at 8 n.10. And because Ms. Myers was neither charged with nor convicted of the burglary, the government must do so with clear and convincing evidence. *Id.*; *Lonich*, 23 F.4th at 914-16.

DEFENDANT APRIL MYRES'S REPLY TO
GOVERNMENTS SENTENCING MEMORANDUM

CASE NO. 17-CR-00180-RS

showed only that Mr. Fowler had not stolen three items that were later found in Ms. Myres's house. In light of Ms. Myres's uncontradicted evidence that Mr. Fowler stole substantial amounts of her property, and without any evidence from the government that any of her other missing property wasn't stolen, the only permissible conclusion is that she suffered at least $57,473.41 in legitimate losses for which she was entitled to payment. That is, in fact, what the jury concluded. Myres Mem. at 4 & n.2.

As a last resort, the government repeats its argument—not adopted by the Ninth Circuit on appeal —that, under *Alphas*, Ms. Myres must "offer evidence of what amount was a legitimate claim" because her claim was "'rife with fraud.'" Gov. Mem. at 8. That is wrong in multiple ways. <u>First</u>, as explained above, Ms. Myres's claim was *not* "rife with fraud." <u>Second</u>, the defendant in *Alphas* "submitted at least ten fraudulent claims" that were "largely bogus" and "supported . . . with documents that had been fraudulently altered or, in some cases, constructed out of whole cloth." 785 F.3d at 778. His fraud was thus far more extensive than even the government's hyperbolic account of Ms. Myres's conduct, but the First Circuit still held that the district court had to exclude the legitimate portions of his claims from intended loss. *Id.* at 784. <u>Third</u>, the alleged lies on which the government relies have nothing to do with determining "what amounts" of Ms. Myres's claim "represent legitimate claims." *Id.* The draft PSR and jury easily concluded from the evidence that the illegitimate portions of Ms. Myres' claim totaled no more than $9,573.37. <u>Finally</u>, even if Ms. Myres had the burden of production to "show that she has some portion of her claim that is legitimate," Gov. Mem. at 8, she has more than satisfied that burden. As explained, the overwhelming and uncontradicted evidence proved that Mr. Fowler stole at least $57,473.41 worth of items from her, and that she was entitled to seek compensation for those losses.

///

///

///

///

///

11

DEFENDANT APRIL MYRES'S REPLY TO GOVERNMENTS SENTENCING MEMORANDUM

CASE NO. 17-CR-00180-RS

## IV. CONCLUSION

For the reasons set forth above, Ms. Myres respectfully request that the Court reject the government's arguments, calculate intended loss as set forth in her sentencing memorandum, and impose a non-custodial sentence.

DATED: September 29, 2022

KING & SPALDING LLP

By:   */s/ Michael J. Shepard*
MICHAEL J. SHEPARD
JAMIE ALLYSON LANG

Attorneys for Defendant
APRIL D. MYRES