Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHIEF JUDGE RICHARD SEEBORG

```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )     No. CR 17-cr-180-RS
                               )
APRIL DIANE MYRES,             )
                               )
            Defendant.         )     San Francisco, California
_____ )
```

Tuesday, October 4, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**


For Plaintiff:          STEPHANIE M. HINDS
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                   BY:  **LAURA VARTAIN**
                        **NICHOLAS WALSH**
                        **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:          KING & SPALDING LLP
                        50 California Street
                        Suite 3300
                        San Francisco, California  94105
                   BY:  **MICHAEL J. SHEPARD, ESQ.**


                        KING & SPALDING LLP
                        633 W. Fifth Street
                        Suite 1600
                        Los Angeles, California  90071
                   BY:  **JAMIE A. LANG, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

**Tuesday - October 4, 2022**                              **9:56 a.m.**

                    P R O C E E D I N G S

          **THE COURTROOM DEPUTY:**  Calling Case 17-CR-180, United

States versus April Diane Myres.  Counsel, please state your

appearances.

          **MS. VERTAIN:**  Good morning, Your Honor.  Laura Vartain

and Nicholas Walsh for the United States.

          **THE COURT:**  Good morning.

          **MR. SHEPARD:**  Good morning, Your Honor.  Michael

Shepard and Jamie Lang on behalf of the defendant, April Myres,

who is present in court and out of custody.

          **THE COURT:**  Good morning.  This is the time set for

resentencing after remand by the Ninth Circuit.  Specifically,

the Court's memorandum of February 16th of this year in which

the Circuit Panel affirmed Ms. Myres's conviction but remanded

to discern -- and was in the memo -- Ms. Myres' intent with

respect to the amount of intended loss.

          Obviously, I am quite familiar with the case and have

reviewed the record.  I've reviewed the revised presentence

reports, the recently submitted sentencing memos submitted by

the parties, including a letter in support of Ms. Myres by an

elder in her church.  And of course, I've reviewed the Ninth

Circuit memorandum.

          As to the revised presentence report, are there any

objections to the factual material presented, beyond what was

1    previously discussed?

2              **MS. VERTAIN:**  Not from the government, Your Honor.

3          **MR. SHEPARD:**  If, if by reference to "what was

4    previously discussed" you mean the objections we have

5    previously raised with the Court and the Court ruled on, --

6              **THE COURT:**  Right.

7          **MR. SHEPARD:**  -- no, as to the facts.

8          **THE COURT:**  Okay.  I reviewed the objections that are

9    listed for each side in the revised presentence report.  I've

10   considered those.  I'm going to overrule the objections each

11   side had presented.

12       Have the parties had an opportunities to review the

13   presentence report?

14             **MS. VERTAIN:**  Yes, Your Honor.

15             **MR. SHEPARD:**  Yes, Your Honor.

16         **THE COURT:**  And Mr. Shepard, have you had an

17   opportunity to review it with Ms. Myres?

18             **MR. SHEPARD:**  Yes.

19         **THE COURT:**  The central question for me, it seems,

20   upon resentencing, is the appropriate calculation of loss and

21   the accompanying advisory sentencing guideline enhancement.

22   Previously I imposed a six-level loss enhancement under

23   2B1.1(b)(1)(B) and (D), which was the 40,000 to 95,000 loss.

24       The defense is arguing, as I understand it, that the

25   appropriate enhancement here would be, at most, a two-level

1   loss, which would be 6,500 to 15,000.  Is that correct,

2   Mr. Shepard?

3             **MR. SHEPARD:**  That is correct, Your Honor.

4             **THE COURT:**  All right.  Ms. Vartain.

5             **MS. VERTAIN:**  Thank you, Your Honor.

6      I think I would propose to go through the -- as the Court

7   knows, the government is recommending that the Court stick with

8   the six-level enhancement, and find that the entire 68,000,

9   approximately, was April Myres' intended to defraud Farmers of

10  that full amount.

11      What I propose to do, Your Honor, is talk about the

12  evidence in three categories.  And when I speak of "the

13  evidence," I essentially mean what April Myres listed on her

14  proof of loss.

15      In the first category are the items that the Sheriff's

16  Department owned and had given back to -- had replaced for

17  April Myres, as well as the three items that when the FBI

18  searched her home in 2017, they found in her home, and that.

19  Of course.  Myres had already claimed to Farmers had been

20  stolen.

21             **THE COURT:**  And that comes up to about a 9,000,

22  roughly, loss?

23             **MS. VERTAIN:**  That's correct, Your Honor.

24             **THE COURT:**  All right.

25             **MS. VERTAIN:**  Let me just continue walking through the

1  buckets, and then I will go --

2          **THE COURT:**  Of course.

3          **MS. VERTAIN:**  -- back to them in order.

4      The second bucket, Your Honor, are those categories of

5  items that April Myres listed on her proof of loss, and are in

6  the wind, as it were.  The government did not find them at any

7  point in time and cannot show them to the Court, could not show

8  them to the jury, because we do not have them.

9      And then sort of as a subcategory of that, there is the

10  third category of items, which are those that her co-defendant

11  Antoine Fowler had on his phone.  A much smaller category.  And

12  of course, also Antoine Fowler had her firearm as well in 2017

13  when the FBI searched him.

14      And what I would like to do, Your Honor, is go through

15  each of those categories and focus on the statements April

16  Myres made with respect to those to Farmers, and use that as

17  the lens by which we assess what -- and what the Court should

18  assess as to what April Myres intended when she made statements

19  to Farmers.

20      Across all of them, Your Honor, what the government is

21  doing and what I believe we urged the Court to do in 2019 when

22  we were at sentencing is to use the statements April Myres

23  made, the untruthful statements she made, as well as the things

24  she did not say to Farmers, as the way by which we assess her

25  intent to defraud Farmers of the full value of the claim.

1    **THE COURT:**  Well, it's kind of a moving target, as I

2    read what the government is arguing.  The government's saying:

3    We're not taking the position that it's essentially fraud in

4    the inducement because the claim has some untruthful parts of

5    it, so the whole thing is a fraud, and you can then just take

6    the whole thing.  Because there's some case law that indicates

7    that I can't do that.

8        But you are suggesting, somehow, that nonetheless, I can

9    consider the false statements in the claim as somehow

10   indicative of her intent with respect to some of these other,

11   as you say, this other two collection -- the buckets, if you

12   will.  And I'm not sure I understand that argument.

13       And in addition to that, I think it's pretty clear that

14   this is different than cases where, to acquire the insurance

15   from the get-go, there is an application for the insurance

16   which is fraudulent.  And then there is an argument that, you

17   know, you never had coverage to start with, because you lied at

18   the beginning.

19       Your argument is, as I understand it, keyed to the claim

20   and the fact that the claim had some falsehoods in it.  But I

21   can't just say that because there's some falsehoods, that means

22   the entire claim establishes her intent.

23       **MS. VERTAIN:**  I think, Your Honor, that you can find

24   that her falsehoods were meant to deceive Farmers.  At no point

25   did April Myres tell Farmers the truth about the critical

1    facts.

2         **THE COURT:**  The problem is, I accepted that argument

3    from the get-go.  And the Ninth Circuit says no.  I mean, if

4    that was the case, why would the Ninth Circuit have remanded it

5    to me?

6         I mean, I understand the Ninth Circuit didn't say: Remand,

7    with instructions that I consider, you know, these -- this

8    amount as proven or not, and then sentence accordingly.

9    They're giving it back to me to exercise my discretion.

10        But if you're right, I don't know why they would have sent

11   it back at all.

12        **MS. VERTAIN:**  I don't think the Court made any clear

13   findings at all.  And --

14        **THE COURT:**  Well, but I accepted your argument.  Your

15   argument then is the same as your argument now, which is, you

16   know, this claim form is -- is riddled with fraud, and -- and

17   one can discern her intent to defraud from that fact, and that

18   even though the government went back and forth on whether or

19   not she was complicit in the robbery, you didn't ultimately ask

20   the jury to convict on that.

21        So, you know, I -- I -- I've read the few sentences the

22   Circuit has provided to me over and over and over again.  And I

23   don't quite see how this case could have come back to me, if

24   you're right.

25        **MS. VERTAIN:**  I -- I mean, the way I read the

1   Circuit's opinion is that the Court didn't know what -- the

2   Circuit did not know what the Court's findings were on that.  I

3   think it was vague that the Court was accepting the

4   government's argument as to the "riddled with fraud."

5        And I certainly think that what we didn't clearly

6   articulate at that time was that by a preponderance of the

7   evidence -- I mean, the jury convicted April Myres of the

8   precise fraud here.  And by a preponderance of the evidence, if

9   we use her false statements to assess what she wanted, she

10  wanted to deceive Farmers.

11       And certainly, by the low standard that a preponderance

12  is, there is no evidence that there was a -- that she was the

13  victim of a burglary.  The opposite is true, Your Honor.  The

14  evidence is that she wanted to throw Farmers off at every turn,

15  as to the circumstances about what happened on March 24th.

16       **THE COURT:**  Just as consistent with the interpretation

17  that she wanted to cheat Farmers out of $9,000.  You know.  The

18  amount -- the items that were in her home that she claimed.

19  And then the items that were -- belonged to the Sheriff's

20  Department.

21       I mean, your presentation is she wanted -- she lied and

22  cheated Farmers.  I think that's true.  I think the jury

23  convicted on that.  But why is it then so clear, by a

24  preponderance, to you that she lied and cheated to the

25  magnitude of $68,000?  Because the government didn't proceed on

the theory -- I know you kind of danced around it, and to this

day, will suggest that there was complicity in that.  But

that's not what was proven to the jury, and I don't think even

by a preponderance you've proven that.

MS. VERTAIN:  But as to what she claimed on her form,

why can't we -- and I think we should take the fact that she

wasn't truthful about some portion of it, and say that lends

itself to the inference -- and certainly, a preponderance could

be met by this -- that she intended some greater portion of it?

It seems far-fetched to believe, given the number of lies

that she made, that there was, in fact, truth at all in this

claim.  I don't think that evidence was presented or -- to the

jury.  And so I think we're sort of giving her a huge benefit

of the doubt that somehow she wasn't trying to deceive Farmers

as to a larger portion than the 9,500.

THE COURT:  Well, I think you have correctly

identified the question, which is whether or not an inference

from what she submitted is sufficient to create a -- to satisfy

your burden, preponderance burden, that the whole 68,000 she

intended to defraud.

And that's the question.  I mean, is that enough?  Or is

that not enough?  And that's what I have to wrestle with.

Go ahead.

MS. VERTAIN:  Oh.  I think in wrestling with that,

Your Honor -- and I'm not going to belabor this point because I

1  know that the Court knows this.  But if we were to walk

2  through, as the jury heard and is outlined in our papers, the

3  number of times that she lied to Farmers about the critical

4  facts as to who was at her house and who wasn't at her house,

5  that shows that she knew far more than the normal victim of a

6  burglary who has no idea who's done it would.  And so on that

7  level, truly, this was a claim riddled with fraud meant to

8  deceive Farmers from asking further questions.

9       And the Court might recall that -- this was a long time

10 ago, but at the jury trial, Farmers was asked repetitively by

11 the prosecutors:  Did you rely on April Myres's statements to

12 you?  And at every time that Farmers representatives were asked

13 that, they said yes.

14      There's a reason Farmers asked all these questions both in

15 the claims form, in the interview and in the sworn statement,

16 because they were trying to assess the truth.  And we know what

17 Farmers did when they found out the truth.  They denied the

18 claim.

19      And I think that that's indicative of the fact that --

20          **THE COURT:**  Of course, there's evidence of a contrary

21 version of events.  And, as I understood the defense argument

22 was, that this was effectively a revenge burglary because we

23 knew about the relationship between Fowler and Myres.  And so

24 their version was:  Well, he was taking it out on her,

25 effectively.

1    And there was some evidence they could point to to

2  support -- there was no -- she didn't end up with any of the

3  funds from Fowler trying to fence these items.  There wasn't

4  any indication that there was ongoing connection of any kind.

5  Apparently there'd been a breakup; there'd been contention

6  between Fowler and her family.  I mean, so there -- it's not as

7  if there's no evidence of a contrary version of events out

8  there.

9    Now, I understand, you don't buy those, but, I mean, it's

10 not as if all we have in this case was your inference, and

11 nothing else.

12    **MS. VERTAIN:**  Yes, Your Honor.  Although, if I can

13 address the items on Fowler's phone and the notion that somehow

14 she was innocent of that, I mean, as the Court knows, Farmers

15 has asked her, under oath:  Do you have a disgruntled

16 ex-boyfriend?  And she said no.  That's plainly false and meant

17 to throw Farmers, to deceive Farmers into paying her claim.

18    Now, we also know --

19    **THE COURT:**  Well, you don't think they were

20 disgruntled.  Do you?  If you're saying she was complicit in

21 the robbery, they're not disgruntled.

22    **MS. VERTAIN:**  The disgruntled ex-boyfriend?

23    **THE COURT:**  Yeah.

24    **MS. VERTAIN:**  We saw him throwing trash cans on her --

25 on --

**THE COURT:**  Okay, so how is she complicit in the robbery?

**MS. VERTAIN:**  Oh.  As to the complicity in the robbery, I'm just talking about the falsity of the answer: "No, I have no disgruntled ex-boyfriend."

Now, the Court will recall that this investigation started with the reporting by the charged defendant -- a defendant that my office charged reporting that he had a cellmate, who was Antoine Fowler, who was saying that his girlfriend, a Deputy Sheriff, was going to give him her firearm.  That turned out to be true, years later, which is indicative of the fact that April Myres knew, certainly, to expect that Fowler had her firearm, if not that she'd given it to him.

And so I think the Court is taking a huge leap of faith to accept the premise that somehow these were genuine losses.  I don't think there's any evidence of that.  And I think the Court can and should take her number of lies throughout the process as indicative of the fact that she intended to cheat Farmers out of the full claim.

**THE COURT:**  Let me shift your focus for a moment.  And that's -- you know, it's not lost on any of us that a lot of time has transpired since the trial and your appeal and the like, and now we're back here again at the instruction of the Circuit.

Should I take into account the fact that Ms. Myres has

1   been out all this time?  She's apparently conducted herself

2   well on -- under the release conditions that she has.  She has

3   some extenuating circumstances now in the form of issues with

4   respect to healthcare for her brother.

5       I mean, you're saying I should just impose the same

6   sentence again.  But do you think it would be wrong for me to

7   take into account some of those factors?

8       **MS. VERTAIN:**  I think that the Court has taken those

9   similar factors into consideration.  Not with respect to the

10  length of time, but in terms of her good behavior in the

11  duration, that was the same as when the Court sentenced her in

12  2019.  Her health issues are not out of the realm of what BOP

13  encounters day-to-day.  And I do think it's --

14      **THE COURT:**  Well, they're not her health issues,

15  they're the health issues of -- she's the caretaker for

16  someone.  And presumably, if she goes into custody, there are

17  some issues as to whether or not she can be the caretaker.

18      **MS. VERTAIN:**  I'm sorry; I was addressing her

19  hypertension, Your Honor.

20      **THE COURT:**  And I was talking about her brother.

21      **MS. VERTAIN:**  And I think those are things the Court

22  can take into consideration.  And I think the Court should also

23  take into consideration and weigh heavily the seriousness of

24  the crime which the Court articulated at the time that she was

25  sentenced.  And, certainly, the length of the appellate

1  proceedings, the exhaustion of all remedies up to the Supreme

2  Court has allowed her the benefit of more time to prove

3  herself.  She has done that.  I still think a custodial

4  sentence is warranted, given the egregious nature of her

5  conduct in this case.

6         **THE COURT:**  Mr. Shepard.

7         **MR. SHEPARD:**  The Court has obviously read very

8  carefully what's been filed, and is familiar with the evidence

9  from the trial, so I won't go through in great detail.  I would

10 just like to take a couple of high-level points that I can

11 articulate perhaps a little differently than what I already

12 wrote for the Court.

13        And, and, I guess that would start with two main

14 propositions.  One is that I don't think the government is

15 correct when they say that because Ms. Myres was not completely

16 truthful with Farmers, that was part of an intent to defraud

17 Farmers.  We illustrated repeatedly that the things the

18 government describes, like no disgruntled ex-boyfriend, that

19 was because if she said that to anybody, the sheriff's

20 department was going to fire her.  And she was trying to

21 preserve her job.  That was proven at trial.  So that was not a

22 lie to defraud Farmers.  That was Ms. Myres trying to save her

23 job at the Sheriff's Department.  And we laid that out for

24 pretty much all of the lies that the government alleges in our

25 papers.  The government has really never responded to that.

1   But that's -- and that, in and of itself, I think, would be

2   sufficient to reject the government's argument.

3        But, even if I was wrong about that, the government's

4   argument is wrong as a matter of law.  And that's embedded in

5   the principles, a few principles that we're all trying to

6   discern from the limited things that the Ninth Circuit said.

7        But, but the loss, intended loss is a really esoteric

8   concept in the guidelines, the more I've looked at it.  And

9   what -- what the courts have said is that the loss must result

10  from the fraud both as a but-for and as a proximate cause.  As

11  the Ninth Circuit said that earlier this year again in the

12  *Lonich* case that we cited.

13       And that means that the Court has to determine to what

14  extent there were legitimate losses embedded in her claim.  And

15  those cannot be included in the fraud.  And that's what the

16  First Circuit said in the *Alphas* case that we cited in our

17  papers here and in the Court of Appeals.

18       **THE COURT:**  Let me stop you for a moment.  Ms. Vartain

19  says, okay, but we can make -- it is an appropriate inference

20  from the untruths that were told to Farmers in the claim form,

21  that we all know are not true, that one can infer from that

22  that Ms. Myres did intend to defraud Farmers to the full extent

23  of the claim.

24       And my question is, is that an impermissible inference?

25  Or is it an inference, but just one that you think you have

1  rebutted?

2       **MR. SHEPARD:**  Both.  It's an inference we have

3  rebutted.  It's also an impermissible inference under *Alphas*,

4  which says you have got to look and see whether there were

5  legitimate claims.  Alphas, to use the phrase from my youth,

6  lied like a rug.  Not only did he have all kinds of false

7  claims, he made up documents in support of his false claims, he

8  altered existing documents to support his false claims.  He

9  made Ms. Myres look like the most -- the best truth teller on

10 the planet.  And the First Circuit still said: Nope, he has

11 some legitimate claims in here there and under this esoteric

12 concept of intended loss in the guidelines, those legitimate

13 claims cannot be included in intended loss.

14      And, and I think that's dispositive of that, of this

15 issue.

16      Another way to look at it is the language in the

17 guidelines, in the comment that explains intended loss, and

18 says -- by the way, this is language that got better for the

19 defense, even after the *Alphas* decision and the *Torlai* decision

20 that the government cites.  It got changed at the end of 2015.

21 It says (As read):

22           "Intended loses is pecuniary harm that the

23           defendant purposely sought to inflict."

24      And that language was taken from an opinion that Justice

25 Gorsuch wrote when he was on the Tenth Circuit and he, in that

1    case expressly rejected the notion, that's *United States versus*

2    *Manatau*, he expressly rejected the notion that intended loss

3    can be satisfied by a loss that the defendant merely knew would

4    result from the scheme, or a loss that the defendant might

5    possibly and potentially have contemplated, and instead,

6    established that intended loss is a loss purposely sought to

7    inflict.

8         And how can someone purposely seek to inflict a loss on

9    the insurer when the items -- at least some of them -- that

10   they're claiming were actually stolen?  It just -- you cannot

11   connect those two.

12        So there are several different ways in which the

13   government is wrong.  They are wrong factually; they are wrong

14   because they don't meet the causation requirement that the

15   Ninth Circuit spelled out in *Lonich*, and the First Circuit

16   applied to a very similar case in *Alphas*, and they're wrong

17   because they don't meet the definition of intended loss under

18   the guidelines.

19        **THE COURT:**  Am I correct that you are drawing a

20   distinction on those cases that the government points to -- is

21   it right that you think the distinction in those cases is that

22   -- that -- I'm not sure all of them, but that the bulk of those

23   cases are cases in which the question is whether or not there

24   was insurance coverage at all?

25        **MR. SHEPARD:**  Yeah --

1          **THE COURT:**  Because of falsehoods in the application

2     process for coverage?

3          **MR. SHEPARD:**  It's a little more than that but,

4     essentially right.  *Torlai*, the leading of the cases the

5     government cites, *Torlai* did not have a legitimate claim at

6     all.  None.

7          **THE COURT:**  Because of the fraud in the request for

8     insurance coverage?

9          **MR. SHEPARD:**  Because none of what he was claiming was

10    actually covered by his policy if he had been truthful.  And

11    here, if Ms. Myres had been truthful, she did have items that

12    she was claiming that were covered by the policy.  And that's

13    the difference between -- and *Alpha*s made that exact

14    distinction.  And that's why *Alpha*s is what governs here, and

15    not the cases the government cites.

16         **THE COURT:**  Okay.

17         **MS. VERTAIN:**  Your Honor, if I could just --

18         **THE COURT:**  Yes, go ahead.

19         **MS. VERTAIN:**  -- be heard on two points.  The first is

20    I would like to talk about *Alpha*s for a minute.  But I'm not

21    asking the Court and the Court should not rely on the void for

22    fraud clause as the -- as indicative, and therefore bypassing

23    Myres' intent.  I don't think that's what the Court did before.

24    And yet, there would have been -- had Myres been truthful, none

25    of her claim was valid.  Because she did have people living

with her -- she had Fowler living with her, a convicted felon,

on the eve of the burglary.  And clearly, Farmers is trying to

assess all of the circumstances to figure out if she fits into

their policy coverage.  And had she been truthful, in fact, she

would not have.

Now, Mr. Shepard relies heavily on *Alphas*.  And to the

extent it's helpful, I think what *Alphas* is clear about is in a

case like this where there is a claim that is rife with fraud,

as *Alphas* says, the burden of production can shift to the

defendant to prove what was legitimate.  And I think here,

that's appropriate, because there's a real question as to what

is legitimate.

You know, the Court -- the government's view is that none

of it is.  But Mr. Shepard could try to show that some portion

of it is legitimate, and then the Court could figure out what

dollar value to assign to the loss enhancement.

**THE COURT:**  Well, that then gets back to where we

started.

What is the proof you would point me to, other than the

inference that we've talked about, that anything over the 9,000

or so dollars with respect to the items she -- were found in

her house and the -- and the items that the sheriff's

department owned, the rest of it, what is your evidence that

she intended to defraud with respect to that additional

property?

 1          **MS. VERTAIN:**  There -- there is none other than her

 2    own statements, which is generally how we assess a fraudster's

 3    intent.  Whether they tell the truth, whether they lie --

 4          **THE COURT:**  And what was the lie?

 5          **MS. VERTAIN:**  No disgruntled ex-boyfriend, no suspect.

 6    "No one at my house when I left it."  The video recording that

 7    the jury watched showed that to be patently false.  She left

 8    people in her house.  And she knew they were there, because

 9    they were there when she was there.

10          **THE COURT:**  Right.  What do I do with Mr. Shepard's

11    rejoinder, which is the explanation for that -- not a laudable

12    explanation, but the explanation is she was lying for a

13    different purpose?

14          **MS. VERTAIN:**  She can have a mixed motive, Your Honor.

15    But she made the lie to Farmers, under oath.  And so one

16    purpose, it would seem, based on the facts of it, was to

17    confuse and defraud Farmers.

18          **THE COURT:**  Well, but isn't what I have to find was

19    that the lie was -- it's the intended loss.  It's that she

20    intended to get the money from Farmers, in addition to the

21    $9,000.

22          **MS. VERTAIN:**  Yes.

23          **THE COURT:**  Right?

24          **MS. VERTAIN:**  Yes.  Because she didn't want Farmers to

25    find out the truth about what happened that day.

1           **THE COURT:**  Okay.  Okay.  Anything more, Mr. Shepard?

2           **MR. SHEPARD:**  Um, I don't think that answers *Alphas*.

3    And in addition, just to the -- again, we've addressed this at

4    some length.  As to who was at the house, she did talk about

5    other people who were at the house.  She was not accurate.

6    Whether that was intentional or not, I don't know.  Was not

7    accurate about who was at the house when she left.

8           She did talk about other people who were at the house that

9    day.  And we know that those people didn't commit the burglary.

10   They left empty-handed that's on the video across the street.

11   We know where the loot ended up, it was with Fowler and not

12   with people who were in her house.

13          So it's just a diversion.  It doesn't address the

14   causation requirement.  It's not a proximate or but-for cause

15   of anything.  So --

16          **THE COURT:**  The other lie the government points to is

17   the video system.  And whether or not it was the -- whatever we

18   call it, was -- that was another one that they point to.

19          **MR. SHEPARD:**  Right.  But that was not false.  And we

20   laid that out --

21          **THE COURT:**  Well --

22          **MR. SHEPARD:**  -- in the briefing.  They tried to make

23   it sound false, if you remember, by calling -- there were two

24   officers who interviewed Ms. Myres about that.  They called the

25   one who didn't write the report to describe what Myres said.

1   But the -- what the writer of the report said was what actually

2   happened, which was nothing was triggered on the video.  That's

3   what Ms. Myres said.  And that's what the officer who wrote the

4   report noted in his report, as opposed to the one who came

5   three years later and said something a little different.  So

6   that one just wasn't a lie.  Not proven as a lie.

7          And as the Court knows, we think the proof would have to

8   be clear and convincing on these things.  But I don't think

9   they prove it under -- under any standard at all.

10         And if the Court would like, I can address the question

11  about, you know, was there a burglary, and who's got the burden

12  of production.  As we noted, the government first tried to put

13  the burden of proof on us.  In fact, *Alphas* suggested at most

14  we would have a burden of production.

15         And I would suggest we certainly met that by showing the

16  information that the government took from Mr. Fowler's home,

17  but did not produce to the jury, which was that he had a bunch

18  of the loot and that he was selling it without her.  And that

19  certainly meets our burden of production, that there was a

20  burglary and a bunch of the items were lost.  That puts the

21  burden of proof back on the government.  And as the Court has

22  noted, they haven't proven anything about that at all.

23              **THE COURT:**  Okay.  Ms. Myres, as the last time, this

24  is your sentencing.  You have a right to speak directly to me.

25  You are not required to do so.  It's up to you.  But if there

is anything that you want to say, now would be the time to say
it.

        **MR. SHEPARD:**  I have discussed that with her, if I
may.  And she would respectfully stand on what she said to the
Court at the first sentencing, which I could remind the Court
of if --

        **THE COURT:**  Go ahead, remind me.

        **MR. SHEPARD:**  -- if desired.  This is what she said.
She said (As read):

        "Honorable Judge Seeborg, there are no words
        to express my sorrow and shame.  The
        disastrous result of my bad associations and
        choices have greatly impacted my family,
        friends, fellow deputies.  And for this I am
        truly sorry.  As a child, and throughout my
        adolescence, my mother would often recite
        Corinthians 5:33 which says 'Do not be
        misled, bad associations spoil useful
        habits.'  Unfortunately, I disregarded this
        sound counsel as an adult.  And now faced
        with life-long consequences, I have no one to
        blame but myself.  I allowed my treacherous
        heart to justify a wrong course."

    I didn't have anything to do with writing that.  It was
much nicer than I would have written.  And she asks if she

1    could just stand on that at this point.

2              THE COURT:  Very well.

3              MR. SHEPARD:  I did have some things I was going to

4    say in further mitigation, leaving the guidelines aside.  I

5    don't know if the Court wants to hear more from me or not,

6    but --

7              THE COURT:  No, go ahead.

8              MR. SHEPARD:  And I certainly won't belabor this.

9    But, you know, we have been talking at great length at this

10   point about the guideline calculation.  But of course, as the

11   Court knows, the sentencing is not just about the guideline

12   calculation.  And these resentencings always inherently call

13   for a fresh look.  As the Court noted in its initial question

14   to the government, that includes post-conviction conduct.

15             So, just to highlight, as the Court has already noted,

16   what has happened since the trial.  She's had no hiccups of any

17   kind on supervised release for five and a half years now.

18   Performs large amounts of community service through her church.

19   She helps friends in need.  She created a plan to keep the

20   church secure.

21             And as the Court pointed out, more importantly, right now,

22   she is taking care of her brother who is battling cancer.  Does

23   transportation to and from the hospital, feeding, arranging for

24   medicine, cleaning the house, everything else.  She is the only

25   person who can provide that care.  And that is a continuation

1    of -- with the narrow period of her life in which she engaged

2    in this offense, that is a continuation of what she had been

3    doing before.

4         She is a hardworking single mother working to raise young

5    black men in our society.  She was an employee of the sheriff's

6    department who was really appreciated because she would always

7    step up for unattractive work, overtime work whenever it was

8    needed.

9         And I know that what the Court focused on at the last

10   sentencing was, well, when she committed this offense she was a

11   jail guard, a deputy sheriff.  And I certainly appreciate that

12   that makes this a different offense than one that was just a

13   small unsuccessful insurance fraud that might have been

14   committed by someone else.  But I don't think that that should

15   make a material difference in what otherwise would be the

16   result of this case, in part because her offense was not

17   job-related in the sense of some of the other cases that we

18   have submitted to the Court.  And she was at the lowest level

19   of the staff in the sheriff's department.

20        And that's why we brought to the Court's attention, you

21   know, the sheriff's lieutenant who assaulted a jail inmate

22   being transferred for a psychiatric exam, the job-related

23   offense -- a lieutenant, a crime of violence, sentenced to four

24   months.  And we have been citing cases like that from the

25   beginning.  And the government hasn't offered any offsetting

examples.

And that's because this sort of non-job-related conduct, while I appreciate the Court looking at it differently because of what her position was, still, it was not job-related.  It should not overwhelm the other strong mitigating factors.

And therefore, putting this all together, I believe her guideline range should, at most, be four to ten months.  That would be the guideline range if the Court views the intended loss as the 9,000 and change that would include both the items found in her home and the items that the sheriff's department claims as belonging to them.

That would put her, four to ten months.  The Court could sentence her under that guideline calculation, even without any accommodation to where the Court could, you know -- any adjustment, any departure, the Court could sentence her to home detention.  That would reflect the seriousness of the offense, but still allow her to take care of her brother.  And I think that's the appropriate sentence, and I would urge that on the Court.

**THE COURT:**  Thank you.

Well, it's -- it's not an easy case.  And I thought a good deal about it.  And as I started out with, I have tried to glean some guidance from the Circuit's opinion in this case.

And I do go back -- I appreciate Ms. Vartain's arguments. As always, they're very good, because she's a very fine

prosecutor.

But I do go back to where the Ninth Circuit has -- the few words they said on this said I needed to focus on the intent with respect to the amount of intended loss.  And I do think the evidence, while somewhat muddled, it does reflect here that that equates to the value of the items found in her home, plus those items that belonged to the sheriff's department.  In other words, the $9,573.37.

Accordingly, I think the appropriate advisory guideline calculation and the starting point would be total offense level 9, Criminal History Category I, which would yield an advisory guideline range of a four to ten-month custodial term.  Mr. Shepard is correct, this is a Zone B, and there are various options under that, even were there not a further variance.

So applying the factors under 3553(a) that we all know tells me to impose a sentence sufficient but not greater than necessary -- I do continue to part company a bit with the defense argument that Ms. Myres's position as a sworn law enforcement officer was disconnected from her commission of the crime here.

You know, I'll just be candid about it.  I remain of the view that in light of her position of public trust, the conduct for which she was convicted here is shameful, and I think it does become even more so because of the public trust that she had undertaken.

At the same time, I do take into account the positive record she's had while on supervised release, while this case was pending on appeal.  And that's what we expect of defendants.  So I don't think that that is, in and of itself, a reason to adjust a sentence.  But I take it into account.

And I also do take into account her role as a caregiver for her brother and the -- and the positive work she does, which is not simply post-conviction.  She was involved in some of the positive community things that she does before that, and I take that into account.

Accordingly, I do think that the appropriate sentence at this point would be a period of six months' home detention, which would afford her the opportunity to take her brother to his medical appointments, and to attend church services, which obviously are very important to her.

And then, either followed by or as part of the period of supervised release -- and perhaps I can ask Ms. Goldsberry. With the understanding that I want to impose the six-month home detention condition, is that a part of the supervised release condition?

**MS. GOLDSBERRY:**  Yes.  It's a numbered condition of supervised release.

**THE COURT:**  That's what I thought.

**MS. GOLDSBERRY:**  So she would need to receive a sentence of time served.  And three years supervised release.

1   Or a sentence of probation.  And the home confinement would be

2   one of the conditions, in addition to the other conditions that

3   are imposed.

4          **THE COURT:**  And which is -- from the Probation

5   Department's perspective, which of those two avenues would you

6   recommend?  Probation?  Or time served, supervised release,

7   with a condition of supervised release being six months home

8   detention?

9          **MS. GOLDSBERRY:**  It looks like she did maybe one night

10  in custody.  Can the defendant confirm that?

11         **THE DEFENDANT:**  (Nods head)

12         **MS. GOLDSBERRY:**  So she did do at least a day in

13  custody, so time served with three years supervised release

14  would work.

15         **THE COURT:**  All right.  Any legal reason why sentence

16  may not be imposed?

17         **MS. VERTAIN:**  No, Your Honor.

18         **MR. SHEPARD:**  No, Your Honor, although I -- I hesitate

19  to do this, but she's been on supervised release essentially

20  for five and a half years already.

21      Obviously, the Court -- we really appreciate the Court's

22  sentence.  And the Court can impose whatever term of -- and

23  should impose whatever term of supervised release it thinks is

24  necessary.  But I just wonder whether three years is -- three

25  years more is really necessary.

1          **THE COURT:**  Okay.  Well, I do think I'm going to

2    impose three years.  I understand your argument.  But I think

3    it is appropriate to have a -- to have that as a responsibility

4    on her part.  And it's something I think we should do.

5          Any objection to the specific supervised release

6    conditions that the Probation Department's recommending in the

7    PSR?

8          **MR. SHEPARD:**  I believe those are the same that we

9    already addressed, and so I don't have anything to add.

10          **THE COURT:**  Okay.

11          **MS. VERTAIN:**  No, Your Honor.

12          **THE COURT:**  All right.  So, pursuant to the Sentencing

13    Reform Act of 1984, it is the judgment of the Court that April

14    Myres is hereby committed to the custody of the Bureau of

15    Prisons, to be imprisoned for a term of time served.  The term

16    consists of terms of time served on each of Counts 1 and 2,

17    both counts to be served concurrently.

18          Upon release from imprisonment, the defendant shall be

19    placed on supervised release for a term of three years.  This

20    term consists of the terms of three years on each of Counts 1

21    and 2, all such terms to run concurrently.

22          Within 72 hours of release from the custody of the Bureau

23    of Prisons, the defendant shall report in person to the

24    Probation Office in the district to which the defendant is

25    released.

 1          You still recommend that language?

 2          **MS. GOLDSBERRY:**  Um, well, we could take that out.

 3     The --

 4          **THE COURT:**  Okay.  So what should I take out?  The

 5     paragraph starting from "Upon release from custody..."?

 6          **MS. GOLDSBERRY:**  Yes.

 7          **THE COURT:**  All right, so I'm striking that.

 8          **MS. GOLDSBERRY:**  I'm sorry, Your Honor.  We still need

 9     "The term consists of three years on each of Counts 1 and 2."

10          **THE COURT:**  Okay.

11          **MS. GOLDSBERRY:**  You could simply say that she needs

12     to report to the Probation Office after sentencing.

13          **THE COURT:**  All right.  I make that adjustment.

14          While on supervised release, the defendant shall not

15     commit another federal, state or local crime; shall comply with

16     the standard conditions adopted by this Court, except for the

17     mandatory drug-testing provision is suspended; and shall comply

18     with the following additional conditions.

19          One, the defendant is -- I'm imposing a term of six months

20     home confinement.  And that is to commence when?

21          **MS. GOLDSBERRY:**  It will commence when they hook her

22     up.

23          **THE COURT:**  Okay.  So I don't need to say anything.

24          **MS. GOLDSBERRY:**  You don't need to say when.  And they

25     do ask that the Court does days, so it would be 180 days of

1    home confinement.

2             **THE COURT:**  180 days.

3             **MS. GOLDSBERRY:**  And it's the Court's choice for home

4    confinement versus a curfew, which is a little more broad.

5    Home confinement allows that she does a schedule with the

6    probation officer, and she leaves only for work, or for

7    appointments.  Where a curfew is a bulk of time.  She can leave

8    at 7:00 a.m. and return at 5:00 p.m.  Gives a little more

9    leeway.  But it's up to the Court.

10            **THE COURT:**  Okay.  And that's still considered -- both

11   are under the rubric home confinement.

12            **MS. GOLDSBERRY:**  Exactly.  Home detention, yes.

13            **THE COURT:**  Home detention.

14            **MS. GOLDSBERRY:**  And home detention is a little more

15   restrictive.

16            **THE COURT:**  All right.

17            **MS. GOLDSBERRY:**  That she should be home most days,

18   except for pre-approved appointments.

19            **THE COURT:**  All right.  I'm, I'm comfortable with the

20   curfew approach.

21            **MS. GOLDSBERRY:**  And the only other thing would be

22   that the technology is left up to the discretion of the

23   probation officer.

24            **THE COURT:**  That's fine with me, as to whether or not

25   it's GPS or --

1          **MS. GOLDSBERRY:**  Exactly.

2          **THE COURT:**  All right.  I'll leave it up to the

3   Probation Department on that score.

4          **MS. GOLDSBERRY:**  And I'm sorry, Your Honor, the only

5   other thing is payment.

6          **THE COURT:**  And payment -- and --

7          **MS. GOLDSBERRY:**  Do you waive?

8          **THE COURT:**  Not requiring payment.  Payment is waived.

9          **MS. GOLDSBERRY:**  Got it.

10         **MS. LANG:**  Excuse me, Your Honor.  Just one quick

11   question, I missed.  Was there a certain time for the curfew?

12   Or will that be imposed by --

13         **MS. GOLDSBERRY:**  That will be agreed upon between the

14   probation officer and Ms. Myres, depending on her schedule.

15         **MS. LANG:**  Okay.

16         **THE COURT:**  I'll give them discretion.

17         **MS. LANG:**  Okay.  Thank you, Your Honor.

18         **THE COURT:**  Two, the defendant must pay any special

19   assessment that is imposed by this judgment and remains unpaid

20   at the commencement of the term of supervised release.

21        Three, the defendant must not open any new lines of credit

22   and/or incur new debt without the prior permission of the

23   probation officer.

24        Four, the defendant must provide the probation officer

25   with access to any financial information, including tax

1  returns, and shall authorize the probation officer to conduct

2  credit checks and obtain copies of income tax returns.

3      Five, the defendant must cooperate in the collection of

4  DNA, as directed by the probation officer.

5      It is further ordered that the defendant shall pay to the

6  United States a special assessment of $200.  Payment shall be

7  made to the Clerk of the United States District Court, 450

8  Golden Gate Avenue, Box 36060, San Francisco, California,

9  94102.

10      The Court finds the defendant does not have the ability to

11  pay a fine, and orders that the fine be waived.

12          **MR. SHEPARD:**  Your Honor, if I may, one clarification?

13          **THE COURT:**  Yes.

14          **MR. SHEPARD:**  Ms. Myres already paid the special

15  assessment.

16          **THE COURT:**  Oh, she did?

17          **MR. SHEPARD:**  She --

18          **MS. GOLDSBERRY:**  We still need it on the judgment,

19  Your Honor.  But if the $200 payment has been made with her

20  docket number, that's fine.

21          **THE COURT:**  All right.

22          **MS. GOLDSBERRY:**  It will show as satisfied.

23          **THE COURT:**  Okay.  And you said -- I'm leaving it to

24  the discretion of the Probation Office as to when they want to

25  begin the period, the 180-day period of home -- whatever we're

1  now calling it.

2        **MS. GOLDSBERRY:**  Curfew.

3        **THE COURT:**  Curfew.

4        **MS. GOLDSBERRY:**  Yes.  It's usually set up within

5  seven to ten days.

6        **THE COURT:**  All right.  Very well.  And then, that

7  does afford Ms. Myres the opportunity to do the care for her

8  brother, and also attend church services.

9        **MS. GOLDSBERRY:**  Yes.

10        **THE COURT:**  Okay.  All right.

11    With respect to appeal in this case, Ms. Myres, if you do

12  wish to file a further notice of appeal, you have 14 days from

13  the date of the entry of this judgment with which to do so.  Do

14  you understand that?

15        **THE DEFENDANT:**  Yes.

16        **THE COURT:**  All right.  Anything further in this

17  matter?

18        **MS. VERTAIN:**  No, thank you, Your Honor.

19        **THE COURT:**  Thank you.

20        **MR. SHEPARD:**  Thank you, Your Honor.

21        **MS. LANG:**  Thank you.

22     (Proceedings concluded)

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

      I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Thursday, October 27, 2022